Keith A. Fink, SBN 146841
Olaf J. Muller, SBN 247372
FINK & STEINBERG
11500 Olympic Boulevard, Suite 316
Los Angeles, California 90064
Telephone: (310) 268-0780
Facsimile: (310) 268-0790

Attorneys for Plaintiff
DOV CHARNEY

A6010
90012
DEPT. 14
TERRY A. GREEN

FILED
Superior Court Of California
County Of Los Angeles

MAY 07 2015

Sherri R. Carter, Executive Officer/Clerk
By Judi Lara, Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**LOS ANGELES COUNTY - CENTRAL DISTRICT**

DOV CHARNEY, an individual,

Plaintiff,

vs.

STANDARD GENERAL, L.P., a Delaware limited partnership; STANDARD GENERAL MASTER FUND, L.P., a New York limited partnership; P STANDARD GENERAL LTD., a British Virgin Islands limited company; and DOES 1 to 50, inclusive,

Defendants.

CASE NO. BC 581130

**PLAINTIFF'S COMPLAINT FOR:**

1. **DEFAMATION;**
2. **FALSE LIGHT;**
3. **INTENTIONAL INTERFERENCE WITH ACTUAL ECONOMIC RELATIONS;**
4. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;**
5. **VIOLATION OF *BUS. & PROF. CODE* §§ 17200, *ET SEQ.***

**[JURY TRIAL DEMANDED]**

CIT/CASE: BC581130
LEA/DEF#:
RECEIPT #: CCH52172044
DATE PAID: 05/07/15 01:30 PM
PAYMENT: $435.00
RECEIVED:
CHECK: $435.00
CASH: $0.00
CHANGE: $0.00
CARD: $0.00

COMES NOW PLAINTIFF DOV CHARNEY and hereby alleges as follows:

## INTRODUCTION

1. This lawsuit centers on press comments issued by Defendant Standard General entities relating to Plaintiff Dov Charney. In December 2014, Defendants falsely claimed to the press and general public that Plaintiff Charney's employment as American Apparel CEO and

Chairman of the Board was terminated by the Board of Directors for "cause" based on the results of a purportedly "independent" investigation conducted by a "third party." Nothing could be further from the truth. In reality, the Standard General-controlled American Apparel Board of Directors paid millions of dollars of the cash-strapped company's funds to American Apparel's outside general counsel Jones Day to manufacture various *ex post facto* excuses for the Board's termination of Charney. Defendants violated almost all of the pertinent contractual terms governing this sham "investigation," which was *not* "independent," nor was it conducted by a "third party." Most egregiously, the Standard General-controlled American Apparel Board literally told Charney that if he did not give up control of American Apparel to them by resigning as CEO and Chairman of the Board and signing over the voting rights to his stock to Defendants (in exchange for which Charney would receive a multi-million-dollar "consultancy" position), Defendants would destroy his character and ruin Charney exactly the way they have endeavored here.

## PARTIES

2. Plaintiff DOV CHARNEY ("Plaintiff" and/or "Charney") is and at all relevant times hereto was an individual residing in Los Angeles County, California.

3. Defendant STANDARD GENERAL L.P. ("Defendant" and/or "Standard General") is, and at all times relevant hereto was, a Delaware limited partnership doing substantial business in Los Angeles County, California.

4. Defendant STANDARD GENERAL MASTER FUND L.P. ("Defendant" and/or "Standard General") is, and at all times relevant hereto was, a New York limited partnership doing substantial business in Los Angeles County, California.

5. Defendant P STANDARD GENERAL L.P. ("Defendant" and/or "Standard General") is, and at all times relevant hereto was, a British Virgin Islands limited partnership doing substantial business in Los Angeles County, California.

6. Plaintiff is unaware of the true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 to 50, inclusive ("the Doe Defendants"), and therefore sues said Doe Defendants by such fictitious names. Plaintiff will seek leave of Court to amend this Complaint to show the true names and capacities of such Doe Defendants when the same has been ascertained. Plaintiff is informed, believes, and thereupon alleges that each of the fictitiously-named Defendants is responsible to Plaintiff for the injuries suffered and alleged herein, and/or is subject to the jurisdiction of the Court as necessary party for the relief herein requested.

7. Plaintiff is informed and believes that Defendant Standard General, and each of the Doe Defendants (hereinafter collectively "Defendants") are now, and were at all times mentioned herein, the agents, principals, partners, joint venturers, employees, joint enterprises, and/or alter-egos of one another and the other Defendants, and that all of the acts and conduct alleged herein were performed within the course and scope and in furtherance of such agency, partnership, joint venture, joint enterprise, employment, and/or alter-ego relationship.

8. Jurisdiction and venue are proper in this Court because the wrongful acts and omissions alleged occurred in the County of Los Angeles, the harm suffered by Plaintiff occurred in the County of Los Angeles, and Defendants are and at all times relevant herein were doing substantial business in the County of Los Angeles, State of California.

## FACTUAL ALLEGATIONS

9. Plaintiff re-alleges and incorporates herein by reference the above paragraphs, inclusive, as though fully set forth herein.

*In June 2014, American Apparel's Board Launched Their Secret Plan to Oust CEO and Board Chairman Dov Charney From American Apparel.*

10. In or around June 2014, American Apparel's Board of Directors abruptly and unlawfully terminated Charney's employment as American Apparel CEO. These Board Members solicited shareholder votes, including but not limited to Charney's own votes, through false and materially misleading proxy statements relating to their plan for the company's future. Charney's termination was part of the Board's then-secret plan to wrest control of the company away from Charney. Charney subsequently learned that this scheme was masterminded by former American Apparel CFO (and subsequently appointed interim CEO) John Luttrell. As Charney later learned, Luttrell secretly worked on selling the company for months beforehand and viewed Charney as an impediment to such a transaction.

11. At the company's Annual Meeting on or around June 18, 2014, American Apparel's Board of Directors presented two (2) options to Charney. Under the first option, Charney could resign his position as CEO and Chairman of the Board and sign over to the Board the voting rights to his then 47.2 million shares in exchange for which he would receive a multi-million-dollar severance package and remain with the company as a consultant. American Apparel's director Allan Mayer specifically informed Charney that the company had drafted a "positive" press release that would accompany his selection of the first option, a true and correct copy of which is attached hereto as **Exhibit A**.

12. If Charney refused the first option, American Apparel informed Charney that the company would terminate him "for cause." Several American Apparel board members specifically informed Charney that his termination would be made public and that the company would do anything and everything to destroy Charney's personal and professional reputation and character. Along those lines, Charney was presented with a Notice of Intent to Terminate Employment (the "Termination Notice"), wherein American Apparel listed several accusations as underlying its

decision to potentially terminate Charney for "cause." A true and correct copy of this Notice is attached hereto as **Exhibit B**. American Apparel's directors informed Charney that they would leak this Termination Notice to the press if Charney did not permit them effectively take over the company so that they could sell it.

13. Charney started to address the various allegations made against him in the Termination Notice to the Board, explaining how they lacked factual and legal merit. He was cut off. Board member Robert Greene explained to Charney that the specific allegations set forth in the Notice did not matter to the Board, nor were they important. What mattered was that the Board was taking over American Apparel, with or without Charney's acquiescence. If Charney resisted the Board's *coup d'état,* the Board would use the false allegations referenced in the Termination Notice to publicly destroy Charney's character and reputation, particularly in the business community, to prevent him from regaining his CEO position at American Apparel.

14. Charney asked for time to consider his options and consult with legal counsel. The Board denied his requests. After Charney left the Board meeting, American Apparel Board member Mayer told Charney that he had "no choice" and repeated Greene's threat, that if Charney did not resign and support the Board, the Board would "destroy [his] character." Mayer later texted Charney that evening, writing him that he had "until 7 to tell us what you want to do. If we don't hear from you by then, we will assume you've rejected our offer."

15. Charney refused to resign and commenced legal proceedings relating to his unlawful termination. Immediately thereafter, American Apparel's Board launched a campaign designed to harass, intimidate, and slander Charney. The Board ultimately paid millions of dollars to effectuate their attack, involving lawyers, public relations experts, and other media manipulators. Among other things, the renegade Board-controlled American Apparel improperly accessed Charney's personal and private email accounts without his knowledge or consent. They subsequently leaked private nude photographs and videos of Charney obtained from his private

email accounts to embarrass and coerce Charney into giving up his fight to regain control of the company.

*After Charney's June 2014 Ouster, Predatory Hedge Fund Defendant Standard General Positioned Itself as Charney's Savior, Gaining His Trust Sufficiently for Standard General to Assert Control Over American Apparel.*

16. Shortly after Charney's ouster, Defendant Standard General reached out to Charney and positioned itself as Charney's savior, a fund that could lend Charney enough money to reassert control over American Apparel and push out the renegade board members who had unceremoniously ousted him from the company he founded nearly twenty years earlier.

17. Standard General explained to Charney that it already had spent months conducting an extensive due diligence analysis American Apparel's operations and finances in connection with a major financing offer to American Apparel, which American Apparel had rejected. Among other things, Standard General spent months investigating and thoroughly auditing the substance and outcomes of litigation threatened and filed against American Apparel and Charney in particular, which they concluded were baseless. Standard General's representatives repeatedly informed Charney that they believed his ouster was "ridiculous" and terrible for the company. They explained to Charney that Standard General could lend Charney enough money to reassert control over American Apparel. The parties quickly entered into a series of agreements with the express purpose of placing Charney back in control over American Apparel as its CEO.

18. Shortly thereafter on or around June 30, 2014, Standard General's junior partner Robert Lavan contacted Charney and told him that the fund's chief executive Soo Kim needed to meet him "on an emergency basis." In hysterical fashion, Kim explained that his relatively conservative investors were unhappy by his association with Charney. Kim claimed that he was being "crucified" by his investors for associating with Charney. Kim further claimed that a major

Standard General investor PAAMCO had just pulled $300 million from Standard General as a result of Kim's ongoing association with Charney. Kim told Charney that if Standard General lost the support of its investors, they were "all fucked," Kim would lose his hedge fund, and Charney would lose his battle to regain control over American Apparel.

19. To that end, Standard General's Kim told Charney that a hostile proxy contest over American Apparel would pose too much risk to Standard General's continued operations. In this way, Kim ultimately induced Charney into "settling" with the American Apparel Board of Directors under terms extremely favorable to Standard General but *not* to Charney or to the company's other shareholders. In this way, Standard General effectively took over American Apparel by and through its control of company stock and the Board of Directors.

20. Part of the "settlement" would also include an investigation of the June 2014 allegations of wrongdoing made by the renegade Board against Charney. During the subsequent negotiations, Standard General's Kim and partner David Glazek both promised Charney that any such investigation would be impartial and fair. They promised Charney that he would be reinstated as CEO unless the investigation revealed something profoundly egregious of which Standard General was unaware. To further induce Charney into "settling" with the Board, Standard General's Kim further promised Charney that any third party investigating Charney's alleged misconduct would *further* investigate the American Apparel Board of Directors and the legality and propriety of their termination of Charney in June 2014. Because Charney had in fact *not* committed the malfeasance alleged and because he wanted the Board's secret conspiracy to unlawfully terminate his employment to be independently investigated, he agreed to these terms.

21. Thus, on July 9, 2014, Charney, American Apparel, and Defendant Standard General entered into a Nomination, Standstill and Support Agreement (the "Standstill Agreement"), a true and correct copy of which is attached hereto as **Exhibit C.**

22. Unbeknownst to Charney, the Standstill Agreement's investigation was to be a sham, a show-trial without the trial, and ultimately a means of reinforcing Charney's exit from the company and entrenching Standard General's control over the same, to Charney's and minority shareholders' detriment.

23. Under the Standstill Agreement, a private investigation company previously employed by American Apparel on many occasions – FTI Consulting, Inc. ("FTI") – was to conduct this investigation of Charney under the oversight of a specially-elected, ostensibly independent Suitability Committee. Standstill Agreement at § 5(a). Charney agreed to be interviewed by FTI as part of this investigation, and he was permitted to "make a statement to the applicable representatives of FTI in connection with such interview." *Id.*

24. The parties agreed that the investigation was to be completed relatively quickly, i.e. within thirty (30) calendar days of the agreement's July 2014 execution date. Standstill Agreement at § 5(b). After FTI completed its investigation, it was required to present its conclusions and supporting evidence to the Suitability Committee. *Id.*

25. Not less than one week before the Suitability Committee made its final determination, the Committee was required to provide Charney and Charney's counsel with "the opportunity to meet with the Suitability Committee (such meeting, the '<u>Preliminary Meeting</u>')." Standstill Agreement at § 5(c). At this meeting, Charney and his counsel were to be presented with "a summary of the evidence and preliminary findings of the Investigation," and they were to be "given a reasonable opportunity to ask questions and respond to such evidence and preliminary findings" at this meeting. *Id.*

26. After the Preliminary Meeting, at least one additional meeting – the "Final Meeting" – was to take place with Charney, his counsel, and the Suitability Committee before the Suitability Committee made its final decision. Standstill Agreement at § 5(c). At this Final Meeting, Charney and his counsel *again* were supposed to be "given another opportunity to ask

questions and respond to the evidence and preliminary findings presented at the Final Meeting or the Preliminary Meeting."

27. Put simply, the Standstill Agreement expressly gave Charney:

(a) an investigation conducted by ostensibly independent third parties;

(b) the right to communicate directly with the investigators into his alleged misconduct;

(c) the right to receive, review, and respond to a summary of the investigators' conclusions;

(d) the right to receive, review, and respond to the investigators' evidence gathered;

(e) the right to question and cross-examine the investigators with respect to their conclusions and evidence gathered;

and

(f) the right to present his own counter-arguments and evidence to the Suitability Committee prior to any final decision by the committee with respect to his position at the company.

*The Charney "Investigation" Was a Sham, a Witch Hunt, a Whitewash Designed by Defendants to Manufacture Ex Post Facto Excuses to Justify Charney's June 2014 Termination.*

28. Charney was denied each and every one of the aforementioned contractual rights listed above, i.e. he was denied the independent, third-party investigation as mandated by and detailed by the Standstill Agreement.

29. Immediately following the execution of the Standstill Agreement, Charney attempted to contact FTI investigators to ask them about the scope of their planned investigation. Defendants, acting by and through American Apparel's general counsel Jones Day, blocked Charney's efforts. Defendants' counsel Jones Day informed Charney that he was forbidden from

contacting or communicating with FTI in any fashion whatsoever except *through* Jones Day, i.e. *through* American Apparel's attorneys.

30. Jones Day made clear to Charney that *it* was overseeing and conducting this investigation on behalf of their client, the Standard General-controlled American Apparel, not the ostensibly neutral Suitability Committee, nor FTI. Jones Day further wrote to Charney that it was also serving as counsel to FTI, such that all communications by and between these parties would be attorney-client privileged. In this way, Charney came to learn that there would be *no* "independent" investigation conducted by a "third party."

31. For its part, Jones Day agreed to perform these "services" to the Standard General-controlled American Apparel notwithstanding the massive conflict of interest and breaches of fiduciary, ethical, and contractual duties incumbent thereto. Jones Day conducted this "investigation" despite the fact that it continued to serve as American Apparel's defense counsel during Charney's concurrently proceeding arbitration relating to his June 2014 wrongful termination from the company.

32. According to the company's publicly-filed financial disclosures, the cash-strapped American Apparel ultimately paid Jones Day millions of dollars in "fees" ostensibly for a few months of worth of work connected to the same. In receiving such payment from the now Standard General-controlled Board of Directors, Jones Day literally received millions of reasons from the Standard General-controlled American Apparel to take their side of this dispute and conclude that Charney was "unfit" to serve American Apparel as its CEO.

33. The sham, show trial nature of the investigation was further underscored by the fact that Charney never received the contractually-mandated investigators' report, nor was Charney permitted to speak with FTI investigators about their findings, nor was he given copies of any "evidence" they gathered as part of their investigation (assuming any such evidence was actually

gathered). When it ultimately came time for Charney to rebut the investigators' findings and conclusions, Charney had nothing to rebut.

34. Plaintiff Charney protested all of the above developments to no avail. He repeatedly demanded that the Standard General-controlled American Apparel comply with its contractual obligations and give him the fair, impartial, and thorough investigation pursuant to the terms of the Standstill Agreement. American Apparel ignored and/or refused his demands, writing Charney that it was "not obligated" to comply with any of his requests.

*In December 2014, Defendants Again Offered Charney a Multi-Million-Dollar-Paying Consultancy Job If He Would Give Up His Fight to Regain Control of American Apparel.*

35. In or around December 2014, *before* the sham investigation was concluded and *before* Charney had an opportunity to present any rebuttal of the same, the Standard General-controlled American Apparel contacted Charney. As in June 2014, when he was first "terminated," Defendants made Charney another job offer in the form of a "consultancy / settlement agreement." Defendants feared Charney's ongoing efforts to take American Apparel private would succeed and Defendants would be forced to relinquish control of American Apparel, which would be contrary to Standard General's best interests in particular.

36. Further underscoring the sham nature of the "investigation," Defendants again offered to prematurely terminate the investigation and give Charney a position at the company. The Standard General-controlled Board offered Charney even more money than he had been offered earlier, *if* Charney agreed to give up his fight to wrest control of the company back from the Standard-General-controlled Board and release all of his claims against Defendants and American Apparel, including but not limited to his shareholder claims for proxy fraud and fiduciary breaches. Defendants expressly informed Charney that if he did not accept this "framework," the Suitability Committee would definitely terminate his employment within ten (10) calendar days. To further pressure Charney into taking their offer, Defendants simultaneously announced that the

investigation had concluded and that the tenth day forward was the "Clearance Determination" date for the investigation. In other words, Charney was given all of ten (10) calendar days to assemble his rebuttal of the investigators' findings, even though he had yet to receive these findings or any evidence supporting the same.

37. In so doing, Defendants again all but told Charney that the aforementioned investigation was a sham, that it was fixed against him from the start, and that its sole purpose was to justify Charney's ouster.

38. Charney rejected Defendants' second consultancy offer and pressed forward with the sham investigation to its inevitable result. As Charney noted via counsel in a December 8, 2014 letter, Charney "still ha[d] not been given access to the witnesses and information" he needed to prepare his response, including but not limited to the investigation file and any evidence relied upon by the investigators. Charney never received *any* facts or evidence supporting the initial allegations made against him, nor was he given the investigation file, nor does he believe any such document was ever created or presently exists (which tracks Charney's "missing" American Apparel personnel file, which was "lost" by the company under mysterious circumstances following his termination).

39. As Charney noted in a December 14, 2014 letter from his counsel to the Standard General-controlled American Apparel's attorneys, the Suitability Committee investigation "was biased from the outset in that you and your law firm (Jones Day) were all times counsel to the [Suitability Committee] as well as investigators into Mr. Charney's suitability.... Your firm was not only involved in the decision to fire Mr. Charney but you were the person who conducted the investigation prior to June 18, 2014 into the allegations set forth in the notice to terminate (which you wrote) and you were counsel hired to defend the arbitration initiated by Mr. Charney against the company. It is incredulous that anyone could find you or your firm to be objective with respect to Mr. Charney. You and Jones Day have 'millions' of reasons why you would want the Suitability

Committee to determine Mr. Charney was unsuitable.... We raised... the issue of bias as to your firm on the one hour initial telephone call with the [Suitability Committee].... We asked that your firm have no involvement in the Suitability Committee process. No arguments were given by anyone opposing the merits of our points.... About a month after our call YOU informed us that the request to remove YOUR law firm had been denied. No reason was given for the denial."

40. As Charney's counsel further noted in this letter,"[a]ll that can be said about the [Suitability Committee] process to date is that its history reads like a Kafkaesque kangaroo court at best, and at worst, like a star chamber. Mr. Charney is told that he could rebut the charges/findings against him prior to a clearance determination, yet he is not told what charges/findings FTI made. Mr. Charney is told that he can rebut the evidence relied upon by FTI but is not told what evidence FTI relied upon to reach any finding nor what witnesses FTI interviewed. Mr. Charney is told he can ask questions relative to the FTI interview but is allowed to interview not a single person he asks to interview – not even the FTI investigator!"

41. As such, under this set of circumstances and *not* for the reasons later claimed via press release, on or around December 15, 2014, the Standard General-controlled American Apparel wrote Charney terminating his employment with American Apparel for "cause."

*Defendants Have Since Maliciously Defamed Charney to Prevent Him From Obtaining Assistance From the Business Community to Regain Control of American Apparel.*

42. Notwithstanding this termination, Charney remained the majority shareholder in American Apparel. As such, Charney retained and still retains some stock-related rights with respect to the company.

43. To prevent Charney from regaining control of the company, Defendants launched a second anti-Charney publicity campaign designed to destroy Charney's personal and professional reputation. Spokespersons for Defendants falsely informed various press outlets that Charney was

terminated for "cause" based on the results of an "independent investigation" conducted by a "third party."

44. Specifically on or around December 22, 2014, Defendant Standard General, speaking via spokesperson Liz Cohen of public relations agency Weber Shandwick made comments to press outlets regarding Plaintiff Charney, which comments contained numerous defamatory falsehoods knowingly made about Charney by Defendant Standard General. Standard General's spokesperson wrote that the hedge fund "supported the independent, third-party[1] and very thorough investigation into the allegations against Mr. Charney, and respect the board of director's decision to terminate him based on the results of that investigation." True and correct copies of press articles referencing this quoted statement are attached hereto and incorporated herein as **Exhibit D**. These statements were repeated verbatim and in substance in news outlets around the world.

*In March 2015, American Apparel's General Counsel Admitted in Writing That NO Independent, Third Party Investigation of Charney Occurred.*

45. On or around February 20, 2015, Charney (acting via counsel) wrote American Apparel demanding a copy of his "new" personnel file, stemming from his second, post June 2014 termination with the company. A true and correct copy of the ensuing exchange is attached hereto as **Exhibit E**. Charney also demanded copies of the investigative file underlying his December 2014 termination. *Id.*

46. In response, American Apparel (acting via general counsel) wrote Charney's attorneys on or around March 9, 2015. *Id.* In its response letter, American Apparel admitted that

---

[1] Notably, Standard General's press release contradicted American Apparel's December 16, 2014 press release relating to the same. In its own press release, American Apparel acknowledged that its investigation was "internal" whereas Standard General falsely claimed that this investigation was conducted by an outside, disinterested "third party."

"**FTI's investigation... was conducted at the request of counsel** to [American Apparel's] Audit Committee [such that] any such materials are [attorney-client] privileged" (emphasis added). *Id.* In other words, American Apparel admitted in writing that there was **no independent, third party investigation** of Charney that led to his termination. *Id.* Instead, the Standard General-controlled American Apparel, i.e. the very people who wanted to fire Charney, who conspired against him to wrest away control of the company, and who violated the various provisions of the Standstill Agreement, directed the "investigation" into whether Charney was "unfit" to remain as company CEO and Board Chairman. *Id.*

## FIRST CAUSE OF ACTION

## DEFAMATION

### (BY PLAINTIFF AGAINST ALL DEFENDANTS AND DOES 1-50)

47. Plaintiff repeats, re-alleges, and incorporates by reference the above paragraphs as though fully set forth herein.

48. On or around December 22, 2014, Defendants made a number of statements containing falsehoods, exaggerations, and/or inaccuracies about Plaintiff as set forth above, namely that he was terminated from American Apparel's employment for "cause" based on the results of an "independent" "investigation" conducted by a "third party." The statements made by Defendants portrayed Plaintiff Charney as someone found liable and/or guilty by "independent" and "third party" investigators of committing financial malfeasance and illegal sexual harassment and discrimination sufficient to terminate his employment for "cause."

49. Defendants' aforementioned characterizations of Plaintiff are false, defamatory, and libelous on their face because they charge Plaintiff with engaging in illegal and criminal misconduct, clearly expose Plaintiff to hatred, contempt, ridicule, and obloquy, and charge Plaintiff with improper and immoral conduct. By and through these statements, Defendants have

caused severe, irreparable harm to Plaintiff's personal and professional reputation, and they have and will continue to cause prospective clients and business associates to shun and avoid doing business with Plaintiff, particularly with respect to his ongoing attempts to regain control of his company American Apparel.

50. Defendants made these statements either with knowledge that they were false and defamatory of Plaintiff and/or, if the false and defamatory nature of these statements was not known to Defendants, with reckless disregard for their obvious falsity and defamatory nature.

51. As a direct and proximate result of the above-described defamatory statements, Plaintiff has suffered and will continue to suffer loss of his personal and professional reputation, shame, mortification, and emotional distress all to his general damage, but which Plaintiff is informed and believes will exceed $20,000,000, plus interest accrued and growing.

52. Each of Defendants' acts as described above was willful, oppressive, fraudulent, and malicious, within the meaning of California *Civil Code* § 3294, thereby entitling Plaintiff to recover exemplary and punitive damages against each Defendant in amounts according to proof at trial, which Plaintiff is informed and believes will collectively exceed $10,000,000.

## SECOND CAUSE OF ACTION

## FALSE LIGHT

### (BY PLAINTIFF AGAINST ALL DEFENDANTS AND DOES 1-50)

53. Plaintiff repeats, re-alleges, and incorporates by reference the above paragraphs as though fully set forth herein.

54. On or around December 22, 2014, Defendants made a number of statements containing falsehoods, exaggerations, and/or inaccuracies about Plaintiff as set forth above, namely that he was terminated from American Apparel's employment for "cause" based on the results of an "independent" "investigation" conducted by a "third party."

55. In making these statements to the press, which statements were subsequently republished online and which were repeated throughout media outlets around the world, Defendants have created publicity that placed Plaintiff in a false light in the public eye.

56. The publicity created by Defendants placed Plaintiff in a false light in the public eye because the statements made by Defendants portrayed Plaintiff Charney as someone found liable and/or guilty by "independent" and "third party" investigators of committing financial malfeasance and illegal sexual harassment and discrimination sufficient to terminate his employment for "cause."

57. The publicity created by Defendants' statements was offensive and objectionable to Plaintiff and to a reasonable person of ordinary sensibilities in that they charged Plaintiff with engaging in illegal and criminal misconduct, clearly exposed Plaintiff to hatred, contempt, ridicule, and obloquy, and charged Plaintiff with improper and immoral conduct.

58. Defendants made these statements either with knowledge that they were false and defamatory of Plaintiff and/or, if the false and defamatory nature of these statements was not known to Defendants, with reckless disregard for their obvious falsity and defamatory nature.

59. As a direct and proximate result of the above-described defamatory statements, Plaintiff has suffered and will continue to suffer loss of his personal and professional reputation, shame, mortification, and emotional distress all to his general damage, but which Plaintiff is informed and believes will exceed $20,000,000, plus interest accrued and growing.

60. Each of Defendants' acts as described above was willful, oppressive, fraudulent, and malicious, within the meaning of California *Civil Code* § 3294, thereby entitling Plaintiff to recover exemplary and punitive damages against each Defendant in amounts according to proof at trial, which Plaintiff is informed and believes will collectively exceed $10,000,000.

**THIRD CAUSE OF ACTION**

**INTENTIONAL INTERFERENCE WITH ACTUAL ECONOMIC RELATIONS**

**(By Plaintiff against All Defendants and Does 1-50)**

61. Plaintiff repeats, re-alleges, and incorporates by reference the above paragraphs as though fully set forth herein.

62. In December 2014, Defendants, acting with the intent to destroy, hinder, and/or otherwise interfere with Plaintiff's aforementioned business, willingly and willfully attempts to destroy, hinder, and/or otherwise disrupt Plaintiff's ongoing negotiations to obtain third-party assistance to regain control over American Apparel, whether in the form of a hostile proxy contest, private buy-out, or similar such transaction. Defendants did this by making their aforementioned defamatory and false statements about Plaintiff, which were republished online.

63. As a direct and proximate result of Defendants' conduct, Plaintiff has and will continue to experience tremendous difficulty regaining control over American Apparel, whether in the form of a hostile proxy contest, private buy-out, or similar such transaction.

64. As a direct and proximate result of the above-described defamatory statements, Plaintiff has suffered and will continue to suffer loss and damage to his business and goodwill in an amount to be proven at trial but which Plaintiff is informed and believes will exceed $20,000,000, plus interest accrued and growing.

65. Each of Defendants' acts as described above was willful, oppressive, fraudulent, and malicious, within the meaning of California *Civil Code* § 3294, thereby entitling Plaintiff to recover exemplary and punitive damages against each Defendant in amounts according to proof at trial, which Plaintiff is informed and believes will collectively exceed $10,000,000.

**FOURTH CAUSE OF ACTION**

**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

**(BY PLAINTIFF AGAINST ALL DEFENDANTS AND DOES 1-50)**

66. Plaintiff repeats, re-alleges, and incorporates by reference the above paragraphs as though fully set forth herein.

67. Plaintiff has actively negotiated with individuals and entities to obtain financing necessary to purchase shares of American Apparel, re-install himself as CEO of the company, and regain control of American Apparel, whether in the form of a hostile proxy contest, private buy-out, or similar such transaction. Plaintiff otherwise has negotiated with individuals and entities to potentially work for other clothing companies, to engage in passive investments within the apparel industry, to start another competing clothing company, and to obtain financing for the same.

68. In December 2014, Defendants, acting with the intent to destroy, hinder, and/or otherwise interfere with Plaintiff's aforementioned business negotiations, willingly attempted to destroy, hinder, and/or otherwise stop these aforementioned business negotiations. Defendants did this by making their aforementioned defamatory and false statements about Plaintiff to the press, which were republished online.

69. As a direct and proximate result of Defendants' conduct, Plaintiff's aforementioned third parties previously willing to assist Plaintiff's efforts to regain control over American Apparel have been dissuaded from doing business with Plaintiff.

70. As a direct and proximate result of the above-described defamatory statements, Plaintiff has suffered and will continue to suffer loss and damage to his business and goodwill in an amount to be proven at trial but which Plaintiff is informed and believes will exceed $20,000,000, plus interest accrued and growing.

71. Each of Defendants' acts as described above was willful, oppressive, fraudulent, and malicious, within the meaning of California *Civil Code* § 3294, thereby entitling Plaintiff to recover exemplary and punitive damages against each Defendant in amounts according to proof at trial, which Plaintiff is informed and believes will collectively exceed $10,000,000.

**FIFTH CAUSE OF ACTION**

**VIOLATIONS OF**

***BUSINESS & PROFESSIONS CODE* §§ 17200, *ET SEQ.***

**(BY PLAINTIFF AGAINST ALL DEFENDANTS AND DOES 1-50)**

72. Plaintiff repeats, re-alleges, and incorporates by reference the above paragraphs as though fully set forth herein.

73. In engaging in the wrongful acts set forth above, Defendants engaged in "unfair business acts" and "false advertising" within the meaning of *Business & Professions Code* §§ 17200, *et seq.*

74. Unless restrained, Defendants will continue to republish their false, defamatory, and demeaning statements regarding Plaintiff to the general public, which is likely to be deceived by the same and which is likely to both avoid business with Plaintiff.

75. Pursuant to *Business & Professions Code* § 17203, Plaintiff seeks an Order from this Court that:

(a) Provides injunctive and declaratory relief finding that Defendants have violated the provisions of *Business and Professions Code* §§ 17200, *et seq.*; and

(b) For an order enjoining Defendants and their respective successors, agents, servants, officers, directors, employees, and all other persons acting in

concert with them, directly or indirectly, from further engaging in conduct which violates *Business and Professions Code* §§ 17200, *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff DOV CHARNEY prays for judgment against Defendant STANDARD GENERAL L.P., Defendant STANDARD GENERAL MASTER FUND L.P., Defendant P STANDARD GENERAL L.P., and DOE DEFENDANTS NOS. 1 through 50 as follows:

1. For general and compensatory damages, including prejudgment interest, in accordance with proof at the time of trial, in the minimum amount of $20,000,000;
2. For punitive damages, where permitted, to be determined at trial, in the minimum amount of $10,000,000;
3. For Plaintiff's costs and attorneys' fees, where permitted;
4. For a preliminary and permanent injunction against Defendants from the unfair business acts and acts of false advertising as described in the Fifth Cause of Action; and
5. For such other and further relief as the Court may deem just and proper.

Dated: May 7, 2015

FINK & STEINBERG

By: ________________________

Keith A. Fink
Olaf J. Muller
Attorneys for Plaintiff
DOV CHARNEY