UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**STANDARD GENERAL L.P.,**

                **Plaintiff,**

     **v.**

**THE TRAVELERS INDEMNITY COMPANY
OF CONNECTICUT,**

                **Defendant.**

Case No. 1:17-cv-00548(WHP)(GWG)

 

**MEMORANDUM OF DEFENDANT THE TRAVELERS INDEMNITY COMPANY
OF CONNECTICUT IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND IN SUPPORT OF
<u>DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

 

                              PUTNEY, TWOMBLY, HALL & HIRSON LLP
                              521 Fifth Avenue
                              New York, NY  10175
                              (212) 682-0020

*Of Counsel*
  Thomas A. Martin
  Philip H. Kalban

# TABLE OF CONTENTS

**Page No.**

Table of Authorities ........................................................................................................... ii

Preliminary Statement......................................................................................................... 1

Argument ............................................................................................................................. 4

I.  THE CHARNEY ACTION ALLEGATIONS
    DO NOT FALL WITHIN THE POLICY'S
    ADVERTISING INJURY COVERAGE................................................................................ 4

II. THE EMPLOYMENT EXCLUSION PRECLUDES
    PERSONAL INJURY COVERAGE.................................................................................... 18

Conclusion ......................................................................................................................... 24

APPENDIX    Unpublished Opinion *Town of Plainfield v. Select Energy Contractors, Inc.*,
            No. CV065000410, 207 WL 4171603 (Conn. Super. Ct. November 5, 2017)

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*AmGuard Ins. Co. v. Country Plaza Associates, Inc.*,
    No. 12-CV-5205, 2014 WL 3016544 (E.D.N.Y. July 3, 2014)........................................20, 21

*Ben Berger & Son, Inc. v. American Motorist Ins. Co.*,
    No. 94 Civ. 3250, 1995 WL 386560 (S.D.N.Y. June 29, 1995)..............................................16

*Bridge Metal Indus., LLC v. Travelers Indem. Co.*,
    559 Fed. Appx 15 (2nd Cir. 2014). ..................................................................10, 15, 16, 17

*Bridge Metal Industries, LLC v. Travelers Indem. Co.*,
    812 F.Supp.2d 527 (S.D.N.Y. 2011)...........................................................................16, 17

*Burt Rigid Box, Inc. v. Travelers Property Casualty Corp.*,
    302 F.3d 83 (2d Cir. 2002)...................................................................................................3

*Ekco Group, Inc. v. The Travelers Indemnity Company of Illinois*,
    273 F.3d 409 (1st Cir. 2001)...........................................................................................9, 10

*Elite Brands, Inc. v. Pennsylvania General Ins.*,
    No. 02-CV-5623, 2004 WL 1945732 (S.D.N.Y. Sept. 2, 2004),
    *aff'd*, 164 Fed. Appx. 60 (2d Cir. 2006) .............................................................................16

*Hosel & Anderson, Inc. v. ZV II, Inc. d/b/a Zelda*,
    No. 00-CV-6957, 2001 WL 392229 (S.D.N.Y. 2001)....................................................7, 8, 16

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.*,
    889 F.2d 1274 (2d Cir. 1989)...............................................................................................4

*Jerry Madison Enterprises, Inc. v. Grasant Manufacturing Co., Inc.*,
    No. 89 Civ. 2346, 1990 WL 13290 (S.D.N.Y. February 14, 1990)................................3, 4, 16

*Liberty Mut. Fire Ins. Co. v. E.E. Cruz & Co., Inc.*,
    475 F.Supp.2d 400 (S.D.N.Y. 2007).....................................................................................20

*Olin Corporation v. American Home Assurance Company*,
    704 F.3d 89 (2d Cir. 2012).................................................................................................19

*R.C. Bigelow, Inc. v. Liberty Mut. Ins. Co.*,
    287 F.3d 242 (2d Cir. 2002)..........................................................................................15, 17

*Travelers Indemn. Co. of Connecticut v. Presbyterian Healthcare Resources*,
    No. Civ. A.3:02-CV-1881-P, 2004 WL 389090 (N.D. Tex. February 24, 2004)....................23

*United States Fidelity and Guaranty Co. v. Fendi Adele S.R.L.*,
  823 F.3d 146 (2d Cir. 2016)......................................................................................11

*United States Fidelity & Guaranty Company v. Ashley Reed Trading, Inc.*,
  43 F.Supp.3d 271 (S.D.N.Y. 2014), *aff'd*, 823 F.3d 146 (2d Cir. 2016)..........................10, 11

**State Cases**

*A. Meyers & Sons Corp. v. Zurich American Insurance Group*,
  74 N.Y.2d 298 (1989) ..............................................................................10, 11, 15, 16

*Allstate Insurance Co. v. Zuk*,
  78 N.Y.2d 41, 571 N.Y.S.2d 429 (1991) ...............................................................3

*Belt Painting Corp. v. TIG Ins. Co.*,
  100 N.Y.2d 377, 763 N.Y.S.2d 790 (2003) ...........................................................11

*Berman v. General Acc. Ins. Co. of Am.*,
  176 Misc.2d 13, 671 N.Y.S.2d 619 (Sup. Ct., N.Y. County 1998) .....................11, 12, 19

*Bethlehem Steel Co. v. Turner Construction Company*,
  2 N.Y.2d 456, 161 N.Y.S.2d 90 (1957)..................................................................4

*Burns Glass Services, Ltd. v. Travelers Indemnity Co. of Illinois*,
  2002 WL 31817916, NY Slip. Op. 50478 (Sup. Ct., Monroe County 2002) .........................22

*George S. May Int'l Co. v. Arrowpoint Capital Corp.*,
  2011-1865 (La. App. 1 Cir. 8/10/12), 97 So.3d 1167, 1176 (Aug. 10, 2012) .....................22

*Northville Indus. Corp. v. National Union Fire Insurance Co. of Pittsburgh, Pa.*,
  89 N.Y.2d 621 (1997) ..............................................................................................12

*National Football League v. Vigilant Insurance Company*,
  36 A.D.3d 207, 824 N.Y.S.2d 72 (1st Dep't 2006) ...............................................21

*S.T.A. Parking Corp. v. Lancer Insurance Co.*,
  128 A.D.3d 479 (1st Dep't 2015) ...........................................................................1

*Structural Bldg Prods. Corp. v. Business Ins. Agency, Inc.*,
  281 A.D.2d 617 (2d Dep't 2001)..........................................................................10

*Town of Plainfield v. Select Energy Contractors, Inc.*,
  No. CV065000410, 207 WL 4171603 (Conn. Super. Ct. November 5, 2017).....................22

**Statutes**

California Business & Professions Code § 17200 .....................................................2, 14

California Business & Professions Code § 17203 ........................................................14

California Code of Civil Procedure §425.16 ...............................................................3

**Rules**

FRCP Rule 56.1 ....................................................................................................6, 11, 23

## **Preliminary Statement**

Defendant The Travelers Indemnity Company of Connecticut ("Travelers")
respectfully submits this Memorandum in Opposition to the Motion of Plaintiff, Standard
General L.P. ("Standard General") for summary judgment and in support of Travelers' Cross-
Motion for summary judgment seeking dismissal of the Complaint.

Through this action[1] and apparently by their motion, Standard General seeks a
declaratory judgment that Travelers had a duty to defend Standard General against the claims
asserted against it in an underlying California action (the "Charney Action") pursuant to the
terms of a commercial general liability policy (the "GL Policy") and an umbrella policy (the
"Umbrella Policy"), (collectively referred to herein as the "Policies"), issued by Travelers to
Standard General.[2]  The complete GL Policy at issue is Steiner Aff. Ex. 2.  The relevant portions
of the GL Policy are Martin Dec. Ex. A.

In May of 2015, Dov Charney, the founder and former CEO of American
Apparel, sued Standard General in the Superior Court of the State of California, asserting causes
of action for defamation, false light, intentional interference with actual economic relations,

---

[1] References to the Exhibits to the Affidavit of Gail Steiner submitted by Standard General on
their motion are denominated "Steiner Aff. Ex. __".  References to Exhibits to the Declaration of
Thomas A. Martin are denominated "Martin Dec. Ex. __"

[2] The Charney Action was dismissed by the trial court, and that dismissal has been affirmed on
appeal.  Thus Standard General is no longer pursuing an indemnity claim in this action.  Further,
although the SG Complaint seeks damages on its meritless duty to defend claims, Standard
General has neither put in any proof on the issue of damages nor addressed the issue in its brief.
In any event, Standard General could never recover more than its "reasonable cost" of defending
the Charney Action.  *S.T.A. Parking Corp. v. Lancer Insurance Co.*, 128 A.D.3d 479 (1st Dep't
2015).

intentional interference with prospective economic relations, and violations of California Business and Professional Code Section 17200 *et seq*. Martin Dec. Ex. E.[3]

Standard General tendered its defense and indemnity as respects the Charney Action to Travelers under the Policies, and Travelers disclaimed coverage. It is under the terms of the Policies that Standard General seeks summary judgment declaring that Travelers is obligated to reimburse Standard General for the costs it alleges were incurred in defending the Charney Action.

Travelers will demonstrate herein that on the relevant documents, the undisputed evidence conclusively demonstrates that (i) there are no facts or allegations against Standard General to support a claim for "advertising injury" as defined by the Policies, and (ii) any "personal injury" offense is explicitly excluded from coverage by the Employment-Related Practices Exclusions in the Policies. The Court, therefore, should grant Travelers' Cross-Motion and deny Standard General's Motion and dismiss the SG Complaint.

Because there is no dispute that (a) Travelers and Standard General were parties to the Policies, (b) Dov Charney sued Standard General in California state court in the Charney Action, (c) Standard General tendered its defense and indemnity in the Charney Action to Travelers, and (d) Travelers disclaimed coverage, the only issue on these cross-motions is whether the allegations in the Charney Action asserted claims that were potentially within the coverage afforded by the Polices. The claims asserted against Standard General were not within the coverage afforded by the Policies and, thus, Travelers had no obligation to defend or indemnify Standard General in the Charney Action.

---

[3] Although the Steiner Affidavit incorrectly states that her Exhibit 3 is the Charney Complaint "with exhibits thereto" (Steiner Affidavit at 2, ¶5), none of such exhibits was submitted.

In the Charney Action, Standard General moved under the anti-SLAPP provisions of the California Code of Civil Procedure §425.16 to strike the Charney Complaint. As Exhibit 4 to the Steiner Affidavit, Standard General purports to attach "a true and correct copy of the California Superior Court's Statement of Decision granting Standard General's anti-SLAPP motion and dismissing the Charney Action complaint with prejudice." Steiner Affidavit at 2, ¶6. What Standard General actually submits is the cover order, not the actual Statement of Decision signed and filed by the California Superior Court on October 30, 2015. *See* Exhibit C. The complete Statement of Decision, called "*Defendants'* Statement of Decision" (emphasis added), was prepared by Standard General and, as shown *infra*, indisputably demonstrates that the claims in the Charney Action do not fall within the advertising injury coverage of the Policies, but do fall within the employment related practices exclusions applicable to the "personal injury" coverage afforded by the Policies.

It is well-settled in New York that an insurer has no duty to defend when it "establishes as a matter of law that there is no factual or legal basis on which it might eventually be obligated to indemnify its insured under any policy provision." *Burt Rigid Box, Inc. v. Travelers Property Casualty Corp.*, 302 F.3d 83, 97 (2d Cir. 2002), quoting *Allstate Insurance Co. v. Zuk*, 78 N.Y.2d 41, 45, 571 N.Y.S.2d 429 (1991). *See also, Jerry Madison Enterprises, Inc. v. Grasant Manufacturing Co., Inc.*, No. 89 Civ. 2346, 1990 WL 13290, *4 (S.D.N.Y. February 14, 1990) ("a comparison of the complaint with the two insurance policies shows that under the most generous reading of the complaint there is no allegation of 'advertising injury' sufficient to engage coverage under the policy").

As shown hereafter, by analyzing the Charney Complaint and the language of the Policies, it is beyond dispute that the applicable language of the Policies is unambiguous and

does not afford coverage for any of the claims asserted in the Charney Action.  Accordingly,

Standard General's complaint should be dismissed.

<div align="center">

**Argument**

**I.  THE CHARNEY ACTION ALLEGATIONS
DO NOT FALL WITHIN THE POLICY'S
ADVERTISING INJURY COVERAGE**

</div>

Coverage B of the GL Policy provides in relevant part:

**1. Insuring Agreement**

  a. We will pay those sums that the insured becomes legally obligated to pay
as damages because of ["personal injury or advertising injury"] to which this
insurance applies. We will have the right and duty to defend the insured against any
"suit" seeking those damages. However, we will have no duty to defend the
insured against any "suit" seeking damages for "personal and advertising injury" to
which this insurance does not apply…

  …

**SECTION V – DEFINITIONS[4]**

1. "Advertisement" mean a notice that is broadcast to the general public or specific
market segment about your goods, products or services for the purpose of attracting
customers or supporters. …

"Advertising injury":

**a.** Means injury… caused by one or more of the following offenses:

  **(1)** Oral or written publication, including publication by electronic means, of
      material in your "advertisement" that slanders or libels a person or
      organization or disparages a person's or organization's goods, products, or
      services, provided that the claim is made or the "suit" is brought by a person

---

[4] As amended by the "Amendment of Coverage B- Personal and Advertising Injury Liability"
endorsement [form CG D4710209] in the GL Policy and the "Amendment of Coverage B-
Personal and Advertising Injury Liability" endorsement [form UM 05 11 02 09] in the Umbrella
Policy.  (Martin Dec. Ex. B)

<div align="center">4</div>

**(2)** Oral or written publication, including publication by electronic means, or material in your "advertisement" that:

...

(b) Unreasonably places a person in a false light...

"Personal injury"

**a.** Means injury caused by one or more of the following offenses:

...

**(4)** Oral or written publication, including publication by electronic means, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services, provided that the claim is made or the "suit" is brought by a   person or organization that claims to have been slandered or libeled, or that claims to have had its goods, products or services disparaged;

**(5)** Oral or written publication, including publication by electronic means, of material that:

...

**(b)** Unreasonably places a person in a false light...

(Martin Dec. Ex. B)

     As Standard General recognizes, to fall within the Policies' advertising injury coverage, "the underlying complaint" must allege that the "publication of material giving rise to any alleged advertising injuries must have been in Standard General's 'advertisement.'" Standard General opening brief at 10.  Standard General goes on to admit that "the Policy *does* contain such a requirement..." and, moreover, the Policy requires that this advertisement be "about [Standard General's] goods, products, or services for the purpose of attracting customers or supporters." *Id.* (emphasis added, insertion in original.)

     Thus, as Standard General concedes, in order to come within the coverage of the Policies' "advertising injury" provisions, the underlying action must seek damages emanating from an enumerated "advertising injury" offense committed in the "advertisement", as defined in

from an enumerated "advertising injury" offense committed in the "advertisement", as defined in the Policies of *Standard General's* goods, products or services for the purpose of attracting customers or supporters. *See* Standard General's Rule 56.1 Statement of Undisputed Facts ¶15.

 The definition of "advertisement" has two components that must be satisfied for there to be coverage under that provision of the Policies: (1) there must be a notice advertising Standard General's goods, products or services *and* (2) the advertisement must be for the purpose of attracting customers or supporters to Standard General. Yet, the only so-called "advertisement" that Standard General points to is its press release that (per Charney's allegations) "falsely claimed to the press and the general public that Plaintiff Charney's *employment* as American Apparel CEO and Chairman of the Board was terminated by the Board of the Directors for 'cause' based on the result of a purportedly 'independent' investigation conducted by a 'third party.'" Steiner Aff. Ex. 3 at 1-2, ¶1 (emphasis added). *See* Standard General opening brief at 3.

 Indeed, the Charney Complaint repeats that the basis for his defamation and related claims against Standard General is Standard General's spokesperson "falsely informed various press outlets that Charney was terminated for 'cause' based on the results of an 'independent investigation' conducted by a 'third party,'" and that Standard General "'supported the independent, third-party and very thorough investigation into the allegations against Mr. Charney, and respect[s] the board of director's decision to terminate him based on the results of that investigation.'" Steiner Aff. Ex. 3 at 13-14, ¶¶43-44 (footnote omitted). Paragraph 44 of the Charney Complaint references copies of articles attached to his Complaint. *See* Martin Dec. Ex. E.

personally and not any "goods, products or services" of Standard General; and (2) the statements

by Standard General related specifically and exclusively to the "decision to terminate

[Charney]…." *See* Standard General opening brief at 3-4. Further, there is nothing in the

Charney Complaint, in the Standard General press release, or within the normal understanding of

a reasonable person of the press release's comments regarding the dismissal of Mr. Charney and

the subsequent investigation that would suggest the press release was an "advertisement" of

Standard General's goods, products or services for the purpose of attracting customers or

supporters to Standard General.

        Standard General's arguments are not dissimilar to those of the insured in *Hosel*

*& Anderson, Inc. v. ZV II, Inc.*, No. 00-CV-6957, 2001 WL 392229 (S.D.N.Y. March 21, 2001),

in which the court characterized the insured's efforts, like those of Standard General here, to

squeeze the allegations of the underlying copyright infringement action into the insurance

policy's "advertising injury" clause as follows: "The complaint in this action charges that

defendant infringed plaintiff's copyrighted designs 'by … reproducing, manufacturing,

displaying, publishing, vending, distributing, selling, promoting, importing or advertising [the]

designs.' Seizing on the word 'advertising,' defendant seeks a declaration that the carrier is

obliged to defend and indemnify it in this action." *Id.* at *1. The court, after reciting in full the

advertising injury provision, continued:

> While the existence of a duty to defend usually is determined from
> the face of the pleadings, a court may look also to admissions in
> the insured's submissions "to confirm or clarify the nature of the
> underlying claims." The papers before the Court clearly show that
> plaintiff does not allege infringement of its copyrights in any
> "advertisement" in the ordinary sense of that word. Defendant's
> theory, rather, is that the garments it made with the infringing
> fabric were their own advertisements.

> Although the Court admires counsel's zeal, the argument is
> without merit, as every case the parties have cited that has dealt
> with the question has held. The product itself is not an
> advertisement within the meaning of the policy. Accordingly, the
> carrier is entitled to summary judgment.

*Id.* at *2 (footnotes omitted).

Although giving lip service to the restrictive language of the Policies, Standard General wants to ignore the requirement in the Policies that any "advertising injury" offense must be committed in the insured's "advertisement" and that "advertisement" is restricted by definition in the Policies (As per the "Amendment of Coverage B – Personal Injury and Advertising Injury Endorsements" of the Policies) to "a notice that is broadcast or published to the general public or specific market segments about *your* [Standard General's] goods, products or services for the purpose of attracting customers or supporters." (emphasis added). *See* Standard General opening brief at 6. Rather, Standard General asserts that Charney's claims that he was demeaned or defamed by Standard General's press release commenting on his termination of employment at American Apparel somehow relates to an "advertisement" of Standard General's services as an investment firm. Without any support for its position, Standard General argues that Standard General's statements were made "for the purpose of attracting customers or supporters" because they were allegedly made in an effort to prevent Mr. Charney from regaining control of the American Apparel Board and/or "relate" to Standard General's investment and interest in American Apparel. The courts[5] do not agree with Standard General's strained interpretation of "advertisement".

---

[5] Although this brief cites for their reasoning to cases from other jurisdictions as well as New York, the law of New York governs the interpretation of the Policies and the contentions on these Cross-Motions. As alleged by Standard General, its "principal place of business [is] in New York," and it "operates as a New York-based investment firm…," and "Travelers issued the

In *Ekco Group, Inc. v. The Travelers Indemnity Company of Illinois*, 273 F.3d 409 (1st Cir. 2001), pursuant to cross-motions for summary judgment, the First Circuit interpreted a general commercial liability policy containing "advertising injury" coverage in the context of a coverage dispute on an underlying misappropriation claim.  The court explained that to be a covered advertising injury, the "offense in question 'must be committed in the course of advertising your [the insured's] goods, products or services.'"  273 F.3d at 412 (insertion in original).  Thus, the language in the advertising injury provision was very similar to that here.

The insured's approach in *Ekco*, like that of Standard General here, "requires one to read at least some of the policy language unnaturally." *Id.* at 413.  To consider Standard General's comments on the legitimacy of Charney's termination to be "*advertising* is surely a very strained way to speak." *Id.* (emphasis in original).  "[S]urely no one imagines that a policy covering 'advertising injury' was intended to provide coverage..." for such statements. *Id.* at 414.  "Coverage on the present facts requires that one stretch the term 'advertising' in a way that has no natural stopping point short of absurd results.  The obvious remedy is to read the term both in the coverage and definitional provisions to refer to conventional advertising...which also happens to be the term's most familiar usage." *Id.*  As here, the First Circuit had "to choose between two different concepts of 'advertising':   the familiar bundle of business activities associated with that term and the far broader concept of inviting public attention, deliberately or not and by any means.  ... [T]he more natural reading and the only one that avoids *outlandish* results is the former.  It is worth adding that if the latter, open-ended definition were employed,

---

these Cross-Motions.  As alleged by Standard General, its "principal place of business [is] in New York," and it "operates as a New York-based investment firm...," and "Travelers issued the Policies at issue herein from its office located in New York, New York."  Steiner Aff. Ex. 1 at 2, ¶5, 3, ¶6.  Standard General's Rule 56.1 Statement at 191.

(emphasis added).  The court concluded: "Taking this policy as a whole, only the conventional reading of the term 'advertising' is reasonable...." *Id.* at 414-15.  New York law interpreting the meaning of "advertising" in commercial general liability policies is to the same effect.  *See, e.g., A. Meyers & Sons Corp. v. Zurich American Insurance Group*, 74 N.Y.2d 298, 303, 546 N.Y.S.2d 818 (1989) (discussed *infra*, pp 12-13); *Structural Bldg Prods. Corp. v. Business Ins. Agency, Inc.*, 281 A.D.2d 617, 620 (2d Dep't 2001).

In *United States Fidelity & Guaranty Company v. Ashley Reed Trading, Inc.*, 43 F.Supp.3d 271, 277-78 (S.D.N.Y. 2014), *aff'd*, 823 F.3d 146 (2d Cir. 2016), the court held that trademark infringement judgments against a policyholder related to the policyholder's sale of allegedly counterfeit handbags were not covered as "advertising injury" under a liability policy. The court explained that the alleged offense did not fall within the policy's definition of "advertising": "Defendants would have to establish that the Ashley Reed Defendants' use of the Fendi trademarks occurred in their advertising, *i.e.,* in the Ashley Reed Defendants' efforts to 'attract[ ] the attention of others.'" *See Bridge Metal Indus., LLC v. Travelers Indem. Co..*, 559 Fed. Appx. 15 (2nd Cir. 2014 at 19 ('[T]he claimed [advertising] injury must both arise out of an offense occurring in the course of the insured's "advertising activities" and constitute one of the enumerated offenses.' (quoting *A. Meyers & Sons Corp. v. Zurich Am. Ins. Grp.,* 74 N.Y.2d 298 at 303, (1989)." *United States Fidelity*, 43 F.Supp.3d at 278.

The definition of "advertisement" in the Travelers' Policies here is far more restrictive than that in *Ashley Reed*, and the claims in the underlying Charney Action have no relationship at all to the advertising of Standard General's services as a "New York based investment firm..." (Standard General Rule 56-1 Statement ¶1).

In affirming *Ashley Reed*, the Second Circuit stated: "Under New York insurance law, the plain language of an insurance policy is construed 'in light of "common speech" and the reasonable expectations of a businessperson.' *Belt Painting Corp. v. TIG Ins. Co.,* 100 N.Y.2d 377, 383, 763 N.Y.S.2d 790, 795 (2003)." *United States Fidelity and Guaranty Co. v. Fendi Adele S.R.L.,* 823 F.3d 146, 150 (2d Cir. 2016). The court continued:

> "The New York Court of Appeals has held that for a claimed advertising injury to be covered, it 'must both arise out of an offense occurring in the course of the insured's "advertising activities" and constitute one of the enumerated offenses.' *A. Meyers & Sons Corp. v. Zurich Am. Ins. Grp.,* 74 N.Y.2d 298 at 303 (1989). There, the court held that an insurer had no duty to defend under a policy that covered the 'named insured's advertising activities,' where the insured had been accused of manufacturing, importing, and selling plastic fasteners that infringed on another company's patents. *Id.* at 301–03. The insured argued that its 'injury' was covered because the complaint against it alleged unfair competition, but the court held that because the alleged unfair competition involved the importation and sale of infringing products, this was 'not injury arising out of Meyers' "advertising activities." ' *Id.* at 303."

*Id.*

The finding in *Berman v. General Acc. Ins. Co. of Am.,* 176 Misc.2d 13, 19, 671 N.Y.S.2d 619 (Sup. Ct., N.Y. County 1998), that an advertisement was involved in the underlying claim, highlights the stark difference in the case at bar. On cross-motions for summary judgment, the *Berman* court identified the reasons for its conclusion that a form letter Berman sent to his clients explaining his employee's discharge was advertising:

> In addition to explaining Dr. Attas's discharge, the letter was clearly intended to persuade Dr. Berman's clients that they should continue to use the clinic's medical services. In the letter, Dr. Berman noted that the clinic had recently hired "a well-trained and experienced veterinarian," promised that the clinic would "continue the same quality of care and the personal attention for which we are known," pointed out that the clinic staff was "available on a 24 hour basis" and expressed his hope that the client would continue to use our services".... Thus, Dr. Berman was soliciting the continuation of business....

*Id.*

11

Standard General can point to nothing in its press release or the Charney Complaint that even approximates the letter/advertisement in *Berman*. The complained of press release just does not mention Standard General's "goods, products or services."

The most telling argument against Standard General's claims is set forth in Standard General's own "Defendants' Statement of Decision" that it submitted in the underlying Charney Action:

> The natural and popular construction that the average reader would give to the statement in its full context is that it was a commentary on American Apparel's decision to terminate Plaintiff, not a statement about Plaintiff's own conduct or character. Plaintiff has made no prima facie showing that the statement reasonably implies that the Defendants were imputing wrongdoing to Plaintiff himself.

Martin Dec. Ex. D at 2, ¶7(a). *See Northville Indus. Corp. v. National Union Fire Insurance Co. of Pittsburgh, Pa.*, 89 N.Y.2d 621, 635 (1997) (courts may look to "formal submissions in the current or underlying litigation to confirm or clarify the nature of the underlying claims"). Thus, Standard General has defined its statements complained of in the Charney Complaint as "a commentary on American Apparel's decision to terminate" Charney, not an advertisement for Standard General.

Standard General continued in its "Defendants' Statement of Decision":

> The natural and popular construction that the average reader would give to the statement in its full context is that "independent, third party investigation" refers to an investigation overseen by an independent committee of American Apparel's board, not an investigation independent of any of the board members themselves.

Martin Dec. Ex. D at 2, ¶7(b).

A reference to an investigation of Charney by an American Apparel committee, whether independent or not, does not advertise any of Standard General's goods, products or

services, and does not implicate the Policies' duty to defend.  Further, these interpretations by Standard General of Charney's allegations show Standard General's agreement that one looks to the "natural and popular construction that the average reader would give..." to the term "advertisement", just as the courts have done.  Such a construction would never consider the Standard General press release about Charney to be an advertisement for Standard General's business.  The claims in the Charney Complaint are not "advertising injury" as defined by the Policies, and Travelers was correct to deny coverage.

Realizing the lack of merit to its assertions that the press release was designed to advertise its services and attract customers or supporters, Standard General switches to another tack to try to squeeze these allegations into the "advertising injury" definition in the Policies. Standard General shifts its attention to Charney's requests for injunctive relief in the Charney Complaint's Fifth Cause of Action.  Standard General opening brief at 2, 10, 11.

Mr. Charney's allegations in his Fifth Cause of Action complain that Standard General engaged in "'unfair business acts' and 'false advertising' within the meaning of *Business & Professions Code* §§17200, *et seq.*"  Steiner Aff. Ex. 3 at 20, ¶73.  These are Charney's claims of "false advertising" concerning *him*, not of Standard General's services.  As stated in the very next paragraph of the Charney Complaint: "Unless restrained, Defendants will continue to republish their false, defamatory, and demeaning statements regarding Plaintiff [Charney] to the general public, which is likely to be deceived by the same and which is likely to ... avoid business with *Plaintiff* [Charney]."  *Id.* at 20, ¶74 (emphasis added).  An assertion that persons will avoid doing business with Charney is not an advertisement for or by Standard General; it does not promote Standard General's services; it does not seek customers or supporters for Standard General.

13

Plainly, the *only* "advertising" referenced anywhere in the Charney Complaint is advertising referencing Charney. Standard General's statements, as asserted in the Charney Complaint, put Charney in a bad light and were "unfair business acts" to and "false advertising" related to him. They had nothing to do with any goods, products or services of Standard General, which does not attempt to claim that references to Charney somehow constituted goods, products or services of Standard General.

In addition, Charney's Fifth Cause of Action seeks only declaratory and injunctive relief against future conduct. California Business & Professions Code §17203 provides that a "person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction." Section 17200 defines unfair competition as "any unlawful, or unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with §17500) of Part 3 of Division 7 of the Business and Professions Code." Standard General's alleged defamatory statements that purportedly interfered with Charney's ability to raise funds to take back control of American Apparel or find other employment in the garment industry in no manner constitute an "advertisement" for Standard General's services. The statements about which Charney complained were not made with regard to the sale of any of Standard General's services, but rather, as Charney alleged in his Complaint, with respect to the grounds for his discharge as American Apparel CEO and the Chairman of the Board. The Charney Complaint's Fifth Cause of Action has nothing to do with advertising Standard General's goods, products, or services and fails to give rise to any duty to defend under the Policies.

Moreover, Standard General's claims are made solely under Coverage B at page 5 of the Commercial General Liability Coverage Form, which specifically limits Travelers'

obligation to payment of "those sums that the insured becomes legally obligated to pay as

damages because of 'personal and advertising injury' to which this insurance applies. We will

have the right and duty to defend the insured against any 'suit' seeking those *damages*." *See*

Policies, Martin Dec. Ex. B at 5, Coverage B(1)(a) (emphasis added). Because Charney only

sought injunctive relief in his Fifth Cause of Action relating to "false advertising", no coverage is

afforded under the Policies.

    Standard General's authorities also do not support its claims here. Indeed, the

only New York advertising injury case Standard General cites supports dismissal of its claims.

In *Bridge Metal Industries, LLC v. Travelers Indem. Co.*, 559 Fed. Appx. 15, 19 (2d Cir. 2014),

the Second Circuit stated:

> Under New York law, "[t]he duty of a liability insurer to defend an
> action brought against an insured is determined by the allegations
> in the complaint." *A. Meyers & Sons,* 74 N.Y.S.2d at 302. To
> trigger the "duty to defend, the claimed injury must both arise out
> of an offense occurring in the course of the insured's 'advertising
> activities' and constitute one of the enumerated offenses." *Id.*
> "[W]here an advertising injury is alleged, the relevant causation
> issue with regard to insurance coverage is not whether the injury
> could have taken place without the advertising, but whether the
> advertising did in fact contribute materially to the injury." *R.C.
> Bigelow, Inc. v. Liberty Mut. Ins. Co.,* 287 F.3d 242, 248 (2d Cir.
> 2002).... A complaint does not claim an advertising injury if it
> alleges only the manufacture, importation, and sale of infringing
> goods without claiming harm arising from advertising, and where
> it seeks relief "without reference to preventing any type of false,
> misleading or injurious advertising." *A. Meyers & Sons,* 74 N.Y.S.
> at 302-03.

Both the Circuit and District Courts found in *Bridge Metal* that infringement of trade dress was a

covered offense and that the underlying complaints alleged that the insured, Bridge Metal, used

information it misappropriated to "'market' and 'advertise'..." its own infringing product. *Id.*

15

Thus, in *Bridge Metal,* the courts found that the insured advertised its product and the advertising of the product contributed to the injuries sustained by the plaintiff in the underlying action. Here, Charney explicitly set forth the offending words constituting the offense, and none of those words advertised Standard General's goods, products or services. Charney Complaint, ¶¶43-44.

The District Court in *Bridge Metal* did not disagree with the findings in *A. Meyers, supra, Hosel, supra, Jerry Madison, supra,* and *Elite Brands, Inc. v. Pennsylvania General Ins.*, No. 02-CV-5623, 2004 WL 1945732 (S.D.N.Y. Sept. 2, 2004), *aff'd,* 164 Fed. Appx. 60 (2d Cir. 2006), all of which found there was no connection in the allegations of the underlying complaint between the activities complained of and the insured's advertising activities and, therefore, no coverage or duty to defend. *Bridge Metal Industries, LLC v. Travelers Indem. Co.*, 812 F.Supp.2d 527, 539 (S.D.N.Y. 2011). The *Bridge Metal* court simply found that on the facts before it, as in others cases where a duty to defend under the advertising injury clause was found, the underlying complaint sufficiently alleged that there was advertising and it played a role in the covered offense. *Id.* at 540-41. The *Bridge Metal* court applied the "common, everyday meaning of 'advertising' … action intended to make something known to the public or to call public attention to something by emphasizing it desirable qualities so as to arouse a desire to buy." *Id.* at 541, quoting *Ben Berger & Son, Inc. v. American Motorist Ins. Co.*, No. 94 Civ. 3250, 1995 WL 386560 at *3, n. 3 (S.D.N.Y. June 29, 1995).

The *Bridge Metal* District Court continued: "As the Second Circuit has noted, 'the relevant causation issue with regard to insurance coverage is not whether the injury *could have* taken place without the advertising, but whether the advertising did in fact *contribute materially* to the injury.'" *Id.*, quoting *R.C. Bigelow, Inc. v. Liberty Mutual Insurance Co.*, 287 F.3d at 248 (emphasis in the original). Here, the Standard General press release did not fall

within the "common, everyday meaning of advertising," and no advertisement contributed materially to the alleged injury. As Standard General acknowledges, "Charney's claim against Standard General arises out of the statements made about him to the public and their impact on him and his business prospects…" (Standard General opening brief at 13)." Thus, even Standard General recognizes that the Charney Complaint and the statements by Standard General's spokesperson have *no* relationship to advertising of Standard General's products or services.

The *Bridge Metal* courts expressly found that the underlying complaint alleged the insured had engaged in marketing and advertising to the public of its offending product. The underlying complaint in *Bridge Metal* charged that the insured was trying "to falsely *advertise* and deceptively palm off their products so as to confuse and deceive the public…." 812 F.Supp.2d at 541. No such allegations are made in the Charney Complaint, and no such finding can be made here. Under no stretch of the imagination is a press release voicing approval of Charney's discharge and of American Apparel's report an advertisement of Standard General's goods, products or services.

## II.  THE EMPLOYMENT EXCLUSION PRECLUDES PERSONAL INJURY COVERAGE

The Travelers Policies contain Employment-Related Practices Exclusions (the "ERP Exclusions") that state as follows:[6]

This insurance does not apply to:

"Personal Injury" to:

> **(1)** A person arising out of:
>   **(a)** Refusal to employ that person;
>   **(b)** Termination of that person's employment; or

---

[6] As per the "Employment Related Practices Exclusion Endorsement" in the GL Policy and Exclusion C3 of the Umbrella Policy. (Martin Dec. Ex. C.)

> **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or
>
> **(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal injury" to that person at whom any of the employment-related practices described in Paragraph (a), (b), or (c) above is directed.
>
> This exclusion applies:
> **(1)** Whether the insured may be liable as an employer or in any other capacity; and
> **(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

(Martin Dec. Ex. B)

Mr. Charney alleges that he was defamed and placed in a false light by the December 2014 Standard General press release supporting his ouster as an American Apparel employee. Thus, while his complaint may assert a "personal injury" offense as defined by the Policies, coverage for such an offense is entirely within the exclusionary language of the ERP Exclusions of the Policies.

The language of the ERP Exclusions unambiguously excludes coverage for employment-related "personal injury," whether Standard General is "liable as an employer or in any other capacity...."" Standard General argues that the ERP Exclusions do not preclude coverage for the "personal injury" alleged in the Charney Action because, *inter alia*, Charney was not an employee of American Apparel at the time the statements were made. (Standard General opening brief at 13). Standard General's reading of the Exclusions is both incomplete and incorrect.

Contrary to Standard General's argument, limiting the Exclusions to current employees would make meaningless the provision precluding coverage for personal injury arising out of an employee's termination. "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation.

The court is not required to find the language ambiguous where the interpretation urged by one party would 'strain [] the contract language beyond its reasonable and ordinary meaning.'" *Jerry Madison, supra,* 1990 WL 13290 at *5, quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir. 1989), quoting *Bethlehem Steel Co. v. Turner Construction Company,* 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90 (1957).  Any interpretation of an insurance policy that 'has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'  *Olin Corporation v. American Home Assurance Company,* 704 F.3d 89 (2d Cir. 2012) (citation omitted)."

   In *Berman, supra,* the insured argued, as here, that the "statements were not 'employment-related' because they were made after Dr. Attas had been discharged...." 176 Misc.2d at 17.  The court disagreed, holding that the "statements constituted an assessment of Dr. Attas's performance as an employee of the clinic and an explanation of why she was discharged.  As such, these statements fall squarely within the policy Exclusion for specified employment-related practices such as evaluation and defamation." *Id.* at 18.  The court continued:  "Even though the statements were made after Dr. Attas was discharged, they were nevertheless clearly 'employment-related." *Id.*  So much more so here where the Exclusions explicitly exclude coverage when the offending conduct arises out of an employee's termination. "The [insured's] argument that the exclusionary language in the policy must be read as limited to injuries sustained while the employee is still employed is 'semantically unreasonable and unacceptable." *Id.*

   In *AmGuard Ins. Co. v. Country Plaza Associates, Inc.,* No. 12-CV-5205, 2014 WL 3016544 (E.D.N.Y. July 3, 2014), the insurer brought an action seeking declaratory judgment that it had no duty to defend.  The court granted summary judgment to the insurer

holding that the exclusion for employment-related practices was plainly applicable based on the allegations in the underlying complaint  The insured in *AmGuard* argued that the underlying complaint did not allege any connection to the plaintiff's employment, and that AmGuard "must wait until discovery (and, potentially, through trial) before being absolved, if at all, of its duty to defend."  The court did not agree:  "[N]one of [insured's] arguments has merit."  *Id.* at *5.

      The *AmGuard* court analyzed the phrase "arising out of" found in the ERP Exclusions in the Policies:  "Under New York law, the term 'arising out of' in general liability insurance contracts is *quite broad*; courts in New York generally understand the words 'arising out of' to mean 'originating from, incident to, or having connection with.'  *Liberty Mut. Fire Ins. Co. v. E.E. Cruz & Co., Inc.*, 475 F.Supp.2d 400, 409 (S.D.N.Y. 2007)...."  *Id.*  As here, the actions of the defendant in the *AmGuard* underlying case "followed plaintiff's termination...." *Id.* at *6 (emphasis added).  The underlying action in *AmGuard* involved communications to dissuade other employers from hiring the plaintiff, very much like Charney alleged in the Charney Complaint.  "Thus, the Court concludes that the statements to the prospective employer alleged as the sole basis for the prima facie tort claim are 'incident to' and have 'some causal relationship' to defendants' excluded employment-related practices, such as evaluations and defamation.  In other words, such alleged conduct arose directly from, and could not have occurred but for, Scordo's employment.  Thus, the claim unambiguously falls within the Employment–Related Practices Exclusion."  *Id.*

      Here, each of the allegations in the Charney Complaint against Standard General could not exist but for Charney's employment and his discharge by American Apparel, and his claim unambiguously falls within the Policies' ERP Exclusions.  The applicable language of the exclusions in the Travelers' Policies is broad and precludes coverage for any "personal injury"

arising out of termination of a person's employment. As in *AmGuard*, Travelers "has no duty to defend." *Id.* *7.

Standard General also argues that the ERP Exclusions do not preclude coverage for the "personal injury" alleged in the Charney Action because Charney was never an employee of Standard General. (Standard General opening brief at 13). This argument completely ignores the language of the ERP Exclusions, which specifically states that the Exclusions apply to Standard General's liability for "personal injury" arising out of employment related offenses excluded therein "whether [Standard General] may be liable as an employer or *in any other capacity*...." Thus, it is of no moment that Charney was not an employee of Standard General.

On the contrary, the language of the ERP Exclusions merely requires that any alleged "personal injury" arise out of the person's termination from employment. There is no other reasonable interpretation. Mr. Charney alleges that he was injured by Standard General when its spokesperson made statements regarding his termination as CEO of American Apparel by what Charney describes as the "Standard General-controlled American Apparel Board of Directors." Standard General's alleged role controlling the American Apparel Board is the "other capacity" which Charney alleges makes Standard General liable for its comments related to the termination of his employment with American Apparel. The damages sought by Charney arising out of the alleged defamation are entirely within the ambit of the ERP Exclusions, having arisen from Charney's termination, regardless of whether Standard General is sued in its capacity as an employer or in any other capacity. In *National Football League v. Vigilant Insurance Company*, 36 A.D.3d 207, 824 N.Y.S.2d 72 (1st Dep't 2006), the Court found an employment practices exclusion without the "in any other capacity" language inapplicable because of the lack of an employment relationship. In so doing, however, the Court noted that an insurer could

extend the exclusion beyond a direct employment context and "…could have accomplished this result by including language clearly indicating that the exclusion was not limited to the NFL's liability as an employer." Id. at 214. That is exactly what Travelers has done by the "in any other capacity" language of the Exclusion in the Standard General Policies. *See also George S. May Int'l Co. v. Arrowpoint Capital Corp.*, 2011-1865 (La. App. 1 Cir. 8/10/12), 97 So.3d 1167, 1176 (Aug. 10, 2012) (In interpreting exclusion with "in any other capacity" language the court found allegations against management services contractor excluded; ERPE not limited to individuals with employment relationship to the insured.); *Town of Plainfield v. Select Energy Contractors, Inc.* No. CV065000410, 207 WL 417603 at *6 (Conn. Super. Ct. Nov. 5, 2017) (same).

The court in *Burns Glass Services, Ltd. v. Travelers Indemnity Co. of Illinois*, 2002 WL 31817916 at *4, NY Slip. Op. 50478 (Sup. County, Monroe County 2002), relied on by Standard General (Standard General opening brief at 14) analyzed whether an employment related practices exclusion afforded the insurer relief from the duty to defend. "Whether this exclusion applies depends upon whether the malicious prosecution 'arose out of' Palmer's termination." The court held that the malicious prosecution claim could have arisen from a number of different reasons having nothing to do with the termination of Palmer's employment. The underlying complaint did not identify the motivation for the malicious prosecution. Here, however, the Charney Complaint asserts throughout that it is all about the termination of Charney's employment. Standard General has itself categorized the statements complained of in the Charney Complaint as "a commentary on American Apparel's decision to terminate" Charney. (Martin Dec. Ex. D at 2, ¶7(a)

In *Travelers Indemn. Co. of Connecticut v. Presbyterian Healthcare Resources*,
No. Civ. A.3:02-CV-1881-P, 2004 WL 389090 (N.D. Tex. February 24, 2004), also relied on by
Standard General (Standard General opening brief at 14), the employment practices exclusion at
issue was different than that here and did not contain the "or in any other capacity" language in
the Exclusion in the Standard General Policies. The court there found that the lack of any
employment relationship with the "person" making the claim made the exclusion inapplicable.
This Texas decision has no application here. Standard General has asserted in its Rule 56.1
Statement of Undisputed Facts, ¶3, that the Charney Complaint "follow[ed] Charney's
termination...." Charney was unquestionably an employee of American Apparel and his
termination was the subject of Standard General's press release which formed the basis of
Charney's Complaint and each of its causes of action. The ERP Practices Exclusions of the
Policies preclude coverage for Standard General for the defamation claim asserted in the
Charney action. The "Insuring Agreement" of the GL Policy provides that Travelers has "no
duty to defend the insured against any 'suit' seeking damages for "personal injury or advertising
injury" to which this insurance does not apply. Since the defamation claim at issue in the
Charney Action is entirely within the language of the ERP Exclusions and no other covered
claims were asserted, the defamation claim did not give rise to Travelers defense obligations
under the GL Policy.

**Conclusion**

By reason of the foregoing, this court should enter an order denying the motion of Standard General, finding that Travelers had no duty to defend Standard General under the Policies, and granting Travelers' cross-motion dismissing the Standard General Complaint in its entirety.

Dated:   New York, New York
         June 15, 2017

<div style="margin-left: 40%;">

PUTNEY, TWOMBLY, HALL & HIRSON LLP
*Attorneys for Defendant The Travelers Indemnity Company of Connecticut*


By:  _____ /S/ _____
              Thomas A. Martin
521 Fifth Avenue
New York, New York 10175
(212) 682-0020
*tmartin@putneylaw.com*

</div>

# APPENDIX

Town of Plainfield v. Select Energy Contracting, Inc., Not Reported in A.2d (2007)

2007 WL 4171603

2007 WL 4171603
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Windham.

TOWN OF PLAINFIELD et al.
v.
SELECT ENERGY CONTRACTING, INC.

No. CV065000410.
|
Nov. 5, 2007.

**Attorneys and Law Firms**

Howd & Ludorf, Hartford, for Town of Plainfield,
Plainfield Board of Education, Kevin Cunningham and
Paul Delmonico.

Janet Marie Helmke, Amy Leete Van Dyke, Northeast
Utilities, Berlin, for Select Energy Contracting Inc.

S. Dwight Stephens, Melito & Adolfsen PC, New York,
NY, for Zurich American Insurance.

**Opinion**

MARTIN, J.

*1 Before the court are motions for summary judgment
filed by the defendant, Zurich American Insurance
(Zurich), and the plaintiffs, the town of Plainfield, the
Plainfield board of education (the board), Paul
Delmonico, and Kevin Cunningham, regarding Zurich's
duty to indemnify the plaintiffs in connection with a prior
lawsuit.

The underlying action was filed in federal district court by
John Kennerson in 2005. In his amended complaint,
Kennerson alleged that Plainfield hired Turner
Construction Company (Turner) as a general contractor to
build a new high school, and Kennerson began working at
the school for subcontractor Select Energy Contracting,
Inc. (Select) in April 2004. In July 2005, Kennerson
found a discarded WWII plaque in a dumpster at the
school. He retrieved it and took it to a VFW Post in
Plainfield. Kennerson asked the post commander to
display the plaque on the wall, which the commander
agreed to do.

On August 15, 2005, Kennerson noticed mold on some
ducts at the construction site, and learned that Turner had
told insulators to wipe off the mold. Kennerson instructed
the insulators to cease wiping off the mold because the
mold could also be present within the ducts. He then told
both his supervisor and the school principal, Susan
Rourke, about the mold, and the supervisor asked
Kennerson to learn more about the problem. On August
16, 2005, a Turner representative viewed the mold and
did not consider it to be a major issue, which concerned
Kennerson. The representative failed to respond to
Kennerson's queries regarding what would be done about
the mold. Two days later, Kennerson visited Rourke to
find out more about the mold issue per his supervisor's
directive to gather more information. Kennerson alleged
that after he knocked on Rourke's open door, Rourke told
Kennerson to come in. Kennerson then shared with
Rourke his concerns about the mold "as a taxpaying
resident of Plainfield," such as the potential effects the
mold might have on children attending the school, and
noted that the mold problem might pervade the entire
building. (Plaintiffs' Ex. B, para. 22.)

On Monday, August 22, 2005, a local news channel
publicized Kennerson's salvage of the WWII plaque, and
the *Norwich Bulletin* published a letter to the editor
complimenting Kennerson and criticizing Plainfield's
building committee for allowing the plaque to end up in
the trash. Kennerson averred that also that day, someone
referred to Kennerson as a "troublemaker" during a
conversation involving Paul Delmonico, the building
committee chair, and Joseph Hammond, a Turner
manager, at a meeting pertaining to the mold issue.
Following the "troublemaker" comment, Delmonico
allegedly stated "that it was necessary to get [Kennerson]
'the f---out of there.' " (Plaintiffs' Ex. B, para. 27.)

Kennerson alleged that Plainfield, the board, Delmonico,
Hammond, and Kevin Cunningham (the board chair) then
took action to retaliate against him. On August 22, 2005,
Hammond notified Kennerson's supervisor at Select by
letter that the board, with the building committee chair's
(i.e., Delmonico's) "okay" had requested Kennerson's
permanent removal from the high school project because
Kennerson "interrupted a private meeting between the

Town of Plainfield v. Select Energy Contracting, Inc., Not Reported in A.2d (2007)

2007 WL 4171603

principal and one of her staff, sat down at the desk and informed her that as a tax paying citizen of the town ... [h]e would like to know how the Town is going to fix the mold issue present throughout the (entire) building." (Plaintiffs' Ex. B, para. 28.) Hammond's letter further stated that Kennerson's actions violated contract policies. Kennerson alleged that in light of the letter, Kennerson's supervisor was "forced" to terminate him. (Plaintiffs' Ex. B, para. 29.)

*2 According to Kennerson, his "actions and expression in connection with his salvaging the World War II memorial plaque, and the concerns he expressed regarding mold in the High School, constitute protected conduct under the First Amendment," and Hammond's letter to Select serves as an admission that the board retaliated against him because he engaged in protected first amendment conduct. (Plaintiffs' Ex. B, para. 32.) Kennerson further alleged that Hammond's claim that Kennerson violated contract policies was pretextual. He averred that on August 27, 2005, Delmonico asked the *Norwich Bulletin* via letter why the finder of the WWII memorabilia (i.e., Kennerson) "did not take the opportunity to point out the problem to the Board of Education and/or the building principal rather than simply turning them over to a third party." (Plaintiffs' Ex. B, para. 36.) Delmonico's letter, Kennerson alleged, made the claim that Kennerson was terminated for violating contract policies "not credible." (Plaintiffs' Ex, B, para. 36.)

In count one of his three-count complaint, Kennerson alleged retaliation in violation of the first amendment under 42 U.S.C. § 1983. More specifically, he claimed that all defendants-Plainfield, the board, Cunningham, Delmonico, and Hammond-acted and conspired under color of state law and through the actions of official decision makers "to intentionally retaliate against [Kennerson] and cause the termination of his employment because he exercised rights to speak on matters of public concern that are protected under the First Amendment ..." (Plaintiffs' Ex. B, para. 41.) Kennerson characterized the defendants' conduct as "intentional and with malice in that it was willful, wanton, and in reckless disregard of [Kennerson's] rights." (Plaintiffs' Ex. B, para. 43.) His alleged damages included "lost wages and employment benefits, damage to reputation, emotional distress, mental anguish, humiliation, embarrassment, and loss of enjoyment of life." (Plaintiffs' Ex. B, para. 44.)

Count two outlined a claim for intentional interference of business and contractual rights. Kennerson alleged that the defendants were aware of his employment relationship with Select, and that in conspiring to bring about his termination, they intentionally, maliciously, and unjustifiably interfered with that relationship. In count three, directed solely against Plainfield, Kennerson alleged that pursuant to General Statutes §§ 7-101a and 7-465,[1] Plainfield would be liable for any judgment that Kennerson obtained against Cunningham or Delmonico.

The defendants in the underlying action settled with Kennerson,[2] and, with the exception of Hammond, are now the plaintiffs in the current suit. On June 1, 2006, the plaintiffs filed a two-count complaint against Select and Zurich. In count one, the plaintiffs allege breach of contract indemnification against Select, claiming that because Select, rather than the plaintiffs, terminated Kennerson, the plaintiffs should not have been made liable for Kennerson's damages, and Select should have indemnified the plaintiffs as Select expressly agreed to do in a contract between Select and Plainfield. In count two, the plaintiffs allege breach of contract indemnification against Zurich, claiming that Select's Certificate of Liability Insurance with Zurich named Plainfield as an additional insured, but Zurich failed to provide insurance benefits to the plaintiffs.

*3 Zurich now moves for summary judgment on the ground that the documentary evidence and language in the liability policy that Zurich issued to Select establish as a matter of law that the policy does not cover the plaintiffs for the claims against them in the Kennerson action. Conversely, the plaintiffs move for summary judgment on the grounds that Zurich breached its duty to defend the plaintiffs because the plaintiffs are additional insureds under the policy, certain allegations in Kennerson's complaint fall within the policy's coverage, and no exclusion clearly precludes coverage.

## DISCUSSION

"Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Internal quotation marks omitted.) *Grey v. Stamford Health System, Inc.*, 282 Conn. 745, 750, 924

A.2d 831 (2007). "When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue ... Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue ... It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact ... are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § [17-45]." (Internal quotation marks omitted.) *Zielinski v. Kotsoris,* 279 Conn. 312, 318-19, 901 A.2d 1207 (2006).

"[B]efore a document may be considered by the court in support of a motion for summary judgment, 'there must be a preliminary showing of [the document's] genuineness, i.e., that the proffered item of evidence is what its proponent claims it to be. The requirement of authentication applies to all types of evidence, including writings ...' Conn.Code Evid. § 9-1(a), commentary. Documents in support of or in opposition to a motion for summary judgment may be authenticated in a variety of ways, including, but not limited to, a certified copy of a document or the addition of an affidavit by a person with personal knowledge that the offered evidence is a true and accurate representation of what its proponent claims it to be." *New Haven v. Pantani,* 89 Conn.App. 675, 679, 874 A.2d 849 (2005). The court notes that Zurich provided a single sparse affidavit purporting to cover all of its submissions, while Plainfield provided detailed affidavits for certain documents, but no affidavits for others, making compliance with § 9-1(a) questionable. Nevertheless, because neither side has objected to the other's submissions, the court has considered all documents presented. See *Barlow v. Palmer,* 96 Conn.App. 88, 92, 898 A.2d 835 (2006) (court has discretion to interpret evidentiary rules "liberally").

*4 The plaintiffs contend that there is a conflict of law with respect to Zurich's duty to defend. They assert that in Connecticut, "the insurer's duty to defend is measured by the allegations of the complaint," quoting *Flint v. Universal Machine Co.,* 238 Conn. 637, 646, 679 A.2d 929 (1996). By contrast, in Massachusetts, "the duty to defend is based on the facts alleged in the complaint and those facts which are known by the insurer;" *Boston Symphony Orchestra, Inc. v. Commercial Union Insurance Co.,* 406 Mass. 7, 10-11, 545 N.E.2d 1156 (1989); meaning that extrinsic facts can be used to determine whether a claim is covered. The plaintiffs further argue that Massachusetts law governs the current case.

In *Interface Flooring Systems, Inc. v. Aetna Casualty & Surety Co.,* 261 Conn. 601, 608, 804 A.2d 201 (2002), the Connecticut Supreme Court discussed in depth its adoption of the 'most significant relationship' approach of the Restatement (Second) of Conflict of Laws, for analyzing choice of law issues involving contracts." The court explicated that "[t]he starting point under the 'most significant relationship' approach is § 188 of the Restatement (Second) of the Conflict of Laws, which provides in relevant part: '(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.' " *Id.,* at 608-09, 804 A.2d 201.

The *Interface* Court further stated the following: "[Section] 6(2) of the Restatement (Second) [of Conflict of Laws], which is applicable to all substantive areas, sets forth seven overarching considerations in determining which state has the 'most significant relationship:' '(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied."

"Section 188(2) [of the Restatement (Second) of Conflict of Laws] lists five contacts to be considered in applying the principles set forth in § 6 to a contract dispute: '(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.' " (Internal quotation marks omitted.) *Id.,* at 609, 804 A.2d 201.

Lastly, the *Interface* Court explained that "Section 188(3) of the Restatement (Second) establishes a general presumption with regard to contracts, namely, that '[w]hen the place of negotiation and the place of performance are in the same state, the local law of this state will usually be applied ... except when the principles stated in § 6 require application of some other law.' 1 Restatement (Second), *supra,* § 188, comment (f), pp.

**Town of Plainfield v. Select Energy Contracting, Inc., Not Reported in A.2d (2007)**

2007 WL 4171603

582-83. In adopting § 188 of the Restatement (Second) in *Reichhold Chemicals, Inc.,* we described it as creating a presumption in favor of the application of the law of the state where 'the bulk of the contracting transactions took place ...' " *Id.,* at 609-10, 804 A.2d 201.

**\*5** The foregoing makes clear that a choice of law analysis is a laborious process involving numerous considerations. The plaintiffs, however, did not provide this court with any detailed analysis of the numerous factors mentioned in *Interface.*

To support their position that Massachusetts law applies, the plaintiffs point primarily to the fact that two the named insureds under Zurich's policy, Select (Kennerson's employer and a party to the construction contract with Plainfield) and Select Energy Services, Inc. (which has its principal office in Massachusetts and many additional offices throughout the country), are incorporated in Massachusetts. The plaintiffs also argue that the Zurich policy was issued in Massachusetts, and claim that Select "performed operations" in Massachusetts. Additionally, they reason that both Zurich and Select could have anticipated being sued in Massachusetts. The plaintiffs further contend that other states linked to this lawsuit, namely Connecticut (the plaintiffs' location) and New York (the state in which Zurich is domiciled, according to the plaintiffs), do not have overriding policy interests in applying their laws in this instance.

The plaintiffs do not provide any information regarding certain elements of § 188(2) of the Restatement (Second), such as the place of negotiation of the contract. Furthermore, they gloss over the fact that the current dispute is not between Select and Zurich, but rather between the additional insureds,[3] who are based in Connecticut, and Zurich. Additionally, the plaintiffs' treatment of the seven factors listed in § 6(2) of the Restatement (Second) is cursory. The plaintiffs summarily discuss the protection of justified expectations and the public policies of Massachusetts and Connecticut, but not of New York, and do not address other factors at all.

Luckily, the choice of law issue is of little consequence here. The plaintiffs assert that "[w]ith the exception of consideration of evidence extrinsic to the Complaint, Massachusetts and Connecticut law regarding an insurer's duty to defend are nearly identical, with Massachusetts law being slightly more favorable to an insured." (Plaintiffs' Br., 13.) The Connecticut Supreme Court,

however, recently determined that extrinsic facts known to an insurer may be relevant to a duty-to-defend analysis. See *Hartford Casualty Ins. Co. v. Litchfield Mutual Fire Ins. Co.,* 274 Conn. 457, 466-67, 876 A.2d 1139 (2005). Moreover, as Zurich correctly argues, the plaintiffs have not identified any extrinsic facts relevant to the analysis of Zurich's duty to defend.[4] Accordingly, it makes no difference whether Connecticut or Massachusetts law is applied to the current case.

The plaintiffs concede that Kennerson's complaint does not contain claims covered by Coverage A of the Zurich policy, but assert that coverage exists under Coverage B, entitled "Personal and Advertising Injury Liability." Coverage B states in relevant part: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'personal and advertising injury' to which this insurance does not apply." (Zurich's Ex. M, D 661.) The policy defines "personal and advertising injury" to mean "injury, including consequential 'bodily injury,' " arising out of "[o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services or "[o]ral or written publication, in any manner, of material that violates a person's right of privacy," among other things. (Zurich's Ex. M, D 670.)

**\*6** The Zurich policy also includes numerous coverage exclusions. For instance, there is no coverage for " '[p]ersonal and advertising injury' caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.' " (Zurich's Ex. M, D 662.) Furthermore, no coverage exists for " '[p]ersonal and advertising injury' to: (1) A person arising out of any: (a) Refusal to employ that person; (b) Termination of that person's employment; or (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person ..." (Zurich's Ex. M, D 629.) Coverage is excluded "[w]hether the insured may be liable as an employer or in any other capacity ..." (Zurich's Ex. M, D 629.)

Additionally, the Zurich policy includes the following language: "Who is an Insured is amended to include as an

additional insured the person(s) or organization(s) shown
in the Schedule, but only with respect to liability for
'bodily injury,' 'property damage' or 'personal and
advertising injury' caused, in whole or in part, by your
acts or omissions or the acts or omissions of those acting
on your behalf: A. In the performance of your ongoing
operations; or B. In connection with your premises owned
by or rented to you." (Zurich's Ex. M, D 630.) "You" and
"your" are defined later in the policy to mean the Named
Insured, in this case, Select. (Zurich's Ex. M, D 657.)
Accordingly, the plaintiffs' policy coverage is limited to
liability for "personal and advertising injury" caused in
whole or in part by Select's acts or omissions or the acts
or omissions of those acting on Select's behalf.

The plaintiffs argue that although Kennerson never
explicitly stated claims for slander, libel, or invasion of
privacy by false light, a liberal reading of the complaint
reveals that the facts pleaded outline such claims. They
rely on Massachusetts' Supreme Judicial Court's
determination that the process of assessing whether an
insurance company has a duty to defend "is not one of
looking at the legal theory enunciated by the pleader but
of envisaging what kinds of losses may be proved as lying
within the range of the allegations of the complaint, and
then seeing whether any such loss fits the expectation of
protective insurance reasonably generated by the terms of
the policy." (Internal quotation marks omitted.) *Boston
Symphony Orchestra, Inc. v. Commercial Union
Insurance Co.,* 406 Mass. 7, 12-13, 545 N.E.2d 1156
(1989). More specifically, "[t]he question ... [is] whether
the allegations of the complaint 'state or adumbrate a
claim covered by the policy terms.' " *Id.,* at 11, 545
N.E.2d 1156. Zurich posits that the complaint does not
adumbrate these claims, and moreover, there is no
coverage because all acts alleged in the complaint were
committed by the plaintiffs, not Select.

*7 The court first addresses the assertion that Kennerson's
complaint adumbrates a claim for invasion of privacy by
false light. To establish such a claim, a plaintiff must
show that "(a) the false light in which the other was
placed would be highly offensive to a reasonable person,
and (b) the actor had knowledge of or acted in reckless
disregard as to the falsity of the publicized matter and the
false light in which the other would be placed." (Internal
quotation marks omitted.) *Honan v. Dimyan,* 52
Conn.App. 123, 132-33, 726 A.2d 613, cert. denied, 249
Conn. 909, 733 A.2d 227 (1999).[5]

The portions of Kennerson's complaint referenced by the
plaintiffs in support of their argument do not give rise to a

false light claim, and the plaintiffs have not pointed to
extrinsic evidence suggesting otherwise. The plaintiffs
assert that "Kennerson alleged he was publicized as a
troublemaker to his employer, Select, and that he was
falsely alleged to have violated the terms of Select's
contract with the Town of Plainfield." However,
Kennerson in no way elaborated on the "troublemaker"
comment. He did not allege that the comment was
offensive; in fact, he did not even allege that the comment
was false. The complaint makes clear that in referencing
the "troublemaker" comment, Kennerson was only setting
the stage for the retaliatory discharge that allegedly
followed, not stating a claim for invasion of privacy either
directly or indirectly.

More importantly, the "troublemaker" comment cannot
serve as a basis for coverage because Select is not alleged
to be involved in publicizing the comment. Kennerson
avers that he was referred to as a "troublemaker" during a
conversation involving Hammond and Delmonico, and
the plaintiffs insist that the allegation must be construed
to mean that either Hammond or Delmonico uttered the
term. Neither Hammond nor Delmonico are Select
employees. Therefore, even assuming that Kennerson's
privacy was invaded, the injury cannot be attributed to
Select.

Similarly, Kennerson's allegation that the plaintiffs
falsely accused him of violating his contract is insufficient
to trigger coverage; nothing in the complaint suggests that
Select, as opposed to the plaintiffs, accused Kennerson of
violating anything. Indeed, the plaintiffs are crystal clear
about Select's noninvolvement in the alleged actions that
purportedly bring Kennerson's complaint under the
defamation and invasion of privacy umbrella, asserting
that "[e]ven if Kennerson was not laid off from Select, he
would still have viable, covered, legal claims against the
Plaintiffs." (Plaintiffs' Br., 20.)

The plaintiffs also posit that defamation claims can be
parsed from Kennerson's allegations. "A defamatory
statement is defined as a communication that tends to
harm the reputation of another as to lower him in the
estimation of the community or to deter third persons
from associating or dealing with him ... To establish a
prima facie case of defamation, the plaintiff must
demonstrate that: (1) the defendant published a
defamatory statement; (2) the defamatory statement
identified the plaintiff to a third person; (3) the
defamatory statement was published to a third person; and
(4) the plaintiff's reputation suffered injury as a result of
the statement." *Hopkins v. O'Connor,* 282 Conn. 821,

Town of Plainfield v. Select Energy Contracting, Inc., Not Reported in A.2d (2007)

2007 WL 4171603

838, 925 A.2d 1030 (2007). "Slander is oral defamation ... Libel ... is written defamation." *Gagnon v. Housatonic Valley Tourism District Commission,* 92 Conn.App. 835, 848, 888 A.2d 104 (2006).

**\*8** The plaintiffs argue that Kennerson has established all necessary elements of a libel claim because he alleged that: 1) the plaintiffs falsely stated that he interrupted a meeting between the principal and one of her staff members and that he was violating the terms of the construction contract between Select and Plainfield; 2) the plaintiffs published these statements to a third party, Select, via letter; and 3) Kennerson's reputation was damaged. Regardless of whether the plaintiffs' characterization of the complaint is correct, the claim is excluded from coverage, because nowhere does Kennerson allege that Select was involved in the purportedly defamatory acts. At best, Select was the passive recipient of the libelous information. The plaintiffs' argument that the "troublemaker" comment is sufficient to make out a claim for slander fails for the same reason; as explained earlier, Select had nothing to do with it.

The plaintiffs further assert that Zurich had a duty to defend because Kennerson's complaint can be interpreted to include a claim for disparagement of services. "[D]isparagement of a business' goods and services ... is recognized by Connecticut and New York courts as a species of defamation." (Citations omitted.) *QSP, Inc. v. Aetna Casualty & Surety Co.,* 256 Conn. 343, 358, 773 A.2d 906 (2001). The plaintiffs contend that the "troublemaker" comment and the allegedly false statement that Kennerson violated the terms of Select's contract with Plainfield could have injured Kennerson's reputation as to his services. The court questions whether the allegations referenced by the plaintiffs relate in any way to Kennerson's reputation as a plumber. In any event, coverage is barred in light of the fact that Select is not alleged to be involved in the so-called disparaging acts.

The plaintiffs next argue that a duty to defend was triggered because of Kennerson's allegations that the plaintiffs violated his first amendment rights. According to the plaintiffs, the definition of "injury" in Zurich's "personal and advertising injury" clause is ambiguous. Therefore, they argue, citing Indiana law, the clause could cover violations of Kennerson's first amendment rights, which the plaintiffs claim " 'arose out of' one of the enumerated personal injury offenses." (Plaintiffs' Br., 18.) The plaintiffs do not specify the offense from which the first amendment violations purportedly arose. Even if this

court were to assume that Kennerson's first amendment violations arose from allegedly defamatory or disparaging comments, the plaintiffs are not entitled to coverage because Select did not cause the injury either in whole or in part, for the reasons discussed earlier.

Zurich posits that the plaintiffs are also unable to recover based on the alternative argument that any "personal or advertising injury" arose from Kennerson's termination, the only relevant act discussed in the complaint that can be traced even remotely to Select. Assuming that Kennerson's "personal and advertising injury" arose from his termination, Zurich correctly notes that such injuries are clearly excluded from the Zurich policy, as the policy states that no coverage exists for " '[p]ersonal and advertising injury' to ... [a] person arising out of any ... [t]ermination of that person's employment." (Zurich's Ex. M, D 629.)

**\*9** The plaintiffs rely heavily on *Peterborough Oil Company, Inc. v. Great American Insurance Co.,* 397 F.Sup.2d 230 (D.Mass.2005) for the proposition that the employment-related exclusions are pertinent only when the person claiming "personal injury" is an employee, former employee, or prospective employee of the insured seeking coverage. *Peterborough,* which primarily addresses a malicious prosecution claim, as opposed to "personal injury" stemming from either termination or defamation, does not help the plaintiffs. There is no dispute that Kennerson was fired by Select. Kennerson's termination is clearly a "matter [ ] that directly concern[s] the employment relationship itself"; *id.,* at 238; and claims stemming from it are therefore barred by the employment-related exclusions.

The fact that the plaintiffs did not terminate Kennerson themselves is irrelevant. The court agrees with the plaintiffs that Zurich must "evaluate the duty to defend and the policy exclusions independently with respect to each insured seeking coverage." (Plaintiffs' Br., 26.) Kennerson alleges, however, that the plaintiffs are liable for his termination, and the Zurich policy specifically excludes termination claims "[w]hether the insured may be liable as an employer or in *any other capacity.*" (Emphasis added.) (Zurich's Ex. M, D 629.)

While few courts appear to have analyzed the "in any other capacity" provision in depth at this juncture, a Connecticut case is directly on point. In *Gottier's Furniture v. La Pointe,* Superior Court, judicial district of Tolland, Docket No. CV 04 0084606 (October 26, 2006, Sferrazza, J.), Janet LaPointe, a member of an LLC, sued

a fellow member, Robert Gottier, for defamation and intentional infliction of emotional distress, among other things. Gottier's insurance company refused to defend and indemnify Gottier, asserting that such claims fell within an "employment-related practices" exclusion nearly identical to Zurich's. *Id.* Despite Gottier's contention that the exclusion did not apply because Gottier was not LaPointe's employer and LaPointe was a member, not an employee, of the company, the court found that the policy "explicitly expands the reach of the exclusion of coverage ... whether the insured has acted as an employer or in any other capacity." (Internal quotation marks omitted.) *Id.;* see also *Green v. Travelers Insurance Co.,* 51 Mass.App.Ct. 1103, 2001 Mass.App. LEXIS 260, 2001 WL 214126 (2001) (finding that because "the plain language of the policy not only excludes coverage for employers but also excludes coverage for an insured who

may be liable in any other capacity," insurance coverage for acts alleged in the complaint was excluded for both employers and insureds who were not employers. The plaintiffs have not presented a compelling reason for this court to deviate from this logic.[6]

Accordingly, Zurich's motion for summary judgment is granted, and the plaintiffs' motion for summary judgment is denied.

**All Citations**

Not Reported in A.2d, 2007 WL 4171603

Footnotes

1   According to Kennerson's complaint, these statutes "provide that a municipality shall protect and save harmless any municipal officer or municipal employee of such municipality from financial loss and expense arising out of any claim for alleged infringement of any person's civil rights, on the part of such officer or such employee while acting in the discharge of his duties."

2   It is unclear whether Hammond participated in the settlement.

3   Although Zurich apparently concedes in its reply brief that Plainfield is an additional insured under Select's policy with Zurich, it argues that certain language in the policy extending coverage to executive officers and directors does not apply to Plainfield's officers and directors (i.e., plaintiffs Cunningham and Delmonico). Moreover, Zurich is silent with respect to coverage for the board. Because Zurich had no duty to defend whether the policy covers only one plaintiff or all four, these issues are immaterial.

4   The only extrinsic evidence upon which the plaintiffs appear to rely is a letter from Kennerson's lawyer to Plainfield, stating that Select was forced to fire Kennerson because Select had no work for him other than the Plainfield High School project. According to the plaintiffs, this letter reveals that the plaintiffs could not have known that Kennerson would be terminated because of the plaintiffs' actions. The plaintiffs' interpretation is directly contradicted by language in Kennerson's complaint in which Kennerson states that the plaintiffs specifically sought his termination. In any case, the outcome of this court's duty-to-defend analysis does not hinge on what the plaintiffs did or did not know regarding Kennerson's termination. Thus, the letter does not bolster any of the plaintiffs' arguments.

5   The parties do not dispute that Connecticut law governs the tort issues in this case; indeed, both sides cite Connecticut law for the majority of their assertions. Because the allegedly tortious acts suffered by Kennerson occurred in Connecticut, this court also applies Connecticut law when relevant. See *Macomber v. Travelers Property & Casualty Corp.,* 277 Conn. 617, 640, 894 A.2d 240 (2006) ("Under Connecticut choice of law rules, for the plaintiff's claims that sound in tort ... we apply the law of the state in which the plaintiff was injured, unless to do so would produce an arbitrary or irrational result").

6   Zurich contends that the exclusion for " 'personal and advertising injury' caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury' " serves as an additional bar to coverage under its policy. (Zurich's Ex. M, D 662 .) Zurich also argues that even assuming the Kennerson complaint alleges claims for defamation and invasion of privacy, those claims are barred because they stem from "[e]mployment-related practices, policies, acts or omissions, such as ... defamation, harassment, humiliation or discrimination ..." (Zurich's Ex. M, D 629.) The court sees no need to address these arguments, as summary judgment in Zurich's favor is clearly warranted on other grounds.

**Town of Plainfield v. Select Energy Contracting, Inc., Not Reported in A.2d (2007)**

2007 WL 4171603

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

---