1  Keith A. Fink, SBN 146841
   Olaf J. Muller, SBN 247372
2  **FINK & STEINBERG**
   11500 Olympic Boulevard, Suite 316
3  Los Angeles, California 90064
   Telephone: (310) 268-0780
4  Facsimile: (310) 268-0790

A6010
90012
PEPT. 14
TENRY A.
GREEN

**FILED**
Superior Court Of California
County Of Los Angeles

MAY 07 2015

Sherri R. ~~Carter, Executive~~ Officer/Clerk
By_____, Deputy
Judi Lara

5  Attorneys for Plaintiff
   DOV CHARNEY

6

7

8           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9             **LOS ANGELES COUNTY – CENTRAL DISTRICT**

10  DOV CHARNEY, an individual,          **CASE NO.   BC 5 8 1 1 3 0**

11              Plaintiff,               **PLAINTIFF'S COMPLAINT FOR:**

12        vs.                            1.  **DEFAMATION;**
                                         2.  **FALSE LIGHT;**
13  STANDARD GENERAL, L.P., a Delaware   3.  **INTENTIONAL INTERFERENCE**
    limited partnership; STANDARD            **WITH ACTUAL ECONOMIC**
14  GENERAL MASTER FUND, L.P., a New         **RELATIONS;**
    York limited partnership; P STANDARD 4.  **INTENTIONAL INTERFERENCE**
15  GENERAL LTD., a British Virgin Islands   **WITH PROSPECTIVE ECONOMIC**
    limited company; and DOES 1 to 50,       **RELATIONS;**
16  inclusive,                           5.  **VIOLATION OF** *BUS. & PROF.*
                                             *CODE* **§§ 17200,** *ET SEQ.*
17              Defendants.

18                                       **[JURY TRIAL DEMANDED]**

19

20

21

22          COMES NOW PLAINTIFF DOV CHARNEY and hereby alleges as follows:

23                          **INTRODUCTION**

24      1.      This lawsuit centers on press comments issued by Defendant Standard General

25  entities relating to Plaintiff Dov Charney. In December 2014, Defendants falsely claimed to the

26  press and general public that Plaintiff Charney's employment as American Apparel CEO and

Chairman of the Board was terminated by the Board of Directors for "cause" based on the results of a purportedly "independent" investigation conducted by a "third party." Nothing could be further from the truth. In reality, the Standard General-controlled American Apparel Board of Directors paid millions of dollars of the cash-strapped company's funds to American Apparel's outside general counsel Jones Day to manufacture various *ex post facto* excuses for the Board's termination of Charney. Defendants violated almost all of the pertinent contractual terms governing this sham "investigation," which was *not* "independent," nor was it conducted by a "third party." Most egregiously, the Standard General-controlled American Apparel Board literally told Charney that if he did not give up control of American Apparel to them by resigning as CEO and Chairman of the Board and signing over the voting rights to his stock to Defendants (in exchange for which Charney would receive a multi-million-dollar "consultancy" position), Defendants would destroy his character and ruin Charney exactly the way they have endeavored here.

## PARTIES

2.      Plaintiff DOV CHARNEY ("Plaintiff" and/or "Charney") is and at all relevant times hereto was an individual residing in Los Angeles County, California.

3.      Defendant STANDARD GENERAL L.P. ("Defendant" and/or "Standard General") is, and at all times relevant hereto was, a Delaware limited partnership doing substantial business in Los Angeles County, California.

4.      Defendant STANDARD GENERAL MASTER FUND L.P. ("Defendant" and/or "Standard General") is, and at all times relevant hereto was, a New York limited partnership doing substantial business in Los Angeles County, California.

5.      Defendant P STANDARD GENERAL L.P. ("Defendant" and/or "Standard General") is, and at all times relevant hereto was, a British Virgin Islands limited partnership doing substantial business in Los Angeles County, California.

6.      Plaintiff is unaware of the true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 to 50, inclusive ("the Doe Defendants"), and therefore sues said Doe Defendants by such fictitious names. Plaintiff will seek leave of Court to amend this Complaint to show the true names and capacities of such Doe Defendants when the same has been ascertained. Plaintiff is informed, believes, and thereupon alleges that each of the fictitiously-named Defendants is responsible to Plaintiff for the injuries suffered and alleged herein, and/or is subject to the jurisdiction of the Court as necessary party for the relief herein requested.

7.      Plaintiff is informed and believes that Defendant Standard General, and each of the Doe Defendants (hereinafter collectively "Defendants") are now, and were at all times mentioned herein, the agents, principals, partners, joint venturers, employees, joint enterprises, and/or alter-egos of one another and the other Defendants, and that all of the acts and conduct alleged herein were performed within the course and scope and in furtherance of such agency, partnership, joint venture, joint enterprise, employment, and/or alter-ego relationship.

8.      Jurisdiction and venue are proper in this Court because the wrongful acts and omissions alleged occurred in the County of Los Angeles, the harm suffered by Plaintiff occurred in the County of Los Angeles, and Defendants are and at all times relevant herein were doing substantial business in the County of Los Angeles, State of California.

## FACTUAL ALLEGATIONS

9.      Plaintiff re-alleges and incorporates herein by reference the above paragraphs, inclusive, as though fully set forth herein.

*In June 2014, American Apparel's Board Launched Their Secret Plan to Oust CEO and Board Chairman Dov Charney From American Apparel.*

10.     In or around June 2014, American Apparel's Board of Directors abruptly and unlawfully terminated Charney's employment as American Apparel CEO. These Board Members solicited shareholder votes, including but not limited to Charney's own votes, through false and materially misleading proxy statements relating to their plan for the company's future. Charney's termination was part of the Board's then-secret plan to wrest control of the company away from Charney. Charney subsequently learned that this scheme was masterminded by former American Apparel CFO (and subsequently appointed interim CEO) John Luttrell. As Charney later learned, Luttrell secretly worked on selling the company for months beforehand and viewed Charney as an impediment to such a transaction.

11.     At the company's Annual Meeting on or around June 18, 2014, American Apparel's Board of Directors presented two (2) options to Charney. Under the first option, Charney could resign his position as CEO and Chairman of the Board and sign over to the Board the voting rights to his then 47.2 million shares in exchange for which he would receive a multi-million-dollar severance package and remain with the company as a consultant. American Apparel's director Allan Mayer specifically informed Charney that the company had drafted a "positive" press release that would accompany his selection of the first option, a true and correct copy of which is attached hereto as **Exhibit A**.

12.     If Charney refused the first option, American Apparel informed Charney that the company would terminate him "for cause." Several American Apparel board members specifically informed Charney that his termination would be made public and that the company would do anything and everything to destroy Charney's personal and professional reputation and character. Along those lines, Charney was presented with a Notice of Intent to Terminate Employment (the "Termination Notice"), wherein American Apparel listed several accusations as underlying its

1  decision to potentially terminate Charney for "cause." A true and correct copy of this Notice is

2  attached hereto as **Exhibit B**. American Apparel's directors informed Charney that they would

3  leak this Termination Notice to the press if Charney did not permit them effectively take over the

4  company so that they could sell it.

5       13.    Charney started to address the various allegations made against him in the

6  Termination Notice to the Board, explaining how they lacked factual and legal merit. He was cut

7  off. Board member Robert Greene explained to Charney that the specific allegations set forth in

8  the Notice did not matter to the Board, nor were they important. What mattered was that the

9  Board was taking over American Apparel, with or without Charney's acquiescence. If Charney

10 resisted the Board's *coup d'état,* the Board would use the false allegations referenced in the

11 Termination Notice to publicly destroy Charney's character and reputation, particularly in the

12 business community, to prevent him from regaining his CEO position at American Apparel.

13      14.    Charney asked for time to consider his options and consult with legal counsel. The

14 Board denied his requests. After Charney left the Board meeting, American Apparel Board

15 member Mayer told Charney that he had "no choice" and repeated Greene's threat, that if

16 Charney did not resign and support the Board, the Board would "destroy [his] character." Mayer

17 later texted Charney that evening, writing him that he had "until 7 to tell us what you want to do.

18 If we don't hear from you by then, we will assume you've rejected our offer."

19      15.    Charney refused to resign and commenced legal proceedings relating to his

20 unlawful termination. Immediately thereafter, American Apparel's Board launched a campaign

21 designed to harass, intimidate, and slander Charney. The Board ultimately paid millions of dollars

22 to effectuate their attack, involving lawyers, public relations experts, and other media

23 manipulators. Among other things, the renegade Board-controlled American Apparel improperly

24 accessed Charney's personal and private email accounts without his knowledge or consent. They

25 subsequently leaked private nude photographs and videos of Charney obtained from his private

26

email accounts to embarrass and coerce Charney into giving up his fight to regain control of the company.

*After Charney's June 2014 Ouster, Predatory Hedge Fund Defendant Standard General Positioned Itself as Charney's Savior, Gaining His Trust Sufficiently for Standard General to Assert Control Over American Apparel.*

16.     Shortly after Charney's ouster, Defendant Standard General reached out to Charney and positioned itself as Charney's savior, a fund that could lend Charney enough money to reassert control over American Apparel and push out the renegade board members who had unceremoniously ousted him from the company he founded nearly twenty years earlier.

17.     Standard General explained to Charney that it already had spent months conducting an extensive due diligence analysis American Apparel's operations and finances in connection with a major financing offer to American Apparel, which American Apparel had rejected. Among other things, Standard General spent months investigating and thoroughly auditing the substance and outcomes of litigation threatened and filed against American Apparel and Charney in particular, which they concluded were baseless. Standard General's representatives repeatedly informed Charney that they believed his ouster was "ridiculous" and terrible for the company. They explained to Charney that Standard General could lend Charney enough money to reassert control over American Apparel. The parties quickly entered into a series of agreements with the express purpose of placing Charney back in control over American Apparel as its CEO.

18.     Shortly thereafter on or around June 30, 2014, Standard General's junior partner Robert Lavan contacted Charney and told him that the fund's chief executive Soo Kim needed to meet him "on an emergency basis." In hysterical fashion, Kim explained that his relatively conservative investors were unhappy by his association with Charney. Kim claimed that he was being "crucified" by his investors for associating with Charney. Kim further claimed that a major

1    Standard General investor PAAMCO had just pulled $300 million from Standard General as a

2    result of Kim's ongoing association with Charney. Kim told Charney that if Standard General lost

3    the support of its investors, they were "all fucked," Kim would lose his hedge fund, and Charney

4    would lose his battle to regain control over American Apparel.

5        19.    To that end, Standard General's Kim told Charney that a hostile proxy contest over

6    American Apparel would pose too much risk to Standard General's continued operations. In this

7    way, Kim ultimately induced Charney into "settling" with the American Apparel Board of

8    Directors under terms extremely favorable to Standard General but *not* to Charney or to the

9    company's other shareholders. In this way, Standard General effectively took over American

10   Apparel by and through its control of company stock and the Board of Directors.

11       20.    Part of the "settlement" would also include an investigation of the June 2014

12   allegations of wrongdoing made by the renegade Board against Charney. During the subsequent

13   negotiations, Standard General's Kim and partner David Glazek both promised Charney that any

14   such investigation would be impartial and fair. They promised Charney that he would be reinstated

15   as CEO unless the investigation revealed something profoundly egregious of which Standard

16   General was unaware. To further induce Charney into "settling" with the Board, Standard

17   General's Kim further promised Charney that any third party investigating Charney's alleged

18   misconduct would *further* investigate the American Apparel Board of Directors and the legality

19   and propriety of their termination of Charney in June 2014. Because Charney had in fact *not*

20   committed the malfeasance alleged and because he wanted the Board's secret conspiracy to

21   unlawfully terminate his employment to be independently investigated, he agreed to these terms.

22       21.    Thus, on July 9, 2014, Charney, American Apparel, and Defendant Standard

23   General entered into a Nomination, Standstill and Support Agreement (the "Standstill

24   Agreement"), a true and correct copy of which is attached hereto as **Exhibit C.**

25

26

---

22.     Unbeknownst to Charney, the Standstill Agreement's investigation was to be a sham, a show-trial without the trial, and ultimately a means of reinforcing Charney's exit from the company and entrenching Standard General's control over the same, to Charney's and minority shareholders' detriment.

23.     Under the Standstill Agreement, a private investigation company previously employed by American Apparel on many occasions – FTI Consulting, Inc. ("FTI") – was to conduct this investigation of Charney under the oversight of a specially-elected, ostensibly independent Suitability Committee. Standstill Agreement at § 5(a). Charney agreed to be interviewed by FTI as part of this investigation, and he was permitted to "make a statement to the applicable representatives of FTI in connection with such interview." *Id.*

24.     The parties agreed that the investigation was to be completed relatively quickly, i.e. within thirty (30) calendar days of the agreement's July 2014 execution date. Standstill Agreement at § 5(b). After FTI completed its investigation, it was required to present its conclusions and supporting evidence to the Suitability Committee. *Id.*

25.     Not less than one week before the Suitability Committee made its final determination, the Committee was required to provide Charney and Charney's counsel with "the opportunity to meet with the Suitability Committee (such meeting, the 'Preliminary Meeting')." Standstill Agreement at § 5(c). At this meeting, Charney and his counsel were to be presented with "a summary of the evidence and preliminary findings of the Investigation," and they were to be "given a reasonable opportunity to ask questions and respond to such evidence and preliminary findings" at this meeting. *Id.*

26.     After the Preliminary Meeting, at least one additional meeting – the "Final Meeting" – was to take place with Charney, his counsel, and the Suitability Committee before the Suitability Committee made its final decision. Standstill Agreement at § 5(c). At this Final Meeting, Charney and his counsel *again* were supposed to be "given another opportunity to ask

questions and respond to the evidence and preliminary findings presented at the Final Meeting or the Preliminary Meeting."

27. Put simply, the Standstill Agreement expressly gave Charney:

(a) an investigation conducted by ostensibly independent third parties;

(b) the right to communicate directly with the investigators into his alleged misconduct;

(c) the right to receive, review, and respond to a summary of the investigators' conclusions;

(d) the right to receive, review, and respond to the investigators' evidence gathered;

(e) the right to question and cross-examine the investigators with respect to their conclusions and evidence gathered; and

(f) the right to present his own counter-arguments and evidence to the Suitability Committee prior to any final decision by the committee with respect to his position at the company.

*The Charney "Investigation" Was a Sham, a Witch Hunt, a Whitewash Designed by Defendants to Manufacture Ex Post Facto Excuses to Justify Charney's June 2014 Termination.*

28. Charney was denied each and every one of the aforementioned contractual rights listed above, i.e. he was denied the independent, third-party investigation as mandated by and detailed by the Standstill Agreement.

29. Immediately following the execution of the Standstill Agreement, Charney attempted to contact FTI investigators to ask them about the scope of their planned investigation. Defendants, acting by and through American Apparel's general counsel Jones Day, blocked Charney's efforts. Defendants' counsel Jones Day informed Charney that he was forbidden from

1  contacting or communicating with FTI in any fashion whatsoever except *through* Jones Day, i.e.

2  *through* American Apparel's attorneys.

3      30.    Jones Day made clear to Charney that *it* was overseeing and conducting this

4  investigation on behalf of their client, the Standard General-controlled American Apparel, not the

5  ostensibly neutral Suitability Committee, nor FTI. Jones Day further wrote to Charney that it was

6  also serving as counsel to FTI, such that all communications by and between these parties would

7  be attorney-client privileged. In this way, Charney came to learn that there would be *no*

8  "independent" investigation conducted by a "third party."

9      31.    For its part, Jones Day agreed to perform these "services" to the Standard

10  General-controlled American Apparel notwithstanding the massive conflict of interest and

11  breaches of fiduciary, ethical, and contractual duties incumbent thereto. Jones Day conducted this

12  "investigation" despite the fact that it continued to serve as American Apparel's defense counsel

13  during Charney's concurrently proceeding arbitration relating to his June 2014 wrongful

14  termination from the company.

15      32.    According to the company's publicly-filed financial disclosures, the cash-strapped

16  American Apparel ultimately paid Jones Day millions of dollars in "fees" ostensibly for a few

17  months of worth of work connected to the same. In receiving such payment from the now Standard

18  General-controlled Board of Directors, Jones Day literally received millions of reasons from the

19  Standard General-controlled American Apparel to take their side of this dispute and conclude that

20  Charney was "unfit" to serve American Apparel as its CEO.

21      33.    The sham, show trial nature of the investigation was further underscored by the fact

22  that Charney never received the contractually-mandated investigators' report, nor was Charney

23  permitted to speak with FTI investigators about their findings, nor was he given copies of any

24  "evidence" they gathered as part of their investigation (assuming any such evidence was actually

25

26

1   gathered). When it ultimately came time for Charney to rebut the investigators' findings and

2   conclusions, Charney had nothing to rebut.

3       34.    Plaintiff Charney protested all of the above developments to no avail. He repeatedly

4   demanded that the Standard General-controlled American Apparel comply with its contractual

5   obligations and give him the fair, impartial, and thorough investigation pursuant to the terms of the

6   Standstill Agreement. American Apparel ignored and/or refused his demands, writing Charney

7   that it was "not obligated" to comply with any of his requests.

8

9   *In December 2014, Defendants Again Offered Charney a Multi-Million-Dollar-Paying Consultancy Job*
10  *If He Would Give Up His Fight to Regain Control of American Apparel.*

11      35.    In or around December 2014, *before* the sham investigation was concluded and

12  *before* Charney had an opportunity to present any rebuttal of the same, the Standard General-

13  controlled American Apparel contacted Charney. As in June 2014, when he was first

14  "terminated," Defendants made Charney another job offer in the form of a "consultancy /

15  settlement agreement." Defendants feared Charney's ongoing efforts to take American Apparel

16  private would succeed and Defendants would be forced to relinquish control of American Apparel,

17  which would be contrary to Standard General's best interests in particular.

18      36.    Further underscoring the sham nature of the "investigation," Defendants again

19  offered to prematurely terminate the investigation and give Charney a position at the company.

20  The Standard General-controlled Board offered Charney even more money than he had been

21  offered earlier, *if* Charney agreed to give up his fight to wrest control of the company back from the

22  Standard-General-controlled Board and release all of his claims against Defendants and American

23  Apparel, including but not limited to his shareholder claims for proxy fraud and fiduciary breaches.

24  Defendants expressly informed Charney that if he did not accept this "framework," the Suitability

25  Committee would definitely terminate his employment within ten (10) calendar days. To further

26  pressure Charney into taking their offer, Defendants simultaneously announced that the

1  investigation had concluded and that the tenth day forward was the "Clearance Determination"

2  date for the investigation. In other words, Charney was given all of ten (10) calendar days to

3  assemble his rebuttal of the investigators' findings, even though he had yet to receive these

4  findings or any evidence supporting the same.

5        37.    In so doing, Defendants again all but told Charney that the aforementioned

6  investigation was a sham, that it was fixed against him from the start, and that its sole purpose was

7  to justify Charney's ouster.

8        38.    Charney rejected Defendants' second consultancy offer and pressed forward with

9  the sham investigation to its inevitable result. As Charney noted via counsel in a December 8, 2014

10 letter, Charney "still ha[d] not been given access to the witnesses and information" he needed to

11 prepare his response, including but not limited to the investigation file and any evidence relied

12 upon by the investigators. Charney never received *any* facts or evidence supporting the initial

13 allegations made against him, nor was he given the investigation file, nor does he believe any such

14 document was ever created or presently exists (which tracks Charney's "missing" American

15 Apparel personnel file, which was "lost" by the company under mysterious circumstances

16 following his termination).

17       39.    As Charney noted in a December 14, 2014 letter from his counsel to the Standard

18 General-controlled American Apparel's attorneys, the Suitability Committee investigation "was

19 biased from the outset in that you and your law firm (Jones Day) were all times counsel to the

20 [Suitability Committee] as well as investigators into Mr. Charney's suitability.... Your firm was

21 not only involved in the decision to fire Mr. Charney but you were the person who conducted the

22 investigation prior to June 18, 2014 into the allegations set forth in the notice to terminate (which

23 you wrote) and you were counsel hired to defend the arbitration initiated by Mr. Charney against

24 the company. It is incredulous that anyone could find you or your firm to be objective with respect

25 to Mr. Charney. You and Jones Day have 'millions' of reasons why you would want the Suitability

26

1    Committee to determine Mr. Charney was unsuitable…. We raised… the issue of bias as to your

2    firm on the one hour initial telephone call with the [Suitability Committee]…. We asked that your

3    firm have no involvement in the Suitability Committee process. No arguments were given by

4    anyone opposing the merits of our points…. About a month after our call YOU informed us that

5    the request to remove YOUR law firm had been denied. No reason was given for the denial."

6         40.    As Charney's counsel further noted in this letter, "[a]ll that can be said about the

7    [Suitability Committee] process to date is that its history reads like a Kafkaesque kangaroo court at

8    best, and at worst, like a star chamber. Mr. Charney is told that he could rebut the charges/findings

9    against him prior to a clearance determination, yet he is not told what charges/findings FTI made.

10   Mr. Charney is told that he can rebut the evidence relied upon by FTI but is not told what

11   evidence FTI relied upon to reach any finding nor what witnesses FTI interviewed. Mr. Charney is

12   told he can ask questions relative to the FTI interview but is allowed to interview not a single

13   person he asks to interview – not even the FTI investigator!"

14        41.    As such, under this set of circumstances and *not* for the reasons later claimed via

15   press release, on or around December 15, 2014, the Standard General-controlled American

16   Apparel wrote Charney terminating his employment with American Apparel for "cause."

17

18   *Defendants Have Since Maliciously Defamed Charney to Prevent Him From Obtaining Assistance From the Business Community to Regain Control of American Apparel.*

19        42.    Notwithstanding this termination, Charney remained the majority shareholder in

20   American Apparel. As such, Charney retained and still retains some stock-related rights with

21   respect to the company.

22        43.    To prevent Charney from regaining control of the company, Defendants launched a

23   second anti-Charney publicity campaign designed to destroy Charney's personal and professional

24   reputation. Spokespersons for Defendants falsely informed various press outlets that Charney was

25

26

1  terminated for "cause" based on the results of an "independent investigation" conducted by a

2  "third party."

3          44.     Specifically on or around December 22, 2014, Defendant Standard General,

4  speaking via spokesperson Liz Cohen of public relations agency Weber Shandwick made

5  comments to press outlets regarding Plaintiff Charney, which comments contained numerous

6  defamatory falsehoods knowingly made about Charney by Defendant Standard General. Standard

7  General's spokesperson wrote that the hedge fund "supported the independent, third-party[1] and

8  very thorough investigation into the allegations against Mr. Charney, and respect the board of

9  director's decision to terminate him based on the results of that investigation." True and correct

10 copies of press articles referencing this quoted statement are attached hereto and incorporated

11 herein as **Exhibit D**. These statements were repeated verbatim and in substance in news outlets

12 around the world.

13

14

15 *In March 2015, American Apparel's General Counsel Admitted in Writing That NO Independent, Third Party Investigation of Charney Occurred.*

16         45.     On or around February 20, 2015, Charney (acting via counsel) wrote American

17 Apparel demanding a copy of his "new" personnel file, stemming from his second, post June 2014

18 termination with the company. A true and correct copy of the ensuing exchange is attached hereto

19 as **Exhibit E**. Charney also demanded copies of the investigative file underlying his December

20 2014 termination. *Id.*

21         46.     In response, American Apparel (acting via general counsel) wrote Charney's

22 attorneys on or around March 9, 2015. *Id.* In its response letter, American Apparel admitted that

23 _____

24 [1] Notably, Standard General's press release contradicted American Apparel's December 16, 2014 press release relating to the same. In its own press release, American Apparel acknowledged

25 that its investigation was "internal" whereas Standard General falsely claimed that this investigation was conducted by an outside, disinterested "third party."

26

1   "**FTI's investigation… was conducted at the request of counsel** to [American Apparel's] Audit

2   Committee [such that] any such materials are [attorney-client] privileged" (emphasis added). *Id.*

3   In other words, American Apparel admitted in writing that there was **no independent, third party**

4   **investigation** of Charney that led to his termination. *Id.* Instead, the Standard General-controlled

5   American Apparel, i.e. the very people who wanted to fire Charney, who conspired against him to

6   wrest away control of the company, and who violated the various provisions of the Standstill

7   Agreement, directed the "investigation" into whether Charney was "unfit" to remain as company

8   CEO and Board Chairman. *Id.*

9

10   ## FIRST CAUSE OF ACTION

11   ### DEFAMATION

12   **(BY PLAINTIFF AGAINST ALL DEFENDANTS AND DOES 1-50)**

13   47.   Plaintiff repeats, re-alleges, and incorporates by reference the above paragraphs as

14   though fully set forth herein.

15   48.   On or around December 22, 2014, Defendants made a number of statements

16   containing falsehoods, exaggerations, and/or inaccuracies about Plaintiff as set forth above, namely

17   that he was terminated from American Apparel's employment for "cause" based on the results of

18   an "independent" "investigation" conducted by a "third party." The statements made by

19   Defendants portrayed Plaintiff Charney as someone found liable and/or guilty by "independent"

20   and "third party" investigators of committing financial malfeasance and illegal sexual harassment

21   and discrimination sufficient to terminate his employment for "cause."

22   49.   Defendants' aforementioned characterizations of Plaintiff are false, defamatory,

23   and libelous on their face because they charge Plaintiff with engaging in illegal and criminal

24   misconduct, clearly expose Plaintiff to hatred, contempt, ridicule, and obloquy, and charge

25   Plaintiff with improper and immoral conduct. By and through these statements, Defendants have

26

1   caused severe, irreparable harm to Plaintiff's personal and professional reputation, and they have

2   and will continue to cause prospective clients and business associates to shun and avoid doing

3   business with Plaintiff, particularly with respect to his ongoing attempts to regain control of his

4   company American Apparel.

5        50.    Defendants made these statements either with knowledge that they were false and

6   defamatory of Plaintiff and/or, if the false and defamatory nature of these statements was not

7   known to Defendants, with reckless disregard for their obvious falsity and defamatory nature.

8        51.    As a direct and proximate result of the above-described defamatory statements,

9   Plaintiff has suffered and will continue to suffer loss of his personal and professional reputation,

10   shame, mortification, and emotional distress all to his general damage, but which Plaintiff is

11   informed and believes will exceed $20,000,000, plus interest accrued and growing.

12        52.    Each of Defendants' acts as described above was willful, oppressive, fraudulent,

13   and malicious, within the meaning of California *Civil Code* § 3294, thereby entitling Plaintiff to

14   recover exemplary and punitive damages against each Defendant in amounts according to proof at

15   trial, which Plaintiff is informed and believes will collectively exceed $10,000,000.

16

17   ## SECOND CAUSE OF ACTION

18   ### FALSE LIGHT

19   **(BY PLAINTIFF AGAINST ALL DEFENDANTS AND DOES 1-50)**

20        53.    Plaintiff repeats, re-alleges, and incorporates by reference the above paragraphs as

21   though fully set forth herein.

22        54.    On or around December 22, 2014, Defendants made a number of statements

23   containing falsehoods, exaggerations, and/or inaccuracies about Plaintiff as set forth above, namely

24   that he was terminated from American Apparel's employment for "cause" based on the results of

25   an "independent" "investigation" conducted by a "third party."

26

1     55.    In making these statements to the press, which statements were subsequently

2  republished online and which were repeated throughout media outlets around the world,

3  Defendants have created publicity that placed Plaintiff in a false light in the public eye.

4     56.    The publicity created by Defendants placed Plaintiff in a false light in the public eye

5  because the statements made by Defendants portrayed Plaintiff Charney as someone found liable

6  and/or guilty by "independent" and "third party" investigators of committing financial

7  malfeasance and illegal sexual harassment and discrimination sufficient to terminate his

8  employment for "cause."

9     57.    The publicity created by Defendants' statements was offensive and objectionable to

10  Plaintiff and to a reasonable person of ordinary sensibilities in that they charged Plaintiff with

11  engaging in illegal and criminal misconduct, clearly exposed Plaintiff to hatred, contempt, ridicule,

12  and obloquy, and charged Plaintiff with improper and immoral conduct.

13     58.    Defendants made these statements either with knowledge that they were false and

14  defamatory of Plaintiff and/or, if the false and defamatory nature of these statements was not

15  known to Defendants, with reckless disregard for their obvious falsity and defamatory nature.

16     59.    As a direct and proximate result of the above-described defamatory statements,

17  Plaintiff has suffered and will continue to suffer loss of his personal and professional reputation,

18  shame, mortification, and emotional distress all to his general damage, but which Plaintiff is

19  informed and believes will exceed $20,000,000, plus interest accrued and growing.

20     60.    Each of Defendants' acts as described above was willful, oppressive, fraudulent,

21  and malicious, within the meaning of California *Civil Code* § 3294, thereby entitling Plaintiff to

22  recover exemplary and punitive damages against each Defendant in amounts according to proof at

23  trial, which Plaintiff is informed and believes will collectively exceed $10,000,000.

24

25

26

### THIRD CAUSE OF ACTION

### INTENTIONAL INTERFERENCE WITH

### ACTUAL ECONOMIC RELATIONS

#### (BY PLAINTIFF AGAINST ALL DEFENDANTS AND DOES 1-50)

61.     Plaintiff repeats, re-alleges, and incorporates by reference the above paragraphs as though fully set forth herein.

62.     In December 2014, Defendants, acting with the intent to destroy, hinder, and/or otherwise interfere with Plaintiff's aforementioned business, willingly and willfully attempts to destroy, hinder, and/or otherwise disrupt Plaintiff's ongoing negotiations to obtain third-party assistance to regain control over American Apparel, whether in the form of a hostile proxy contest, private buy-out, or similar such transaction. Defendants did this by making their aforementioned defamatory and false statements about Plaintiff, which were republished online.

63.     As a direct and proximate result of Defendants' conduct, Plaintiff has and will continue to experience tremendous difficulty regaining control over American Apparel, whether in the form of a hostile proxy contest, private buy-out, or similar such transaction.

64.     As a direct and proximate result of the above-described defamatory statements, Plaintiff has suffered and will continue to suffer loss and damage to his business and goodwill in an amount to be proven at trial but which Plaintiff is informed and believes will exceed $20,000,000, plus interest accrued and growing.

65.     Each of Defendants' acts as described above was willful, oppressive, fraudulent, and malicious, within the meaning of California *Civil Code* § 3294, thereby entitling Plaintiff to recover exemplary and punitive damages against each Defendant in amounts according to proof at trial, which Plaintiff is informed and believes will collectively exceed $10,000,000.

# FOURTH CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH

## PROSPECTIVE ECONOMIC RELATIONS

### (BY PLAINTIFF AGAINST ALL DEFENDANTS AND DOES 1-50)

66.    Plaintiff repeats, re-alleges, and incorporates by reference the above paragraphs as though fully set forth herein.

67.    Plaintiff has actively negotiated with individuals and entities to obtain financing necessary to purchase shares of American Apparel, re-install himself as CEO of the company, and regain control of American Apparel, whether in the form of a hostile proxy contest, private buy-out, or similar such transaction. Plaintiff otherwise has negotiated with individuals and entities to potentially work for other clothing companies, to engage in passive investments within the apparel industry, to start another competing clothing company, and to obtain financing for the same.

68.    In December 2014, Defendants, acting with the intent to destroy, hinder, and/or otherwise interfere with Plaintiff's aforementioned business negotiations, willingly attempted to destroy, hinder, and/or otherwise stop these aforementioned business negotiations. Defendants did this by making their aforementioned defamatory and false statements about Plaintiff to the press, which were republished online.

69.    As a direct and proximate result of Defendants' conduct, Plaintiff's aforementioned third parties previously willing to assist Plaintiff's efforts to regain control over American Apparel have been dissuaded from doing business with Plaintiff.

70.    As a direct and proximate result of the above-described defamatory statements, Plaintiff has suffered and will continue to suffer loss and damage to his business and goodwill in an amount to be proven at trial but which Plaintiff is informed and believes will exceed $20,000,000, plus interest accrued and growing.

71.     Each of Defendants' acts as described above was willful, oppressive, fraudulent, and malicious, within the meaning of California *Civil Code* § 3294, thereby entitling Plaintiff to recover exemplary and punitive damages against each Defendant in amounts according to proof at trial, which Plaintiff is informed and believes will collectively exceed $10,000,000.

## FIFTH CAUSE OF ACTION

## VIOLATIONS OF

## *BUSINESS & PROFESSIONS CODE* §§ 17200, *ET SEQ.*

## (BY PLAINTIFF AGAINST ALL DEFENDANTS AND DOES 1-50)

72.     Plaintiff repeats, re-alleges, and incorporates by reference the above paragraphs as though fully set forth herein.

73.     In engaging in the wrongful acts set forth above, Defendants engaged in "unfair business acts" and "false advertising" within the meaning of *Business & Professions Code* §§ 17200, *et seq.*

74.     Unless restrained, Defendants will continue to republish their false, defamatory, and demeaning statements regarding Plaintiff to the general public, which is likely to be deceived by the same and which is likely to both avoid business with Plaintiff.

75.     Pursuant to *Business & Professions Code* § 17203, Plaintiff seeks an Order from this Court that:

> (a)     Provides injunctive and declaratory relief finding that Defendants have violated the provisions of *Business and Professions Code* §§ 17200, *et seq.*; and

> (b)     For an order enjoining Defendants and their respective successors, agents, servants, officers, directors, employees, and all other persons acting in

1    concert with them, directly or indirectly, from further engaging in conduct

2    which violates *Business and Professions Code* §§ 17200, *et seq.*

3

4                              **PRAYER FOR RELIEF**

5         WHEREFORE, Plaintiff DOV CHARNEY prays for judgment against Defendant

6    STANDARD GENERAL L.P., Defendant STANDARD GENERAL MASTER FUND L.P.,

7    Defendant P STANDARD GENERAL L.P., and DOE DEFENDANTS NOS. 1 through 50 as

8    follows:

9         1.    For general and compensatory damages, including prejudgment interest, in

10              accordance with proof at the time of trial, in the minimum amount of $20,000,000;

11        2.    For punitive damages, where permitted, to be determined at trial, in the minimum

12              amount of $10,000,000;

13        3.    For Plaintiff's costs and attorneys' fees, where permitted;

14        4.    For a preliminary and permanent injunction against Defendants from the unfair

15              business acts and acts of false advertising as described in the Fifth Cause of Action;

16              and

17        5.    For such other and further relief as the Court may deem just and proper.

18   Dated: May 7, 2015                        FINK & STEINBERG

19

20                              By:            _____
                                               Keith A. Fink
21                                             Olaf J. Muller
                                               Attorneys for Plaintiff
                                               DOV CHARNEY

22

23

24

25

26

Exhibit A

"We are grateful to Dov Charney for his dedication and visionary leadership in creating one of the most powerful and widely recognized apparel brands of the last twenty years," Mr. Mayer said. "Since the company's founding in 1998, American Apparel has grown into a global enterprise, operating 249 stores and employing 10,000 people throughout the world," said Mr. Danziger, who has chaired the Board's Audit Committee since 2011. "We look forward to Dov's continued contributions to the company in his new role."

**CONFIDENTIAL**

June 18, 2014

**<u>Via Hand Delivery To</u>**:
Dov Charney in New York

**<u>Via Certified Mail (7005 1820 0006 1268 8242)</u>**
**<u>Return Receipt Requested To</u>**:
Dov Charney
18 Apex Avenue
Los Angeles, California 90026

747 Warehouse Street
Los Angeles, California 90021

> Re:   *Notice of Events and Circumstances Amounting to Cause*
> *Notice of Intent to Terminate Employment*

Dear Mr. Charney:

Pursuant to Section 7(a) of your Employment Agreement dated April 1, 2012 (the "Employment Agreement"), the Board of Directors of American Apparel, Inc. (the "Company") hereby provides notice that (i) you have willfully and continuously failed to substantially perform your job duties under the Employment Agreement and (ii) you have engaged in willful misconduct that has materially injured the financial condition and business reputation of the Company. Based on your failures and misconduct, the Board intends to terminate your employment with the Company <u>for cause</u> effective July 19, 2014 unless you are able to fully effect a cure in accordance with the terms of the Employment Agreement.

The Board's investigation of your misconduct is ongoing and has been hindered by the fact that certain information has not been made available to the Board. However, to date, the events and circumstances by which you failed to perform your job duties and the details of your willful misconduct include the following:

1.      <u>Breach of Fiduciary Duty</u>. As an officer and director of American Apparel, you owe fiduciary duties to the Company. Among other things, your fiduciary obligations require you to act in the best interests of the Company, to act in good faith and to refrain from conduct that amounts to self dealing or presents a conflict of interest. You have violated the fiduciary obligations owed to the Company in several material ways. For example, you were aware of, but took no steps to prevent an employee under your direct supervision and control from creating and maintaining false, defamatory and impersonating blog posts about former American Apparel employees. You were in a position to prevent this conduct from occurring but, since it benefitted you personally, you allowed it to continue. Your failure to act was not in the best interest of the Company. It exposed the Company to liability and at least in once instance,

Dov Charney                                                    **CONFIDENTIAL**
June 18, 2014
Page 2 of 4

directly resulted in an arbitrator finding that the Company acted with malice. Your failure to act also directly resulted in one arbitrator finding that the Company was vicariously liable for the conduct of your subordinate. Those findings, in turn, exposed the Company to a significant punitive damages award. You engaged in similar misconduct with respect to several other former American Apparel employees, resulting in material payments and probable future settlements of such claims.

We also recently learned that you presented significant severance packages to numerous former employees (including packages to Tina Pellegrino, Shannon Nadj and Josephine Delapaz) to ensure that your misconduct vis-a-vis these employees would not subject you to personal liability. None of these severance packages were discussed with or approved by the Board of Directors. These severance packages were material expenditures of Company funds that were not in the best interests of the Company and instead were to protect you from personal liability for misconduct.

Moreover, we were recently appraised that you engaged in misconduct – including the potential subordination of perjury – in a pending litigation matter and that your misconduct will undermine the Company's position in that case.

2.     Violation of Company Policy. You have violated numerous Company policies and have failed to take action to enforce the Company's policies in derogation of your obligations as Chief Executive Officer. As is evident from a number of recent court rulings and arbitrator awards and decisions, you repeatedly engaged in conduct that violated the Company's sexual harassment and anti-discrimination policy. Furthermore, you engaged in conduct that repeatedly put yourself in a position to be sued by numerous former employees for claims that include harassment, discrimination and assault.

In the recent past, you refused to participate in mandatory sexual harassment training and undermined the Company's policies by interrupting employee sexual harassment training mandated under California law. By engaging in such conduct, you violated the Company's Code of Ethics which, among other things, requires you to deter wrongdoing and promote compliance with applicable law, rules and regulations. You also violated the Code of Ethics by failing to stop your subordinate from posting false and defamatory blogs as discussed above. Furthermore, on several occasions you have made derogatory and disparaging remarks directed at persons of certain ethnicities or related to their gender, sexual orientation or religious persuasions that are discriminatory and offensive and are not in accordance with Company policies.

3.     Misuse of Corporate Assets. You have used corporate assets in an inappropriate manner and for personal, non-business reasons without approval of the Board. For example, you continue to seek reimbursement by the Company for personal services such as legal consultation and certain property rentals and related expenses for various employees/consultants. The Board has reason to believe that many of these expenses were not legitimately incurred to advance the interests of the Company. These funds were instead used for personal reasons and to advance your personal objectives. Additionally, you have used Company assets to make substantial severance payments to protect you from personal liability. You have provided to employees

Dov Charney                                                                    **CONFIDENTIAL**
June 18, 2014
Page 3 of 4

various salary increases, bonuses, and commission payments that were not meant to reward exemplary performance or further the Company's interests. Instead, you authorized these payments to induce employees to sign release agreements that were aimed at protecting you from personal liability for your misconduct. These payments, like the severance payments discussed above, were incurred for personal reasons and not to advance the legitimate business interests of the Company. You also have engaged in self dealing by purchasing travel for family members with Company funds. These self-dealing transactions were not approved by the Board.

Your misconduct has injured the Company's financial condition and business reputation. In terms of finances, your conduct has required the Company to incur significant and unwarranted expenses, including expenses associated with litigation and defense costs, significant settlement payments, substantial severance packages that were granted to employees, and unwarranted business expenses that you incurred for personal reasons. The Company's employment practices liability insurance retention has grown to $1 million from $350,000, causing an unacceptable level of risk for the Company, and the premiums for this insurance are well outside of industry standards. These risks and costs to the Company are a direct result of your actions. The resources American Apparel had to dedicate to defend the numerous lawsuits resulting from your conduct, and the loss of critical, qualified Company employees as a result of your misconduct are also costs that cannot be overlooked.

Your misconduct has also harmed the business reputation of the Company. This is illustrated by voluminous press reports describing your behavior and the fact that the Company has had a very difficult time raising capital and securing debt financing at reasonable rates because of your actions. Indeed, many financing sources have refused to become involved with American Apparel as long as you remain involved with the Company. When the Company has been able to secure financing, it has been required to pay a significant premium for that financing in significant part because of your conduct.

Based on the events and circumstances detailed above, you are hereby suspended and placed on administrative leave effective today, June 18, 2014. Your suspension and administrative leave will last until July 19, 2014 or until such earlier time as you are able to fully effect a cure of your misconduct. On July 19, 2014 we will inform you of our final decision concerning your employment status.

Effective immediately, you will be relieved of all of your job duties and obligations, including as President and Chief Executive Officer; your power to act on the Company's behalf is hereby suspended. During your suspension, you shall not, on behalf of the Company, negotiate or enter into contracts, disburse funds, make any statements on the Company's behalf to the press, public or vendors (or induce, condone or fail to prevent others from making such statements), attempt to communicate with current employees or former employees with continuing contractual obligations to the Company (including under severance arrangements), or disrupt or interfere in any way with the Company's operations. You remain subject to and must continue to abide by the Company's policies, including the Company's confidentiality and non-disparagement policy. You also remain subject to continuing obligations under federal securities laws (including the prohibition against unauthorized disclosure of, or trading while in possession

Dov Charney                                                          **CONFIDENTIAL**
June 18, 2014
Page 4 of 4

of, material non-public information) and continuing fiduciary duties under state law. During your suspension, you are not permitted to access directly or indirectly the Company's computer systems or files, use any of the Company's assets, or interact with any of the Company's employees or former employees with continuing contractual obligations to the Company, visit the Company's facilities (including but not limited to its manufacturing facilities, headquarters, distribution center, apartments and stores), or contact vendors or landlords, unless you obtain advance written permission from the Board of Directors and your request is tied directly to an attempt to cure the violations and misconduct described herein.  If you violate the directives outlined in this paragraph, the Board will consider such conduct an additional "cause" to terminate your employment. During your suspension, you will continue to receive your monthly salary and the other benefits required to be paid under your Employment Agreement.

The Board is continuing to investigate the scope and extent of your misconduct.  The Board reserves the right to notify you of additional events and circumstances that constitute cause to terminate your employment.  The Board also reserves the right to supplement and amend this notice as additional information is learned through the course of its ongoing investigation into your actions.

If you require additional details concerning the events and circumstances amounting to cause as outlined in this letter, please contact Tobias S. Keller, the Company's Interim General Counsel at (213) 488-0226.

Sincerely,

_____
On behalf of the Board of Directors
of American Apparel, Inc.

Exhibit C

EXECUTION COPY

## NOMINATION, STANDSTILL AND SUPPORT AGREEMENT

This Nomination, Standstill and Support Agreement, dated as of July 9, 2014 (this "Agreement"), is by and among the persons and entities listed on Schedule A hereto (collectively, the "Standard General Group" and each, individually, a "member" of the Standard General Group), and American Apparel, Inc., a Delaware corporation (the "Company").

### RECITALS

WHEREAS, the Standard General Group beneficially owns 74,560,813 shares of common stock of the Company, par value $0.0001 per share (the "Common Stock") (excluding 1,178,097 shares of Common Stock held by Standard General Master Fund L.P. for its own account and 361,903 shares of Common Stock held by P STANDARD GENERAL LTD. for its own account), representing approximately 42.98% of the Common Stock issued and outstanding as of May 1, 2014; and

WHEREAS, the Company and the Standard General Group have determined that it is in their respective best interests to come to an agreement with respect to certain matters, as provided in this Agreement.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Board Matters.

(a) The Directors identified on Schedule B (the "Directors") as resigning directors (the "Resigning Directors") shall resign from the Board of Directors of the Company (the "Director Resignations") with effect on the tenth day following the date of the Company's filing of an Information Statement on Schedule 14f-1 (the "Schedule 14f-1") with the United States Securities and Exchange Commission (the "SEC") relating to such Director Resignations and the Director Appointments (as defined herein) pursuant to Rule 14f-1 promulgated under the Securities Exchange Act of 1934 (as amended) (the "Exchange Act").

(b) Immediately following the Director Resignations, the Directors then still in office shall appoint the following individuals to fill the vacancies resulting from the Director Resignations: one individual designated by Standard General L.P. ("Standard General") to the Company to serve as a Class A director of the Company (the "Class A Designee"), two other individuals designated by Standard General to the Company to serve as Class B directors of the Company (the "Class B Designees" and, together with the Class A Designee, the "Standard General Designees") and two other individuals



mutually agreed between Standard General and the Company to serve as Class C directors of the Company (the "Joint Designees" and together with the Standard General Designees, the "New Board Designees") each to serve until their successors are duly elected and qualified (the "Director Appointments"). David Danziger and Allan Mayer shall each continue to serve as a Co-Chairman of the Board.

(c)     Charney will not serve as a Board member or be nominated by the Company or Standard General as a Board member.

(d)     As promptly as practicable following the date of this Agreement, and in any event within five business days after the date hereof, the Company shall file with the SEC and transmit to applicable holders of securities of the Company the Schedule 14f-1. The Standard General Group shall promptly provide the Company, and in any event within three business days after the date hereof, any information reasonably necessary concerning the Standard General Designees in connection therewith and requested by the Company within one business day after the date hereof, including the Nomination Documents (as hereinafter defined).

(e)     Each New Board Designee, other than the Class A Designee, (i) constitutes an independent director of the Board under the rules of the NYSE MKT LLC (an "Independent Director"), (ii) is not affiliated with or have any material relationship with the Standard General Group and (iii) is not affiliated with or have any material relationship with Dov Charney ("Charney"). The Board shall make a determination as to the Class A Designee's independence under applicable NYSE MKT LLC independence rules after the Director Resignations and the Director Appointments have occurred, and, if he or she is determined to so qualify, he or she shall be an Independent Director for all purposes hereunder.

(f)     For so long as no member of the Standard General Group (other than Charney) has breached Section 3 of this Agreement, and subject to compliance by the members of the Board with their fiduciary duties, the Company shall use its reasonable best efforts to cause the election, at the 2015 Annual Meeting of Stockholders of the Company (the "2015 Annual Meeting") of each such New Board Designee as a director of the Company (including by including each such New Board Designee in the Company's proxy statement for such Annual Meeting, recommending that the Company's stockholders vote in favor of the election of each such New Board Designee and otherwise supporting each such New Board Designee for election in a manner no less rigorous and favorable than the manner in which the Company supports its other nominees).

(g)     Each committee of the Board existing as of the date of this Agreement or created after the date hereof (a "Board Committee") shall consist of Independent Directors, provided that (i) the Class A Designee shall be permitted to serve on any such committee, subject to NYSE MKT LLC independence rules and other independence rules

2

under applicable law and regulation and (ii) the Suitability Committee (as defined herein) shall have the composition set forth herein. So long as any Standard General Designee serves on the Board, at least one Standard General Designee shall be offered the opportunity to be a member of each Board Committee, provided that such Standard General Designee meets independence requirements under applicable regulatory standards, and, upon the acceptance of any Standard General Designee of any offer to become a member of any Board Committee, the Board shall effect such change in the composition of such Board Committee immediately (and no less than two business days following such acceptance); provided further that the majority of the members of each Board Committee shall be comprised of Independent Directors other than Standard General Designees and at least 1/3 of the members of each such Board Committee shall be Standard General Designees unless Standard General otherwise agrees.

(h)     For so long as a Standard General Designee is a member of the Board, except as otherwise provided in Section 5(a), the Board shall not create an executive committee, and shall cause the dissolution of any currently existing executive committee, including the Executive Succession Committee. For purposes of this Section 1(g), the term "executive committee" shall include any committee of the Board that is empowered, instructed to, tasked with or otherwise takes any action or proposes to take any action regarding any matter that relates to the Company's strategic direction, extraordinary transactions or any other matters that are of a material nature to the Company; provided that nothing in this Section 1(g) shall prohibit the Company or the Board from creating a committee that does not include any Standard General Designees to consider specific matters that involve conflicts of interests between the Company and any member of the Standard General Group (other than Charney) if it would be prudent as a matter of law to exclude the Standard General Designees from membership on such committee.

(i)     As promptly as practicable after the date hereof, and in any event within three business days after the date hereof, the Standard General Group and the Board shall provide to the Company an executed consent from each New Board Designee and a completed D&O Questionnaire in the form previously provided to the Standard General Group (collectively, the "Nomination Documents"). After the date hereof, each New Board Designee shall promptly provide to the Company, as requested by the Company from time to time, such information as the Company is entitled to reasonably receive from other members of the Board, including as is required to be disclosed in the Schedule 14f-1 and proxy statements under applicable law.

(j)     At all times while serving as a member of the Board, the New Board Designees shall comply with all policies, procedures, processes, codes, rules, standards and guidelines applicable to Board members, including the Company's code of business conduct and ethics, securities trading policies, Regulation FD-related policies, director confidentiality policies and corporate governance guidelines, in each case that have been identified to the New Board Designees, and preserve the confidentiality of Company

3

business and information, including discussions or matters considered in meetings of the Board or Board Committees (all subject to Section 4 of this Agreement); provided, however, that the Company acknowledges that Standard General and its Affiliates (except for Charney, the "Standard General Affiliates") manage a large pool of capital in its normal course of business and invest in many public and private securities, and the Company agrees that the service of the Standard General Designees on the Board shall not prevent Standard General and its Affiliates from investing in any companies or businesses in the ordinary course of business of Standard General or such Affiliates so long as such investment was not made on the basis of confidential information received by a Standard General Designee in his or her capacity as a member of the Board or any Committee. For purposes of this Agreement, the term "Affiliate" shall have the meaning set forth in Rule 12b-2 promulgated by the SEC under the Exchange Act.

(k)     So long as any Standard General Designee is a member of the Board, and subject to Section 2(d), the Company shall not take any action, or support or encourage any action, to amend the Bylaws of the Company (the "Company Bylaws") to increase the size of the Board or change the number of votes any member of the Board has with respect to any matter; provided, however that the Board may amend the Company Bylaws to increase the size of the Board of Directors in connection with any capital raising activity after the Director Appointments have occurred with the consent of Standard General (which consent shall not be unreasonably withheld, conditioned or delayed).

(l)     So long as any Standard General Designee is a member of the Board, (i) no single individual shall serve as both Chairman of the Board and Chief Executive Officer ("CEO") of the Company and (ii) the Chairman of the Board shall be an Independent Director.

(m)     The Company and the Standard General Group shall use their reasonable best efforts to procure from Lion Capital (Guernsey) II Limited ("Lion") a waiver of Lion's right to designate persons for nomination for election to the Board pursuant to the Investment Agreement, dated as of March 13, 2009, between the Company and Lion (as amended).

(n)     The Standard General Designees shall be appointed to the Board as provided herein unless the representations of Standard General set forth in Section 10(c)(ii) (viewing the independence rules of NYSE MKT LLC from the perspective of a board of directors acting reasonably) are inaccurate with respect to any such Standard General Designee. In such event, Standard General shall nominate a new Standard General Designee with respect to whom such representations are accurate to fill such vacancy and such Standard General Designee shall be appointed to the Board as provided herein. Each of the Joint Designees shall be evaluated by the Nominating and Corporate Governance Committee.  In the event that the Nominating and Corporate Governance Committee determines that it is unable to support any Joint Designee for appointment as

4

a member of the Board, the parties hereto shall agree in good faith on a replacement for such Joint Designee.  The parties shall use all efforts to ensure that in no event shall the foregoing delay or prevent the appointment of the New Board Designees as contemplated hereby.

2.      Certain Other Matters.

(a)      Standard General commits to timely provide, or to cause one or more of its Affiliates (other than Charney) or third parties approved by the Company to provide, additional capital or other financial support to the Company in an aggregate amount up to $25 million, (i) to the extent necessary to permit the Company to repay amounts due under the Credit Agreement, dated as of May 22, 2013, by and among the Company, the facility guarantors party thereto, and Lion/Hollywood L.L.C. (as amended) and amounts related thereto (or, if any such amounts previously have been repaid by the Company, replenishment of such amounts used to pay such amounts), and (ii) for any other purposes as the Board, following the Director Appointments, may determine are appropriate.  Any such capital or financial support shall be provided on market terms reasonably agreed by Standard General and the Company unless Standard General accepts other terms. Standard General and the Company shall work together reasonably and in good faith to structure the terms and conditions of the provision of such additional capital or other financial support as soon as practicable, and in such a manner as to comply with applicable NYSE MKT LLC rules and applicable legal requirements.

(b)      Charney hereby irrevocably withdraws his letter dated June 27, 2014 providing notice to the Company of his call of a special meeting of stockholders on September 25, 2014 (the "Special Meeting Request").

(c)      Prior to the execution of this Agreement and the execution of the Cooperation Agreement (as defined herein), the Board has amended the Rights Agreement, dated as of June 27, 2014, between the Company and Continental Stock Transfer & Trust Company (the "Rights Agreement") to fix the Final Expiration Date (as defined in the Rights Agreement) to 5:00 p.m. Eastern Time on July 24, 2014 and to clarify that no Person shall become an "Acquiring Person" under the Rights Agreement as a result of (i) the negotiation of and entry into this Agreement, (ii) the performance of such Person's obligations or the exercise of such Person's rights under this Agreement or (iii) the performance of obligations or the exercise of rights under the Letter Agreement, including but not limited to entry into the Cooperation Agreement and the other agreements and arrangements described in the Letter Agreement (including, without limitation, the SG Loan Documents and related pledge of Additional Shares and Original Shares, and the Warrant Agreements and Warrants, in each case as such capitalized terms are defined in the Letter Agreement), and the performance of obligations or the exercise of rights thereunder.  The Company shall not assert that any communications, agreements or any other actions taken by or among the members of the Standard General Group in connection with the negotiation of this Agreement or otherwise have caused or would

5

cause the Standard General Group or any member thereof to become an "Acquiring Person" under the Rights Agreement, and the Company shall oppose any such claim asserted by any stockholder of the Company.

(d)     Promptly following the execution of this Agreement, the Board shall amend and restate the Company Bylaws to the form adopted on October 1, 2010, except that the size of the Board shall be fixed at nine directors.

(e)     Between the date hereof and the Director Appointments, except with the prior written consent of Standard General (which consent shall not be unreasonably withheld, conditioned or delayed), the Company shall, and shall cause its subsidiaries to, conduct its business in the ordinary course in all material respects, consistent with past practice.

(f)     The Company shall honor and comply with all severance arrangements between the Company and any of its employees or directors entered into or modified between May 1, 2014 and the date hereof that have been disclosed to Standard General in writing prior to the date hereof (including such arrangements pending final documentation, the material terms of which have been disclosed in writing to Standard General).  The Company represents that all such arrangements have been disclosed to Standard General in writing prior to the date hereof, and agrees that no further such arrangements will be entered into or modified prior to the occurrence of the Director Resignations and the Director Appointments.

(g)     The Company shall abide by its obligations under its Amended and Restated Certificate of Incorporation, the Company Bylaws and other indemnification agreements in effect on the date hereof (it being understood that no such agreements have been entered into within the last three months other than in the ordinary course of business consistent with past practice and not in connection with the matters contemplated hereby) to indemnify its existing Independent Directors and officers and all New Board Designees for any damages arising out of actions to remove Charney as CEO and all related matters, including negotiation and execution of this Agreement and the transactions and covenants contemplated thereby.

(h)     Concurrently with the execution of this Agreement, Charney and Standard General shall enter into a cooperation agreement (the "Cooperation Agreement") in the form previously provided to the Company.  The Cooperation Agreement shall not be amended in any manner, terminated or superseded, directly or indirectly, to circumvent any of the agreements contemplated by this Agreement.

3.     Standstill.  Until completion of the 2015 Annual Meeting, no member of the Standard General Group or any of its Affiliates (as to the Standard General parties, Affiliates that are directly or indirectly controlled by Soohyung Kim or his successor as

6

Chief Executive Officer of Standard General (the "Controlled Affiliates")), directly or indirectly, shall:

(a)     (i) solicit proxies or written consents of holders of Common Stock or become a "participant" (as such term is defined in Instruction 3 to Item 4 of Schedule 14A promulgated under the Exchange Act) in or assist any other person in any "solicitation" of any proxy, consent or other authority (as such terms are defined under the Exchange Act) with respect to any shares of Common Stock (other than such encouragement, advice or influence as is consistent with the Board's recommendation in connection with such matter) (for the avoidance of doubt, excluding such activities among members of the Standard General Group and their Controlled Affiliates); or (ii) encourage any other person to solicit or withhold any proxy, consent or other authority with respect to any shares of Common Stock or otherwise advise, encourage or influence any other person with respect to voting any shares of Common Stock (other than such encouragement, advice or influence as is consistent with the Board's recommendation in connection with such matter);

(b)     form or join in a partnership, limited partnership, syndicate or other group, including a "group" as defined under Section 13(d) of the Exchange Act, with respect to the Common Stock (for the avoidance of doubt, excluding any group composed solely of members of the Standard General Group and their Controlled Affiliates) or otherwise support or participate in any effort by any third party with respect to the matters set forth in clause (a) above;

(c)     present at any Special Meeting of Stockholders or through action by written consent any proposal for consideration for action by stockholders or seek the removal of any member of the Board or propose any nominee for election to the Board or seek representation on the Board (excluding the actions of any Standard General Designee taken in his or her capacity as a member of the Board);

(d)     grant any proxy, consent or other authority to vote with respect to any matters (other than to the named proxies included in the Company's proxy card for any Special Meeting of Stockholders) or deposit any shares of Common Stock in a voting trust or subject them to a voting agreement or other arrangement of similar effect with respect to any Special Meeting (except as provided in Section 4 below or as among members of the Standard General Group and their Controlled Affiliates) or action by written consent (excluding customary brokerage accounts, margin accounts, prime brokerage accounts and the like);

(e)     without the prior approval of a majority of the members of the Board who are not Standard General Designees, separately or in conjunction with any other person or entity in which it is or proposes to be either a principal, partner or financing source, publicly propose or participate in, effect or seek to effect, any extraordinary corporate transaction, tender offer or exchange offer, merger, acquisition, reorganization,

7

restructuring, recapitalization, change in the Company's dividend policy, change in the Company's Amended and Restated Certificate of Incorporation or the Company Bylaws (other than as contemplated by this Agreement), business combination involving the Company or a material amount of the assets or businesses of the Company or any action which would result in a class of securities of the Company being delisted from a national securities exchange or to ceasing to be authorized to be quoted in an inter-dealer quotation system of a registered national securities association or becoming eligible for termination of registration pursuant to Section 12(g)(4) of the Exchange Act or encourage any other person in any such activity (excluding the actions of any Standard General Designee taken in his or her capacity as a member of the Board).  Notwithstanding the foregoing, the Company agrees that the Standard General Group shall not be deemed to be in breach of this Agreement in the event that a Standard General Designee receives an unsolicited inquiry regarding a potential transaction proposed by a third party, does not engage in any negotiations or substantive discussions without the prior approval of the Board (including by a majority of the members who are not Standard General Designees) and promptly apprises the Company's lead independent director of the foregoing if required by his or her fiduciary duties to the Company;

(f)     purchase or cause to be purchased or otherwise acquire or agree to acquire beneficial ownership of any shares of Common Stock (other than in connection with a stock split, dividend or similar transaction); provided, however, that any Common Stock (i) received by Standard General Designees as equity grants in connection with their service as directors or officers of the Company or (ii) acquired by Charney in connection with his anti-dilution agreement (in the form in effect as of the date hereof and without amendments thereto) shall not be deemed to be beneficially owned by the Standard General Group under this clause (f); provided further, that the consummation of the agreements and arrangements contemplated by the June 25, 2014 Letter Agreement among certain members of the Standard General Group (in the form filed by Charney on June 27, 2014 with the SEC and without amendments thereto, the "Letter Agreement") shall not be deemed to violate this clause (f);

(g)     disclose any intention, plan or arrangement inconsistent with the foregoing;

(h)     instigate, encourage, join, act in concert with or assist any third party to do any of the foregoing;

(i)     take any action that would reasonably be expected to require the Company to make a public announcement regarding the possibility of any of the events described in this Section 3; or

(j)     request that the Company or the Board or any of their respective representatives amend or waive any provision of this Section 3 (including this sentence)

8

1000297859v10

or for the Board to specifically invite any member of the Standard General Group to take any of the actions prohibited by this Section 3.

The foregoing provisions of this Section 3 shall not be deemed to prohibit the transfer of shares of Common Stock beneficially owned by any member of the Standard General Group to any of its Affiliates, provided that such Affiliate agrees to be bound by the terms and conditions of this Agreement as a member of the Standard General Group.

4.    Voting.  Until completion of the 2015 Annual Meeting, (i) each member of the Standard General Group and its Affiliates (in respect of Charney) and its Controlled Affiliates (in respect of Standard General) shall cause all Common Stock beneficially owned by them as of the record date for any Annual or Special Meeting of Stockholders (the "Applicable Record Date Holding") to be present at such meeting for quorum purposes, and (ii) to the extent that the Applicable Record Date Holding exceeds 33 and one-third percent of the outstanding Common Stock at any Annual or Special Meeting of Stockholders or any adjournments or postponements thereof, the Standard General Group shall cause any excess stock over 33 and one-third percent of the outstanding Common Stock to be voted for any proposals or other business that comes before any such meeting in proportion to the votes for such proposals or other business cast by the other stockholders of the Company voting at such meeting; provided, that nothing contained herein shall prevent Charney from performing his obligations under the Investment Voting Agreement, dated March 13, 2009, between Charney and Lion Capital (Guernsey) II Limited (in the form in effect as of the date hereof and without amendments thereto).

5.    Investigation of Chief Executive Officer.

(a)    No later than one business day following the Director Resignations, the Company shall form a committee of the Board (the "Suitability Committee") consisting of David Danziger, one Standard General Designee and one Joint Designee.  All decisions of the Suitability Committee shall be made by majority vote of the members of the Suitability Committee.  The Suitability Committee shall oversee the investigation (the "Investigation") of alleged misconduct by Charney.  In connection with the Investigation, and subject to the timeframe for the Investigation set forth in Section 5(b), FTI Consulting, Inc. ("FTI") shall be permitted to complete its investigation pursuant to FTI's existing engagement with the Company, including having full and unrestricted access to relevant employees, servers and Company-owned equipment.  Charney agrees to be interviewed as part of the Investigation, and Charney may make a statement to the applicable representatives of FTI in connection with such interview.

(b)    The Investigation shall continue until the Suitability Committee determines, consistent with its fiduciary duties, that the Investigation is complete, provided that the Suitability Committee shall use its reasonable best efforts to conclude the Investigation as promptly as practicable but no later than 30 days after the date hereof

(the "<u>Completion Date</u>") (subject to any extensions that the Suitability Committee, by majority vote, determines in good faith are reasonably required to satisfy its members' fiduciary duties or to comply with formal and informal requests from auditors, regulators and other governmental authorities).  Based on the findings of the Investigation, the Suitability Committee shall determine, by majority vote and in good faith and consistent with its members' fiduciary duties, whether it is appropriate under the circumstances for Charney to be reinstated as CEO of the Company or serve as an officer or employee of the Company or any of its subsidiaries (the "<u>Clearance Determination</u>").  The Clearance Determination shall be made (based solely on the information available to the Suitability Committee at the time of such determination) no later than the earlier of (<u>i</u>) 10 days after the conclusion of the Investigation under this Section 5(b), and (ii) the Completion Date if (<u>x</u>) the Investigation is not concluded by the Completion Date and (<u>y</u>) Charney so elects in writing not later than 15 days prior to the Completion Date.

(c)    Not less than one week prior to the Suitability Committee making its final determination pursuant to Section 5(b), the Suitability Committee shall provide Charney and his legal advisors the opportunity to meet with the Suitability Committee (such meeting, the "<u>Preliminary Meeting</u>").  At the Preliminary Meeting, Charney and his legal advisors shall be presented a summary of the evidence and preliminary findings of the Investigation.  Charney and his legal advisors shall be given a reasonable opportunity to ask questions and respond to such evidence and preliminary findings at such Preliminary Meeting.  A final meeting between the Suitability Committee and Charney and his legal advisors shall be held prior to the Suitability Committee making its final determination under Section 5(b) (such meeting, the "<u>Final Meeting</u>").  At the Final Meeting, Charney and his legal advisors shall be given another opportunity to ask questions and respond to the evidence and preliminary findings presented at the Final Meeting or the Preliminary Meeting.  Nothing shall prevent the Suitability Committee from holding additional meetings, in addition to the Preliminary Meeting and the Final Meeting, with Charney and his legal advisors relating to the Investigation and/or the Suitability Committee's Clearance Determination.  Charney shall not, in any way, interfere with or attempt to influence the outcome of the Investigation.  Unless specific authorization has been granted by the Suitability Committee, Charney shall not directly or indirectly access the Company's computer systems; <u>provided</u>, however, that upon request, Charney shall be provided with a copy of his Company email mailbox.

(d)    Charney shall not serve as CEO of the Company or serve as an officer or employee of the Company or any of its subsidiaries unless and until the Investigation is completed and the Suitability Committee makes a Clearance Determination in favor of such service.  From the date hereof through the date of the Clearance Determination, Charney shall serve as a consultant to the Company with no supervisory authority over any employees of the Company.  The terms of such consulting relationship shall be negotiated by the Board as soon as practicable following the Director Appointments.  Pursuant to such consulting relationship, from the date hereof through the date of the

10

Clearance Determination, Charney shall receive compensation equal to the base salary payable under his existing employment agreement with the Company (without duplication of any payments received in connection with his employment agreement).

(e)     Charney agrees, without prejudice to any claim for damages relating to allegations of wrongful dismissal, to stay the pending arbitration proceeding relating thereto (the "Arbitration") until the Suitability Committee makes its Clearance Determination under Section 5(b). If the Suitability Committee makes a Clearance Determination that permits Charney to be reinstated as CEO, and Charney is reinstated as CEO, Charney agrees to promptly dismiss with prejudice all claims asserted or that could have been asserted by Charney in the Arbitration (and, for the avoidance of doubt, not to bring future claims relating thereto in arbitration or litigation).

6.     Public Announcements; Non Disparagement.

(a)     Promptly following the execution of this Agreement, the Company and the Standard General Group shall announce this Agreement and the material terms hereof by means of a jointly issued press release in the form attached hereto as Exhibit B (the "Press Release"). Neither the Company (and the Company shall cause each of its Affiliates, and its and their directors and officers not to) nor the Standard General Group or any Controlled Affiliate of Standard General or Affiliate of Charney shall (and each shall cause their respective directors and officers not to) make or cause to be made any public announcement or public statement that is inconsistent with or contrary to the statements made in the Press Release, except as required by law or the rules of any stock exchange or with the prior written consent of Standard General, the Company and Charney. The Company acknowledges that members of the Standard General Group intend to file this Agreement and the Press Release as an exhibit to its Schedule 13D pursuant to an amendment that the Company will have an opportunity to review in advance.

(b)     The members of the Standard General Group, their respective officers, directors, representatives and Affiliates (with respect to the Standard General parties, their Controlled Affiliates) shall refrain from making or causing to be made to any third party, including but not limited to by press release or similar public statement to the press or media or to any analyst, any statement or announcement, whether orally or in writing, that disparages or otherwise negatively reflects upon the Company, its employees, officers or directors or any person who has served as an employee, officer or director of the Company in the past, or who serves on or following the date of this Agreement as an employee, officer or director of the Company. The Company and its directors, officers and employees (including the Resigning Directors) shall refrain from making or causing to be made to any third party, including but not limited to by press release or similar public statement to the press or media or to any analyst, any statement or announcement, whether orally or in writing, that disparages or otherwise negatively reflects upon Standard General, the Standard General Affiliates or (subject to the final results of the

11

Investigation as determined by the Suitability Committee) Charney, except disclosures relating to Charney to the extent the Company in good faith determines such disclosure is required as a result of applicable law, regulation, order by a governmental authority or SEC or stock exchange rules, or is required or advisable in connection with any arbitration or other legal proceeding. The non-disparagement agreements set forth in this Section 6(b) shall not apply to any statement, position, argument, briefing or communication of any nature that takes place in or relates to the Arbitration or any legal proceeding.

7.     Company Philosophy.  In the Press Release, Standard General shall publicly affirm its commitment to the Company's sweatshop-free, "Made in the USA" manufacturing philosophy, maintaining the Company's manufacturing headquarters in Los Angeles, California, and the Company's tradition of passion, creativity, contrarian thinking, social responsibility, ethical business practices and fair treatment of employees.

8.     Confidentiality Agreement.  The Company hereby agrees that: (i) the Standard General Designees are permitted to and may provide confidential information to certain specified persons subject to and solely in accordance with the terms of the confidentiality agreement in the form attached hereto as Exhibit B (the "Confidentiality Agreement") (which the Standard General Group shall execute and deliver to the Company simultaneously with the Standard General Group's execution and delivery of this Agreement) and (ii) the Company shall execute and deliver the Confidentiality Agreement to the Standard General Group substantially contemporaneously with execution and delivery thereof by the other signatories thereto.

9.     Mutual Release; Reservation of Rights; No Admission.

(a)     The Company, on the one hand, and the Standard General Group, on the other hand, on behalf of themselves and for all of their past and present affiliated, associated, related, parent and subsidiary entities, joint ventures and partnerships, successors, assigns, and the respective owners, officers, directors, partners, members, managers, principals, parents, subsidiaries, predecessor entities, agents, representatives, employees, shareholders, advisors, consultants, attorneys, heirs, executors, administrators, successors and assigns of any said person or entity, security holders of any said person or entity, and any other person claiming (now or in the future) through or on behalf of any of said persons or entities (collectively "Released Persons"), irrevocably and unconditionally release, settle, acquit and forever discharge the other and all of their Released Persons, from any and all causes of action, claims, actions, rights, judgments, obligations, damages, amounts, demands, losses, controversies, contentions, complaints, promises, accountings, bonds, bills, debts, dues, sums of money, expenses, specialties and fees and costs (whether direct, indirect or consequential, incidental or otherwise, including attorney's fees or court costs, of whatever nature) incurred in connection therewith of any kind whatsoever, whether known or unknown, suspected or unsuspected, in their own right, representatively, derivatively or in any other capacity, in law or in

12

equity or liabilities of whatever kind or character, arising under federal, state, foreign, or common law or the laws of any other relevant jurisdiction (the "Claims"), to the extent such Claims have arisen, could have arisen, arise now, or hereafter may arise out of the allegations, facts, events, transactions, acts, occurrences, statements, representations, misrepresentations, omissions or any other matter, thing, or cause whatsoever, or any series thereof, embraced, involved, arising out of or set forth in the formation of the Standard General Group, its acquisition prior to the date hereof of beneficial ownership of Common Stock, the public disclosure by its members with respect thereto, any existing arrangements or agreements between Charney and any Standard General Affiliates and those contemplated by the Letter Agreement, the Special Meeting Request, actions taken by the Suitability Committee (as to the Company and the Suitability Committee), the negotiation of this Agreement and, if the Suitability Committee makes a Clearance Determination that is favorable to Charney, actions taken to remove Charney from his position as CEO (collectively, the "Released Claims"); provided, however, the Released Claims shall not include claims to enforce the terms of this Agreement. It is further understood and agreed that each of the parties expressly waives all rights as to the Released Claims under Section 1542 of the California Civil Code. Said Section reads as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

      (b)     The parties acknowledge and agree that they may be unaware of or may discover facts in addition to or different from those which they now know, anticipate or believe to be true related to or concerning the Released Claims. The parties know that such presently unknown or unappreciated facts could materially affect the claims or defenses of a party or parties. It is nonetheless the intent of the parties to give a full, complete and final release and discharge of the Released Claims. In furtherance of this intention, the releases herein given shall be and remain in effect as full and complete releases with regard to the Released Claims notwithstanding the discovery or existence of any such additional or different claim or fact. To that end, with respect to the Released Claims only, the parties expressly waive and relinquish any and all provisions, rights and benefits conferred by any law of the United States or of any state or territory of the United States or of any other relevant jurisdiction, or principle of common law, under which a general release does not extend to claims which the parties do not know or suspect to exist in their favor at the time of executing the release, which if known by the parties might have affected the Parties' settlement. The parties acknowledge and agree that the inclusion of this Section 9(b) was separately bargained for and is a material term of this Agreement.

      (c)     The parties hereto reserve all rights not specifically limited by this Agreement. Nothing in this Agreement shall be construed as an admission of liability or

13

fault by any party hereto, which liability and fault, with respect to each party hereto, are expressly denied by such party.

(d)     In connection with any arbitration or litigation proceeding brought by Charney against any of the Released Persons relating to allegations of wrongful dismissal or related matters, the prevailing party, as determined by the final judgment of an arbitrator or a court of competent jurisdiction (as applicable), shall be entitled to reimbursement for all reasonable legal fees and costs incurred in connection therewith.

10.     Representations and Warranties.

(a)     Each party represents and warrants to each other party that: (i) such party has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder; (ii) this Agreement has been duly and validly authorized, executed and delivered by it and is a valid and binding obligation of such party, enforceable against such party in accordance with its terms; and (iii) this Agreement will not result in a violation of any terms or conditions of any agreements to which such person is a party or by which such party may otherwise be bound or of any law, rule, license, regulation, judgment, order or decree governing or affecting such party.

(b)     The Company represents and warrants to the Standard General Group that the Rights Agreement has been amended so that the negotiation of and entry into this Agreement and the performance by the Standard General Group of its obligations hereunder and under the Letter Agreement would not cause the Standard General Group or any member thereof to become an "Acquiring Person" under the Rights Agreement.

(c)     Each member of the Standard General Group represents and warrants to the Company (i) that, as of the date of this Agreement, the Standard General Group beneficially owns 74,560,813 shares of Common Stock and that no Controlled Affiliate of any member of the Standard General group beneficially owns any shares of common Stock other than as a member of the Standard General Group (excluding 1,178,097 shares of Common Stock held by Standard General Master Fund L.P. for its own account and 361,903 shares of Common Stock held by P STANDARD GENERAL LTD. for its own account), (ii) that each New Board Designee, other than the Class A Designee is "independent" under the rules of the NYSE MKT LLC and is not affiliated with and does not have any material relationship with the Standard General Group and is not affiliated with and does not have any relationship with Dov Charney and  (iii) that it has no agreements, arrangements or understandings (written or oral) with respect to any shares of Common Stock (including voting arrangements) other than this Agreement, the Letter Agreement the other agreements referenced herein.

11.     Miscellaneous.  The parties acknowledge and agree that if for any reason any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, immediate and irreparable harm or injury would

14

be caused for which money damages would not be an adequate remedy.  Accordingly, each party agrees that in addition to other remedies the other party shall be entitled to at law or equity, the other party shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement exclusively in the Court of Chancery or other federal or state courts of the State of Delaware.  Furthermore, each of the parties hereto (a) consents to submit itself to the exclusive personal jurisdiction of the Court of Chancery or other federal or state courts of the State of Delaware in the event any dispute arises out of this Agreement or the transactions contemplated by this Agreement, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (c) agrees that it shall not bring any action relating to this Agreement or the transactions contemplated by this Agreement in any court other than the Court of Chancery or other federal or state courts of the State of Delaware, (d) irrevocably waives the right to trial by jury and (e) irrevocably consents to service of process by a reputable overnight mail delivery service, signature requested, to the address set forth in Section 14 (if applicable), the address of such party's principal place of business (if the address of such party is not set forth in Section 14) or such party's address as determined pursuant to applicable law. THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO CONTRACTS EXECUTED AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES OF SUCH STATE.  For avoidance of doubt, the provisions of subsections (a) through (e) of this Section 11 do not apply to any arbitration or litigation between or among any of the Released Persons relating to Charney's employment by the Company and his dismissal from such employment.

12.    No Waiver.  Any waiver by any party of a breach of any provision of this Agreement shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Agreement.  The failure of a party to insist upon strict adherence to any term of this Agreement on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

13.    Entire Agreement.  This Agreement, the Confidentiality Agreement, the Letter Agreement and the Cooperation Agreement contain the entire understanding of the parties with respect to the subject matter hereof.

14.    Notices.  All notices, consents, requests, instructions, approvals and other communications provided for herein shall be in writing and shall be deemed validly given, made or served, if (a) given by email, when such email is sent to the email address set forth below and the appropriate confirmation is received or (b) if given by any other means, when actually received during normal business hours at the address specified in this subsection:

15

1000297859v10

If to the Company:

American Apparel, Inc.
747 Warehouse Street
Los Angeles, CA 90021
Attention:     General Counsel
Email:          tobiaskeller@AmericanApparel.net

With a copy to (which shall not constitute notice):

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Attention:     Jeffrey H. Cohen
                    David C. Eisman
Email:          jeffrey.cohen@skadden.com
                    david.eisman@skadden.com

If to the Standard General Group:

c/o Standard General L.P.
767 Fifth Avenue, 12th Floor
New York, New York 10153
Attention:     Gail Steiner
Email:          gsteiner@standgen.com

With copies to (which shall not constitute notice):

Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Attention:     Jonathan E. Levitsky
Email:          jelevitsky@debevoise.com

and

Glaser, Weil, Fink, Howard, Avchen & Shapiro
LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, California 90067
Attention:     Jeffrey C. Soza
Email:          jsoza@glaserweil.com

16

15.     Counterparts.  This Agreement may be executed in two or more counterparts which together shall constitute a single agreement.

16.     Successors and Assigns.  This Agreement shall not be assignable by any of the parties hereto.  This Agreement, however, shall be binding on successors of the parties hereto.

17.     Third Party Beneficiaries.  The Directors identified on Schedule B shall be, and are hereby, named as an express third-party beneficiaries of Sections 2(f), 6(b) and 9 of this Agreement, with full rights as such.  Except as otherwise provided by the preceding sentence, this Agreement is not enforceable by any persons other than the parties hereto.

18.     Interpretation and Construction.  Each party acknowledges that it has been represented by counsel of its choice throughout all negotiations that have preceded the execution of this Agreement, and that it has executed the same with the advice of said independent counsel.  Each party and its counsel cooperated and participated in the drafting and preparation of this Agreement and the documents referred to herein, and any and all drafts relating thereto exchanged among the parties shall be deemed the work product of all of the parties and may not be construed against any party by reason of its drafting or preparation.  Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against any party that drafted or prepared it is of no application and is hereby expressly waived by each party hereto, and any controversy over interpretations of this Agreement shall be decided without regards to events of drafting or preparation.  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  The term "including" shall be deemed to mean "including without limitation" in all instances.

19.     Liability Several and Not Joint.  Notwithstanding anything contained herein to the contrary, the obligations of the members of the Standard General Group hereunder are several and not joint or collective.

20.     Amendments.  This Agreement may only be amended pursuant to a written agreement executed by Standard General, Charney and the Company and approved by a majority of the members of the Board who are not Standard General Designees.

[Signature Pages Follow]

17

IN WITNESS WHEREOF, each party has executed this Agreement as of the date first above written.

**AMERICAN APPAREL, INC.**

By: _____
Name: John J. Luttrell
Title: Interim Chief Executive Officer,
Executive Vice President and
Chief Financial Officer

**STANDARD GENERAL L.P.**

By: _____
Name:
Title:

**STANDARD GENERAL MASTER FUND L.P.**

By: _____
Name:
Title:

**P STANDARD GENERAL LTD**

By: _____
Name:
Title:

**DOV CHARNEY**

_____

IN WITNESS WHEREOF, each party has executed this Agreement as of the date first above written.

**AMERICAN APPAREL, INC.**

By: _____
Name:
Title:

**STANDARD GENERAL L.P.**

By: _____
Name: David Glazek
Title: partner

**STANDARD GENERAL MASTER FUND L.P.**

By: _____
Name: David Glazek
Title: partner of its investment Manager

**P STANDARD GENERAL LTD**

By: _____
Name: David Glazek
Title: partner of its investment Manger

**DOV CHARNEY**

_____

IN WITNESS WHEREOF, each party has executed this Agreement as of the date first above written.

**AMERICAN APPAREL, INC.**

By: _____
Name:
Title:

**STANDARD GENERAL L.P.**

By: _____
Name:
Title:

**STANDARD GENERAL MASTER FUND L.P.**

By: _____
Name:
Title:

**P STANDARD GENERAL LTD.**

By: _____
Name:
Title:

**DOV CHARNEY**

_____

## SCHEDULE A

Standard General L.P.
Standard General Master Fund L.P.
P STANDARD GENERAL LTD.
Dov Charney

1000297859v10

## SCHEDULE B

Dov Charney *
Alberto Chehebar *
David Danziger
Robert Greene *
Marvin Igelman *
Billy Mauer *
Allan Mayer

* Denotes Resigning Directors

CBS News  /  CBS Evening News  /  CBS This Morning  /  48 Hours  /  60 Minutes  /  Sunday Morning  /  Face The Nation  /  CBSN          Log In   [Search        🔍]

⊙CBS **money watch**    Markets   Money   Work   Small Business   Retirement   Tech   Trending   Video                    Quote   🔍

LAST CHANCE! SAVE 15%   [SHOP NOW]      AdChoices ▷

By JONATHAN BERR / MONEYWATCH / *December 22, 2014, 5:07 PM*

# American Apparel's Dov Charney isn't going quietly

Comment  /  f Shares  /  🐦 Tweets  /  ⊛ Stumble  /  @ Email                              More +

The drama around American Apparel (APP) took strange turn Friday after founder Dov Charney told Bloomberg TV that he was double-crossed by a hedge fund he had turned to for help to take the company private. He also claimed to be down to his last $100,000 and was sleeping on a friend's couch in New York City.

Earlier this year, Standard General loaned Charney, a Canadian native who launched American Apparel in 1989, about $20 million so that he could increase his ownership stake to 40 percent. In exchange, Charney gave up his voting rights. Standard General pushed for the company to replace its board and, much to Charney's chagrin, backed his ouster as well.

Charney told Bloomberg's Trish Regan that Standard General reneged on its promise to help restore him to a leadership role at American Apparel once the investigation into allegations of sexual misconduct was completed. He said he saw Standard General's support of his ouster as a betrayal, according to Regan. Charney has filed numerous lawsuits to regain control of American Apparel. Standard General refuted his claims.



Play **VIDEO**

**American Apparel board votes to fire founder Dov Charney**

"As we have stated previously, our objective is to help American Apparel grow and succeed," the firm said in a statement. "We supported the independent, third-party and very thorough investigation into the allegations against Mr. Charney, and respect the Board of Director's decision to terminate him based on the results of that investigation."

Meanwhile, shares of Los Angeles-based American Apparel climbed 6.5 percent to $1.14 on Monday after it received a buyout offer from an investor group backed by private equity firm Irving Place Capital, according to Bloomberg.

Irving Place is "open" to retaining Charney "in some capacity," the news service said, without providing any specifics. The offer values American Apparel at $226 million to $243 million ($1.30-$1.40), as much as a 23 percent premium over where the stock recently traded. The fact that the stock hasn't moved to the level of the offer price indicates that many on Wall Street are skeptical that it will happen.

Irving Place Capital didn't respond to request for comment, and American Apparel declined to elaborate beyond its previously released statements.

Charney was suspended as American Apparel president and CEO in June for a litany of misdeeds including violating policies and charging the company for

CBSN Live                    POP-OUT ⤢

LIVE

#CBSN10

⊙CBS   Always On.

Market Data

[Enter Ticker Symbol or Company Name    🔍]

NASDAQ: May 06, 2015



4,930

4,910

4,890

10AM   12PM   2PM   4PM

| Symbol | Last | Change | % Change |
|---|---|---|---|
| DOW | 17,841.98 | -86.22 | -0.48% |
| NASDAQ | 4,919.64 | -19.68 | -0.40% |
| S&P 500 | 2,080.15 | -9.3˙ | -0.45% |

AdChoices ▷
Be the reason Mom...˙ *feels loved.*

Best-Selling Mother's Day Flowers & Gifts

[SHOP NOW]   



personal expenses. He also has faced numerous sexual harassment lawsuits and has made headlines for his erratic behavior for years. For instance, Charney showed up unexpectedly at Bloomberg's headquarters to talk to Regan.

While the claims against him were being investigated by an outside company, Charney served as a consultant to American Apparel. That relationship has since been terminated. Veteran fashion executive Paula Schneider has been named to replace Charney as CEO.

Under Charney's leadership, American Apparel has struggled recently, generating $210 million in net losses since 2010, and Wall Street analysts expect the losses to continue for the foreseeable future.

Bloomberg has also reported that 30 American Apparel executives have asked the company, which operates 245 stories in 20 countries, to reinstate him.

© 2014 CBS Interactive Inc.. All Rights Reserved.

Comment / **f** Shares / **🐦** Tweets / **Ⓢ** Stumble / **@** Email                    More +

## Recommended


Angelika Graswald, fiancee of missing New York kayaker Vincent Viafore, charged wi...


Millionaire faces possible third conviction in wife's death


Dr. Ron Paul's Big Warning for U.S. Seniors
Stansberry Research Sponsored ⓘ


4 Billionaires Say: Big Change Coming in U.S.A
Stansberry Research Sponsored ⓘ

Learn more                                             Powered by YAHOO! for you

## Featured in Moneywatch

## Popular



### The 22 most dependable airlines in the world
You might be surprised at who's missing from this ranking of on-time performance, checked baggage fees and fleet age



### The 9 states with the highest property taxes
Many of these states tend to cluster in one geographic region, where residents

## Watch CBSN Live



### Watch CBS News Live
*Watch CBS News anytime, anywhere with the new 24/7 digital news network. Stream CBSN live or on demand for FREE on your TV, computer, tablet, or smartphone.*

**Watch Now**

## Latest Features


Investing in vice pays, but not as much as this index


Why Apple Watch rubs some users the wrong way


What's next for oil prices?


Here's what an undercover probe of funeral homes found


Daimler puts first self-driving semi-truck on road

## Market News

Los Angeles Business Journal ▼    SUBSCRIBE   ADVERTISE   EVENTS   THE LISTS   RESOURCES   ABOUT US   LOGIN

labusinessjournal.com

# LOS ANGELES BUSINESS JOURNAL®
### THE COMMUNITY OF BUSINESS™

HOME | LISTS | FINANCE | HEALTHCARE | MANUFACTURING | REAL ESTATE | SERVICES | TECHNOLOGY | GOVERNMENT | TRAVEL/LEISURE

HOME   NEWS >                                                    | print | email

# American Apparel: Takeover Bid, Board Shakeup and 'Betrayal'

By HANNAH MIET

Monday, December 22, 2014

American Apparel Inc. on Monday confirmed reports that a buyer has expressed interest in acquiring the company for as much as $1.40 a share.

"The Board takes these matters seriously, and it will evaluate this proposal in the ordinary course of business," the company said in a statement. Rumors of a buyout bid had surfaced last week, sending the company's stock soaring.

The embattled downtown L.A. clothing company also announced a board shakeup on Monday. Co-Chairmen Allan Mayer and David Danziger have stepped down and will be replaced by Colleen Brown, who joined the board in August, the company said in a statement. Mayer and Danziger will remain directors and keep their committee posts.

The news comes a week after the company ousted founder and former chief executive Dov Charney as chairman, citing allegations of misconduct, including violations of sexual harassment policy and misuse of corporate funds. Charney had already been suspended as chief executive in June. After firing Charney, the company announced that retail veteran Paula Schneider would become its first female chief executive.

American Apparel has not named the source of the takeover proposal, but sources told Bloomberg it was backed by New York private equity firm Irving Place Capital and that the proposal would involve Charney returning to American Apparel in some capacity.

Charney is still American Apparel's largest shareholder, with a 43 percent stake in the company, but that doesn't translate to power. He handed over his voting rights to New York hedge fund Standard General as collateral for a loan in July that helped him boost his ownership in the company after his initial suspension from the company.

Charney told Trish Regan at Bloomberg TV that he felt betrayed by the hedge fund, which he said promised to reinstate him in a leadership role and instead supported his ouster.

"They robbed me," Charney told Trish Regan at Bloomberg TV in an off-camera interview.

A Standard General spokesman said that the fund's objective has been to help American Apparel grow and succeed.

"We supported the independent, third-party and very thorough investigation into the allegations against Mr. Charney, and respect the Board of Director's decision to terminate him based on the results of that investigation," the spokesman said. "We believe that American Apparel will benefit from the leadership of its new CEO, Paula Schneider, and we are focused on supporting her and American Apparel going forward."

Shares of American Apparel rose 7 cents, or about 7 percent, on Monday to close at $1.14.

GET EMAIL NEWS ALERTS    >>

SEARCH



# LOS ANGELES BUSINESS JOURNAL
## TO GET AHEAD, STAY INFORMED.
SIGN UP FOR OUR FREE E-NEWS UPDATES.



Enter your email

SUBMIT

### YOU MAY ALSO LIKE

American Apparel Stock Rises on Charney Ouster

Charney Reacts to Firing, Yahoo Reports

Charney Suspension Boosts American Apparel Stock

Dov Charney Fired -- Again

Shareholders Challenge Board of Garment Firm

Union Looks to Fold In Garment Maker's Workers

Union Drive On at American Apparel

American Apparel to Add Paid Holidays

# BuzzFeedNEWS

News    Buzz    Life    Quizzes    Videos    More ⌄

BUSINESS

## American Apparel Founder Says He's Down To His Last $100,000

**Ousted CEO Dov Charney told Bloomberg News that he's been living on the Lower East Side on a friend's couch. He also plans to "sue everyone," as per the report. Updated with comment from Standard General.**

posted on Dec. 22, 2014, at 7:41 a.m.



**Sapna Maheshwari**
BuzzFeed News Reporter

     



*Bloomberg Television / Via bloomberg.com*

American Apparel founder Dov Charney, who was booted from the company last week, says he's down to his last $100,000, according to an interview with Bloomberg News.

The ousted executive told Bloomberg reporter Trish Regan that he's living on a friend's couch on New York's Lower East Side, aiming to muster support to take his company private, she said on Bloomberg Television today. Regan was reporting on a conversation she had with Charney last Thursday afternoon which was not televised.

Charney, who pledged 43% of his stake in the company to hedge fund Standard General this summer during an internal investigation, is apparently "very upset" at the firm and has accused them of conspiring with a board member to oust him, she said.

She quoted Charney as saying: "I gave them my entire life's work and they agreed to put me back in, but instead they used this investigation to fire me. They betrayed me. I gave them my heart. My shares. They teamed up with Allan and worked against me." (Charney was referring to Allan Mayer, former co-chair of the board.)

The hedge fund, in an e-mailed statement, responded to Charney's accusation, saying: "As we have stated previously, our objective is to help American Apparel grow and succeed."

"We supported the independent, third-party and very thorough investigation into the allegations against Mr. Charney, and respect the board of director's decision to terminate him based on the results of that investigation," a Standard General spokesperson said in the e-mail. "We believe that American Apparel will benefit from the leadership of its new CEO, Paula Schneider, and we are focused on supporting her and American Apparel going forward."

"He would like to see this company taken private," Regan said of Charney. "He's suing everyone, by the way."

American Apparel fired Charney last Tuesday and named his successor, retail veteran Paula Schneider. Charney was working as a paid consultant for the company during an internal investigation that began in July; he was suspended as CEO and chairman for "alleged misconduct and violations of company policy" in June.

It's unclear how Charney is down to his last $100,000, given he was still earning his base CEO salary of around $800,000 in the consultant role. He is technically still the company's biggest shareholder.

A group of at least 30 executives wrote a letter to the board hours after Charney's dismissal last week, urging the company to bring him back in some leadership capacity. They wrote that he "makes this thing tick."

Charney was served with a termination letter in June for a long list of reasons including breaching his fiduciary duty, violating company policy, sexual harassment, and misusing corporate assets, according to the letter, which was obtained by BuzzFeed News. In news reports following his dismissal, Charney proclaimed his innocence and called the board's accusations baseless.


bloomberg.com

**UPDATE**

Updates with comment from hedge fund Standard General in fifth paragraph.

Dec. 22, 2014, at 12:44 p.m.

Sapna Maheshwari is a business reporter for BuzzFeed News and is based in New York.
Maheshwari reports on retail and e-commerce.
Contact Sapna Maheshwari at sapna.maheshwari@buzzfeed.com

Tagged:american apparel, american apparel ceo, american apparel founder, business, charney, dov charney, ousted executives, retail

Advertise   Jobs   Mobile   Newsletter   | US Edition ✔

About   Press   RSS   Privacy   User Terms   Ad Choices   Help   Contact      © 2015 BuzzFeed, Inc.



# BUSINESS INSIDER

# Ousted American Apparel CEO Dov Charney Claims He Was Robbed By A Hedge Fund

 **HAYLEY PETERSON**
DEC. 22, 2014, 1:46 PM

American Apparel founder Dov Charney is speaking out against a hedge fund he says betrayed him and forced him out of the retail brand.

"They robbed me," Charney told Trish Regan at Bloomberg TV in an off-camera interview.

Charney got a loan from Standard General in July so he could boost his ownership of American Apparel to 43% after he was fired as CEO in June.



*Bloomberg TV*
**Dov Charney (left) and Trish Regan (right)**

He gave up his voting rights to the firm as collateral for the loan, and since then, Standard General has pushed American Apparel to replace most members of its board.

Charney claims that when he pledged his stake to Standard General, the firm promised to give him back his position, "not necessarily as CEO but that he would effectively running the company" once an internal investigation against him was completed, Regan said.

But Standard General ended up using the deal to push him out of the company, Charney alleges.

Regan quoted Charney as saying, "I gave them my entire life's work and they agreed to put me back in, but instead they used this investigation to fire me. They betrayed me. I

gave them my heart. My shares. They teamed up with Allan [Mayer, co-chairman of American Apparel's board] and worked against me."

American Apparel initially fired Charney as CEO because of "concerns about his trustworthiness" and allegations of sexual misconduct, the Wall Street Journal reported. An investigation followed and Charney remained in a consulting role at the company until last week, when he was officially terminated.

Responding to the allegations, a Standard General spokesperson said, "Our objective is to help American Apparel grow and succeed. We supported the independent, third-party and very thorough investigation into the allegations against Mr. Charney, and respect the Board of Director's decision to terminate him based on the results of that investigation. We believe that American Apparel will benefit from the leadership of its new CEO, Paula Schneider, and we are focused on supporting her and American Apparel going forward."

Meanwhile, Charney says he is down to his last $100,000 and sleeping on a friend's couch in the Lower East Side neighborhood of Manhattan, and he's plotting a counteroffensive.

"He wants support to take his company private and to have a role there," Regan said. "He's suing everyone, by the way."

* Copyright © 2015 Business Insider Inc. All rights reserved.

Our Terms of Service and Privacy Policy have changed.
By continuing to use this site, you are agreeing to the new **Privacy Policy** and **Terms of Service**.

CNN   U.S. Edition ∨

**Money**   Business   Markets   Tech   Personal Finance   Small Business   Luxury

stock tickers

# How Dov Charney got fired from American Apparel - twice

   

By Cristina Alesci  @cristi

**Most Popular**


Wendy's to s
restaurants


Al Jazeera Ar
CEO dismiss


McDonald's I
new Hambur



For Dov Charney, the press release announcing his firing last week was déjà vu in the worst way. It was his second ousting in less than a year, and was an unexpected turn of events.

That's because when American Apparel's board fired Charney for the first time in June, he almost immediately began charting his comeback.

At the time, the board said it had learned of "disturbing" information that suggested "misconduct" by Charney, American Apparel's founder.

Still, Charney wasn't entirely out. The board kept him on as a consultant.

And in July, Charney turned to hedge fund Standard General for help. Standard General agreed to buy a large portion of the company's shares. In exchange, Charney handed the hedge fund voting power of his shares, enabling the fund to secure a majority of the board seats.

The hedge fund promised Charney an internal review into his conduct, which included reports of sexual harassment.

It's unclear exactly what additional assurances  if any, Standard General made to Charney in return.

Initially, Charney thought he'd be back as CEO, according to people familiar with Charney's position.

And throughout the summer, Charney had several conversations with Standard General, and asked


**Search for Jobs**

Millions of job openings!

Job title

Location

Search                          >

Accounting    Engineering    Deve
Finance       Management     Medi
Marketing     Sales          See

about getting representation on the board.

By the fall, Charney and Standard General began to hammer out an agreement that would provide a framework for his involvement with the company.

Charney wouldn't get to be CEO, but he did help find a CEO, Paula Schneider. Charney assumed Schneider -- presumably a Charney ally - would get a board seat.

Charney's attorney says American Apparel ultimately "offered him a substantial amount of money to play a leadership role." A source close to the company acknowledges that there was an offer but disputes the level, saying it was just a consulting role.

But that day never came.

As of early December, Charney hadn't formally committed to the terms of the offer.

One of his issues: The new CEO wouldn't be getting a board seat. A person familiar with Standard General's position says board composition never arose as a formal condition to his employment offer, which Charney disputes.

A person close to discussions says that the board was willing to give Schneider a seat at some point in the future.

Charney faced a tough choice. Having handed Standard General control of the company and with an ethical investigation hanging over him, he had almost no leverage.

Complicating dynamics further: American Apparel (APP) received a buyout offer from private equity firm Irving Place. A source close to Charney says the possibility of a takeover bid caused Standard General to hunker down. A source close to the company said the Irving Place bid had nothing to do with its discussions with Charney.

To force a decision, Standard General gave Charney 10 days to respond to the results of the internal review, the results of which were unfavorable to Charney.

In the end, the internal review served as a justification to "terminate" Charney last week.

Now, Charney's attorney is calling the review investigation a "sham," claiming that Charney was not allowed to respond to charges and that not all evidence was considered.

Standard General says the investigation was "independent" and "thorough." A source at the company also said Charney was given an opportunity to respond.

Charney is vowing to fight...for the second time.

**Related: American Apparel board learned of 'disturbing' misconduct by company founder**

**Related: Dov Charney is out for good** ∎

CNNMoney (New York) December 30, 2014: 3:17 PM ET

☐glassdoor·

Hot List


Every piece c made here


Inside McLar high-tech au


Self-driving s the road


2 ways to ge guaranteed retirement inc


Playboy is be China expans

Most Popular Videos


5 stunning st about the U.S


Surface creat losing $1 billi


Undercover n takes on reve porn king


To fight rever porn, I had to copyright my

CNNMoney Sponsors

PERSONAL SAVINGS   American Expre FSB, Member F

Get up to $600 when you open an IRA. »

You May Also Like            Recommended by Outbrain

Exhibit E



FINK & STEINBERG

ATTORNEYS AT LAW

11500 OLYMPIC BLVD, SUITE 316, LOS ANGELES, CA 90064
WWW.FINKSTEINBERG.COM

PHONE: (310) 268-0780    FAX: (310) 268-0790

LOS ANGELES  ·  SAN FRANCISCO  ·  MACAU

February 20, 2015

**VIA E-MAIL**
Chelsea Grayson
General Counsel
AMERICAN APPAREL
747 Warehouse St.
Los Angeles, California 90021-1106

   *Re: CHARNEY PERSONNEL FILE*

Dear Chelsea:

As you know Mr. Charney initiated arbitration against American Apparel on or around June 18, 2014, immediately upon his termination from the company. Sometime thereafter, American Apparel re-hired Mr. Charney and employed him again for many months. Notwithstanding the same, the parties continued on with the arbitration proceedings.

During the discovery phase of the arbitration, American Apparel informed Mr. Charney's counsel Paul Salvaty that American Apparel had "lost" almost all of Mr. Charney's personnel records. Specifically, American Apparel claimed to have "lost" all of his personnel records spanning his employment with the company from the company's founding through his June 2014 termination. Based on the same, we presume that American Apparel *did* generate a new personnel file for Mr. Charney spanning his second stint with the company.

Pursuant to Labor Code § 1198.5, I hereby demand that you immediately produce a copy of Mr. Charney's "new" personnel file, which I trust the company has not "lost" as it "lost" his original personnel file..

Based on the company recent leaks to the media (which leaks directly violate the company's new anti-free speech, non-media contact policy), American Apparel ostensibly fired Mr. Charney for "cause" following an internal "investigation," which investigation apparently was conducted in part by consulting firm FTI and apparently in part by certain members of American Apparel management. All documents, communications, and records relating to that "investigation" also are part of Mr. Charney's personnel file and as such should be included in your production to me. *See e.g., Wellpoint Health Networks v. Superior Court* (1997) 59 Cal.App.4th 110, 124 [ "[T]he labor commissioner has stated: '... Categories of records which are defined as personnel records are those that are used or have been used to determine that employee's qualifications for employment, promotion, additional compensation, or termination or other disciplinary action. The



Chelsea Grayson
February 20, 2015
Page 2 of 2

following, but not limited to, are examples of items (if maintained) which are subject to inspection: ...Investigation of FEPC or EEOC matters.'"

Please feel free to call or contact me if you have any questions or concerns. I otherwise look forward to your prompt compliance with Labor Code § 1198.5.

Very truly yours,

[Dictated but not read]

Keith A. Fink
For FINK & STEINBERG

# American Apparel®

Crafted With Pride
In the USA

American Apparel, Inc.
HQ/Factory
747 Warehouse St.
Los Angeles, CA 90021
Phone (213) 488-0226
Fax (213) 488-0334

www.americanapparel.net

March 9, 2015

**VIA E-MAIL**

Rick C. Madden
Partner
Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, California 90071

Re: Dov Charney's Personnel File

Dear Mr. Madden:

Enclosed is a recent letter from Mr. Fink, in which he asks American Apparel to provide Dov Charney's personnel records under Labor Code Section 1198.5. Because Mr. Fink has a conflict of interest in representing Mr. Charney against American Apparel, I am directing my response to you.

Mr. Fink's letter suggests that American Apparel created a "new personnel file" for a supposed "second stint" of employment. As you know, Mr. Charney was suspended from June 2014 until his termination in December 2014; to the extent Mr. Charney provided services to American Apparel during that time, it was pursuant to a written consulting agreement. We believe Mr. Charney has a copy of that document. If he does not, please let us know. The only other personnel records in American Apparel's possession (specifically, Mr. Charney's payroll records) were already produced on February 2, 2015.

Finally, to the extent Mr. Fink's letter requests the production of documents relating to the FTI's investigation, that investigation was conducted at the request of counsel to the Audit Committee. American Apparel declines Mr. Charney's apparent request at this juncture, as any such materials are privileged. *See Wellpoint Health Networks v. Superior Court*, 59 Cal. App. 4th 110, 124-125 (1997) ("[Labor Code Section 1198.5] does not express a legislative intention to overthrow the traditional protections afforded attorney-client communications and work product documents. The area of privilege is one of the few instances where the Evidence Code precludes the courts from elaborating upon the statutory scheme. If the Legislature intended to require employers to turn over privileged documents, we believe it would have said so plainly. We refuse to read into the Labor Code an implied exception to the attorney-client privilege or work product doctrine") (internal citations omitted).

Mr. Rick C. Madden
March 9, 2015
Page 2


If you have any questions, please let me know

Very truly yours,

Chelsea A. Grayson
General Counsel, Executive Vice President & Secretary


Enclosure

cc:    Paula Schneider, Chief Executive Officer
       Jeffrey H. Cohen, Skadden, Arps, Slate, Meagher & Flom LLP
       Jeffrey C. Soza, Glaser, Weil, Fink, Howard, Avchen & Shapiro LLP



# FINK & STEINBERG
ATTORNEYS AT LAW

11500 OLYMPIC BLVD, SUITE 316, LOS ANGELES, CA 90064
WWW.FINKSTEINBERG.COM

PHONE : (310) 268-0780    FAX: (310) 268-0790

LOS ANGELES  ·  SAN FRANCISCO  ·  MACAU

February 20, 2015

**VIA E-MAIL**
Chelsea Grayson
General Counsel
AMERICAN APPAREL
747 Warehouse St.
Los Angeles, California 90021-1106

Re:    *CHARNEY PERSONNEL FILE*

Dear Chelsea:

As you know Mr. Charney initiated arbitration against American Apparel on or around June 18, 2014, immediately upon his termination from the company. Sometime thereafter, American Apparel re-hired Mr. Charney and employed him again for many months. Notwithstanding the same, the parties continued on with the arbitration proceedings.

During the discovery phase of the arbitration, American Apparel informed Mr. Charney's counsel Paul Salvaty that American Apparel had "lost" almost all of Mr. Charney's personnel records. Specifically, American Apparel claimed to have "lost" all of his personnel records spanning his employment with the company from the company's founding through his June 2014 termination. Based on the same, we presume that American Apparel *did* generate a new personnel file for Mr. Charney spanning his second stint with the company.

Pursuant to Labor Code § 1198.5, I hereby demand that you immediately produce a copy of Mr. Charney's "new" personnel file, which I trust the company has not "lost" as it "lost" his original personnel file..

Based on the company recent leaks to the media (which leaks directly violate the company's new anti-free speech, non-media contact policy), American Apparel ostensibly fired Mr. Charney for "cause" following an internal "investigation," which investigation apparently was conducted in part by consulting firm FTI and apparently in part by certain members of American Apparel management. All documents, communications, and records relating to that "investigation" also are part of Mr. Charney's personnel file and as such should be included in your production to me. *See e.g., Wellpoint Health Networks v. Superior Court* (1997) 59 Cal.App.4th 110, 124 [ "[T]he labor commissioner has stated: '... Categories of records which are defined as personnel records are those that are used or have been used to determine that employee's qualifications for employment, promotion, additional compensation, or termination or other disciplinary action. The

Chelsea Grayson
February 20, 2015
Page 2 of 2


following, but not limited to, are examples of items (if maintained) which are
subject to inspection: …Investigation of FEPC or EEOC matters.'"

Please feel free to call or contact me if you have any questions or concerns. I
otherwise look forward to your prompt compliance with Labor Code § 1198.5.


                              Very truly yours,


                              [Dictated but not read]


                              Keith A. Fink
                              For FINK & STEINBERG

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Keith A. Fink, SBN 146841 and Olaf J. Muller, SBN 247372<br>FINK & STEINBERG<br>11500 Olympic Boulevard, Suite 316<br>Los Angeles, California 90064<br>TELEPHONE NO.: (310) 268-0780    FAX NO.: (310) 268-0790<br>ATTORNEY FOR *(Name)*: Plaintiff Dov Charney | **FILED**<br>Superior Court Of California<br>County Of Los Angeles<br><br>MAY 07 2015<br><br>Sheri R. ~~Carter, Executive~~ Officer/Clerk<br>By _____, Deputy<br>Judi Lara |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Los Angeles
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS: 111 N. Hill Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central District

CASE NAME:
Dov Charney v. Standard General, L.P., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: **BC 5 8 1 1 3 0** |
|---|---|---|---|---|
| ✔ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ Limited<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter  ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br><br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

**1.** Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
✔ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

**2.** This case ☐ is  ✔ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. ☐ Large number of separately represented parties
b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. ☐ Substantial amount of documentary evidence
d. ☐ Large number of witnesses
e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. ☐ Substantial postjudgment judicial supervision

**3.** Remedies sought *(check all that apply)*: a. ✔ monetary  b. ✔ nonmonetary; declaratory or injunctive relief  c. ✔ punitive
**4.** Number of causes of action *(specify)*:  Five (5)
**5.** This case ☐ is  ✔ is not   a class action suit.
**6.** If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: May 7, 2015
Olaf J. Muller, SBN 247372
_____
(TYPE OR PRINT NAME)                                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courtinfo.ca.gov*

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) (*if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto*)
**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
   Asbestos Property Damage
   Asbestos Personal Injury/ Wrongful Death
Product Liability (*not asbestos or toxic/environmental*) (24)
Medical Malpractice (45)
   Medical Malpractice– Physicians & Surgeons
   Other Professional Health Care Malpractice
Other PI/PD/WD (23)
   Premises Liability (e.g., slip and fall)
   Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
   Intentional Infliction of Emotional Distress
   Negligent Infliction of Emotional Distress
   Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) (*not civil harassment*) (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
   Legal Malpractice
   Other Professional Malpractice (*not medical or legal*)
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
   Breach of Rental/Lease Contract (*not unlawful detainer or wrongful eviction*)
   Contract/Warranty Breach–Seller Plaintiff (*not fraud or negligence*)
   Negligent Breach of Contract/ Warranty
   Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
   Collection Case–Seller Plaintiff
   Other Promissory Note/Collections Case
Insurance Coverage (*not provisionally complex*) (18)
   Auto Subrogation
   Other Coverage
Other Contract (37)
   Contractual Fraud
   Other Contract Dispute
**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
   Writ of Possession of Real Property
   Mortgage Foreclosure
   Quiet Title
   Other Real Property (*not eminent domain, landlord/tenant, or foreclosure*)
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential*)
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
   Writ–Administrative Mandamus
   Writ–Mandamus on Limited Court Case Matter
   Writ–Other Limited Court Case Review
Other Judicial Review (39)
   Review of Health Officer Order
   Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims (*arising from provisionally complex case type listed above*) (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
   Abstract of Judgment (Out of County)
   Confession of Judgment (*non-domestic relations*)
   Sister State Judgment
   Administrative Agency Award (*not unpaid taxes*)
   Petition/Certification of Entry of Judgment on Unpaid Taxes
   Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified above*) (42)
   Declaratory Relief Only
   Injunctive Relief Only (*non-harassment*)
   Mechanics Lien
   Other Commercial Complaint Case (*non-tort/non-complex*)
   Other Civil Complaint (*non-tort/non-complex*)
**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition (*not specified above*) (43)
   Civil Harassment
   Workplace Violence
   Elder/Dependent Adult Abuse
   Election Contest
   Petition for Name Change
   Petition for Relief From Late Claim
   Other Civil Petition

| SHORT TITLE: Charney v. Standard General, L.P., et al. | CASE NUMBER: BC 5 8 1 1 3 0 |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

This form is required pursuant to Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.

**Item I.** Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES   CLASS ACTION? ☐ YES   LIMITED CASE? ☐ YES   TIME ESTIMATED FOR TRIAL 5-7 ☐ HOURS/ ☑ DAYS

**Item II. Indicate** the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.0.

> **Applicable Reasons for Choosing Courthouse Location (see Column C below)**

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | **A** Civil Case Cover Sheet Category No. | **B** Type of Action (Check only one) | **C** Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/ Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070 Asbestos Property Damage<br>☐ A7221 Asbestos - Personal Injury/Wrongful Death | 2.<br>2. |
| | Product Liability (24) | ☐ A7260 Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons<br>☐ A7240 Other Professional Health Care Malpractice | 1., 4.<br>1., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250 Premises Liability (e.g., slip and fall)<br>☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270 Intentional Infliction of Emotional Distress<br>☐ A7220 Other Personal Injury/Property Damage/Wrongful Death | 1., 4.<br>1., 4.<br>1., 3.<br>1., 4. |

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**

| SHORT TITLE: Charney v. Standard General, L.P., et al. | CASE NUMBER |
|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C**<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☑ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice<br>☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3.<br>1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case<br>☐ A6109  Labor Commissioner Appeals | 1., 2., 3.<br>10. |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction)<br>☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019  Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 2., 5.<br>2., 5.<br>1., 2., 5.<br>1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff<br>☐ A6012  Other Promissory Note/Collections Case | 2., 5., 6.<br>2., 5. |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud<br>☐ A6031  Tortious Interference<br>☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 5.<br>1., 2., 3., 5.<br>1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation          Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure<br>☐ A6032  Quiet Title<br>☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6.<br>2., 6.<br>2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

| SHORT TITLE: Charney v. Standard General, L.P., et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2., 9. |
| | | ☐ A6160  Abstract of Judgment | 2., 6. |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment | 2., 3., 9. |
| | | ☐ A6123  Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190  Election Contest | 2. |
| | | ☐ A6110  Petition for Change of Name | 2., 7. |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100  Other Civil Petition | 2., 9. |

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 3 of 4

| SHORT TITLE: Charney v. Standard General, L.P., et al. | CASE NUMBER |
|---|---|

**Item III.** Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON:  Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case.<br><br>☐1. ☑2. ☑3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS:<br>Los Angeles Superior Court, Central District<br>111 N. Hill Street<br>Los Angeles, California 90012 |
|---|---|

| CITY: Los Angeles | STATE: CA | ZIP CODE: 90012 | |
|---|---|---|---|

**Item IV.** *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the Stanley Mosk courthouse in the Los Angeles Central District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.0, subds. (b), (c) and (d)].

Dated: May 7, 2015

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/11).

5. Payment in full of the filing fee, unless fees have been waived.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 4 of 4